## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IMRAN KHAN and JOAN BULLOCK, individually and as representatives of a class of participants and beneficiaries on behalf of the Pentegra Defined Contribution Plan for Financial Institutions, | No. _____ |
| *Plaintiffs,* | CLASS ACTION |
| v. | |
| BOARD OF DIRECTORS OF PENTEGRA DEFINED CONTRIBUTION PLAN, PENTEGRA RETIREMENT SERVICES, INC., JOHN E. PINTO, SANDRA L. MCGOLDRICK, LISA A. SCHLEHUBER, MICHAEL N. LUSSIER, WILLIAM E. HAWKINS, JR., BRAD ELLIOTT, GEORGE W. HERMANN, AND JOHN DOES 1–12, | |
| *Defendants.* | |

## COMPLAINT

Table of Contents

COMPLAINT .................................................................................................... 1

JURISDICTION AND VENUE ......................................................................... 2

PARTIES ........................................................................................................... 3

    I.   The Pentegra Defined Contribution Plan for Financial Institutions ............ 3

    II.  Plaintiffs .................................................................................................... 4

    III. Defendants ................................................................................................ 5

ERISA'S FIDUCIARY STANDARDS ............................................................. 9

BACKGROUND FACTS ................................................................................ 12

    I.   Defined contribution retirement plan fees.................................................... 12

    II.  Multiple employer plans ............................................................................ 15

DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES ................................... 18

    I.   Defendants breached their fiduciary duties and engaged in prohibited
        transactions by failing to monitor and control the Plan's administrative
        fees and causing the Plan to pay excessive fees. .......................................... 18

        A.  Prudent fiduciaries negotiate reasonable administrative fees,
            monitor all sources of revenue paid to plan recordkeepers, regularly
            monitor plan fees and compare them to competitive market rates,
            and diligently negotiate fee reductions to benefit participants.............. 19

        B.  Contrary to the practices of prudent fiduciaries, Defendants failed to
            monitor and control administrative fees, resulting in significant
            Plan losses. ........................................................................................ 25

    II.  Defendants breached their fiduciary duties and engaged in prohibited
        transactions by unlawfully causing payments to Pentegra from Plan
        assets. ...................................................................................................... 34

        A.  ERISA's self-dealing and prohibited transactions provisions. .............. 34

        B.  Defendants acted for the purpose of benefiting Pentegra in causing
            unreasonable and unnecessary amounts for purported
            administrative services to be paid from Plan assets to Pentegra. ......... 37

III. Defendants breached their fiduciary duties by including Plan investments with excessive and unreasonable investment management fees. ........................................................................................... 41

    A.  Prudent retirement plan fiduciaries select the lowest-cost available share classes for retirement plan investment alternatives. .................. 41

    B.  Contrary to the practices of prudent professionals, Defendants caused investments with excessive investment management fees to be included in the Plan. ........................................................................ 42

CLASS ACTION ALLEGATIONS ............................................................... 46

COUNT I: Breach of Fiduciary Duties Related to Excessive Administrative Fees (29 U.S.C. §1104(a)(1)) ................................................................................ 53

COUNT II: Prohibited Transactions (29 U.S.C. §1106(a)(1)(a), (a)(1)(b)–(d); (b)(1)–(2); 29 U.S.C. §1132(a)(3)) ............................................................... 55

COUNT III: Breach of Fiduciary Duties Related to Unreasonable Investment Management Fees (29 U.S.C. §1104(a)(1)) .................................................... 59

COUNT IV: Failure To Monitor Fiduciaries  (Against The Board) .......................... 60

JURY TRIAL DEMANDED ........................................................................ 62

PRAYER FOR RELIEF ............................................................................. 62

## COMPLAINT

1.      Plaintiffs Imran Khan and Joan Bullock, individually and as representatives of a class of participants and beneficiaries of the Pentegra Defined Contribution Plan for Financial Institutions (the "Plan"), bring this action under 29 U.S.C. §1132(a)(2) and (a)(3) on behalf of the Plan against the Board of Directors of Pentegra Defined Contribution Plan (the "Board"), Pentegra Retirement Services, Inc. ("Pentegra"), John E. Pinto, Sandra L. McGoldrick, Lisa A. Schlehuber, Michael N. Lussier, William E. Hawkins, Jr., Brad Elliott, George W. Hermann, and John Does 1–12 (collectively the "Defendants"), for breach of fiduciary duties and prohibited transactions under ERISA.[1]

2.      As the Plan's fiduciaries, Defendants are obligated to act for the exclusive benefit of Plan participants and beneficiaries and to ensure that Plan expenses are reasonable. The marketplace for retirement plan services is established and competitive. Multi-billion dollar defined contribution plans, like the Plan, have tremendous bargaining power to obtain high quality, low-cost administrative services. Exercising this bargaining power, among others, is part of Defendants' fiduciary obligations and these duties are the "highest known to the law", and must be discharged with "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). Instead of using the Plan's bargaining power to benefit participants and beneficiaries, Defendants acted to enrich themselves, including Pentegra, by

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

allowing exorbitantly unreasonable expenses to be charged to participants for administration of the Plan.

3.      Defendants, furthermore, profit from collecting additional fees directly from employers who participate in the Plan—putatively to pay for "outsourced" fiduciary responsibility—but act directly contrary to that assumed fiduciary responsibility by draining the retirement assets of Plan participants to enrich themselves.

4.      To remedy these breaches of duty, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan profits made through Defendants' use of Plan assets. In addition, Plaintiffs seek equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

5.      **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2).

6.      **Venue.** This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district where the Plan is administered, where at least one of the alleged breaches took place, and where at least one defendant resides.

7.    **Standing.** An action under §1132(a)(2) allows recovery only for a plan, and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id*. at 254. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of a plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains exposed to harm and continued future losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, each Plaintiff has suffered such an injury. Each named Plaintiff's individual account in the Plan suffered losses because each participant's account was assessed an excessive amount for administrative fees, which would not have been incurred had Defendants discharged their fiduciary duties to the Plan and reduced those fees to a reasonable level.

## PARTIES

### I.    The Pentegra Defined Contribution Plan for Financial Institutions

8.    The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34), established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1).

9.    The Plan is intended to be a multiple employer plan ("MEP") pursuant to 26 U.S.C. §413(c). Its participants consist of employees of financial institutions,

such as banks, that participate in the Plan. As of December 31, 2018, per the Plan's Form 5500 filed with the U.S. Department of Labor ("DOL"), the Plan had nearly 250 participating employers ("Participating Employers").

10. The Plan provides retirement benefits for employees of Participating Employers. Under the Plan, participants are responsible for investing their individual accounts and will receive in retirement only the current value of that account, which will depend on contributions made on behalf of each employee by his or her employer, deferrals of employee compensation and employer matching contributions, and on the performance of investment options net of fees and expenses. Plan fiduciaries control what investment options are provided in the Plan and the Plan's fees and expenses.

11. As of December 31, 2014, the Plan reported 26,469 participants with account balances and $1.9 billion in assets. By December 31, 2018, those numbers had grown to 27,227 participants and $2.1 billion in assets.

12. The Plan is among the largest 0.07% of all defined contribution plans in the United States based on plan assets. Professionals commonly refer to plans of such great size as "jumbo plans" or "mega plans." The Plan's massive size gives it enormous bargaining power to command very low administrative fees for its participants.

## II. Plaintiffs

13. Imran Khan resides in Monmouth Junction, New Jersey and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are eligible to receive benefits under the Plan.

4

14.     Joan Bullock resides in Colonial Beach, Virginia and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

## III.  Defendants

15.     The Board consists of executives of Participating Employers. According to Article IX, Section 1(A) of the Plan document, the Board controls and manages the operation and administration of the Plan. The Plan also names as the ERISA "plan administrator" a "President of the Plan", who is the "chief administrative officer of the Plan, [and] a member ex officio of the Board[.]"

16.     The Board conducts its business regarding the Plan in White Plains, New York.

17.     The Plan designates the Board and its individual members as named fiduciaries and plan administrators under 29 U.S.C. §1102(a)(2). Under the terms of the Plan, the members of the Board "must be Members of the Plan" and the Board has "general responsibility for carrying out the provisions of the Plan." Article IX, Section 1(A). The Board and its individual members are fiduciaries to the Plan because they are named fiduciaries under 29 U.S.C. §1102(a) and exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets, and have or had discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

5

18.     The Plan's 2018 Summary Plan Description ("SPD") states that the Plan's sponsor was "the Pentegra Defined Contribution Plan for Financial Institutions"—that is, the Plan was its own sponsor.

19.     The Plan reported in its 2012–2014 Forms 5500 filed with the DOL that the Plan's sponsor was Pentegra.

20.     According to the Plan's Investment Policy Statement, the Board has retained Pentegra to provide administrative services for the Plan.

21.     Pentegra is a corporation organized under Delaware law with its principal place of business in White Plains, New York. Pentegra acts through its employees, including those acting as Board members, and administers the Plan. Pentegra is an employer of other Plan fiduciaries, including current and former members of the Board. As is evident from the Plan's structure, Plan administration tasks are and have been delegated by the Board and/or Pentegra to Pentegra employees.

22.     Pentegra markets the Plan to prospective participating employers based on Pentegra's claims that its status as a plan administrator under 29 U.S.C. § 1002(16) (ERISA §3(16)) shifts fiduciary responsibility away from Participating Employers. Pentegra has, however, publicly acknowledged that 3(16) fiduciary services may be of no additional value to retirement plans.[2]  Said Pentegra,

---

[2] Pentegra Retirement Services, *Ten Years, 300 New Clients: A MEP Strategy*, https://www.pentegra.com/upload/The%20Advisors%20Newsletter%20February%207,%202017%20presented%20by%20401k%20Rekon.pdf, *archived at* https://perma.cc/6MLQ-H2PV.

6

"perhaps it's all just smoke and mirrors," "a hoax[,] and any competent [Third Party Administrator] already does this[.]"[3]

23.     Pentegra controls the administration of the Plan, including negotiations and relationships with service providers to the Plan. Pentegra states in advertising material that its services to defined contribution retirement plans include the assumption of fiduciary liability. Pentegra actively markets membership in the Plan to companies that are prospective Participating Employers. In contrast with service providers in other 401(k) plans, who do not market their services to participants for their own benefit, Pentegra employs dedicated sales staff to sell services and grow Pentegra's retirement business, including by distributing marketing materials encouraging membership in the Plan. Pentegra regularly publishes and distributes "whitepapers" regarding Pentegra's corporate philosophies. These activities promote Pentegra's corporate interests by soliciting membership in the Plan. This marketing and soliciting of the Plan to prospective Participating Employersis is paid in part by Plan participants out of their retirement assets, and fund in part Pentegra's marketing and solicitation of the Plan to prospective Participating Employers, from which Pentegra stands to gain additional profits.

24.     Pentegra exercises control over the Board and its fiduciary decisions through Pentegra executives who are current and former Board members, as well as through the Board's delegees who are Pentegra employees.

---

[3] *Id.*

25.     One of the seven current Board members is Pentegra's President, Defendant John Pinto. Other Board members consist of a rotating group of executives of Participating Employers.

26.     As alleged herein, Pentegra is a fiduciary under 29 U.S.C. §1002(21)(A) because it exercises discretionary authority or discretionary control respecting management of the Plan, exercises authority or control respecting management or disposition of Plan assets, or has discretionary authority or discretionary responsibility in the administration of the Plan. Pentegra executives who undertook the acts alleged herein did so for the benefit of and as agents for Pentegra.

27.     Defendant John E. Pinto is President & CEO of Pentegra and is a member of the Board.[4]

28.     Defendant Sandra L. McGoldrick is President & CEO of Winter Hill Bank in Somerville, Massachusetts, and is Chair of the Board.

29.     Defendant Lisa A. Schlehuber is CEO of Elements Financial in Indianapolis, Indiana and is Vice Chair of the Board.

30.     Defendant Michael N. Lussier is President & CEO of Webster First Federal Credit Union in Worcester, Massachusetts and is a member of the Board.

31.     Defendant William E. Hawkins, Jr. is President & CEO of Tensas State Bank in Newellton, Louisiana and is a member of the Board.

---

[4] Pentegra publishes current Board membership online. Pursuant to 29 U.S.C. §1024(b)(4) and 29 CFR 2550.404c-1, Plaintiffs requested documents, including Board meeting minutes, before filing suit, but Defendants did not provide these. These documents likely contain additional information regarding the tenure of each Defendant on the Board, as well as the identities of additional Board members.

32.     Defendant Brad Elliott, Chairman & CEO of Equity Bancshares in Wichita, Kansas, and is a member of the Board.

33.     Defendant George W. Hermann is President & CEO of Windsor Federal Savings & Loan Association in Windsor, Connecticut, and is a member of the Board.

34.     John Does 1–12 are unknown members of the Board and/or other Pentegra employees who exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets, and have or had discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

## ERISA'S FIDUCIARY STANDARDS

35.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)     for the exclusive purpose of
>
> > (i)  providing benefits to participants and their beneficiaries; and
> > (ii) defraying reasonable expenses of administering the plan;
>
> [and]
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a

9

like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

36.     Under ERISA, fiduciaries that exercise any authority or control over plan assets, including, but not limited to, the selection of plan investments and service providers, must act prudently and for the *exclusive* benefit of participants in the plan, monitor the funds in the plan and remove imprudent or excessively expensive funds. Fiduciaries cannot act for the benefit of third parties, including service providers to the plan such as recordkeepers, affiliated businesses, brokerage firms, or managed account service providers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to service providers is no more than reasonable. 29 U.S.C. §1104(a)(1)(A)(ii); *see also* 29 U.S.C. §1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

37.     An ERISA fiduciary has a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828–29 (2015). Prudence requires a review at "regular intervals." *Id.* at 1828. When making investment decisions, an ERISA fiduciary "is duty-bound 'to make such investments and only such investments as a prudent [person] would make of his own property[.]'" *In re Unisys*, 74 F.3d 420, 434 (3d Cir. 1996) (quoting Restatement (Second) of Trusts §227 (1959)). "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *Id.* at 435.

10

38.     A defined contribution plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Instead, fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original); *see also* 29 C.F.R. §2550.404a-1; DOL Adv. Op. 98-04A; DOL Adv. Op. 88-16A. Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones" within a reasonable time. *Tibble*, 135 S. Ct. at 1828–29.

39.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
>
> (2)     if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

11

(3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## BACKGROUND FACTS

### I.   Defined contribution retirement plan fees

40.    "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). In the private sector, such plans have largely replaced the defined benefit pension plans that were America's retirement system when ERISA was enacted in 1974. The consulting firm Towers Watson studied Fortune 100 companies from 1985 to 2012 and found that the type of retirement plan offered by the companies has essentially flipped over the last three decades.[5] The survey found that whereas in 1985, 89 of the Fortune 100 companies offered a traditional defined benefit plan, in 2012, only eleven of the Fortune 100 companies offered defined benefit plans to newly hired employees. Defined contribution plans have become America's retirement system.

41.    A fundamental difference between traditional pension plans and defined contribution plans is that in the former, the employer's assets are at risk. Because the employer is responsible for funding the pension plan to satisfy its commitments to employees, it bears all investment risks. In a defined contribution plan, the employees and retirees bear all investment risks.

42.    Each participant in a defined contribution plan has an individual account and directs plan contributions into one or more investment alternatives in a

---

[5] Towers Watson, *Retirement Plan Types of Fortune 100 Companies in 2012*, Towers Watson Research Insider, Oct. 2012.

lineup chosen by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826.

43.     Expenses, such as those for plan administration, "can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.*

44.     The fees of mutual funds and other investment alternatives are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the fund deducts 1.0% of fund assets each year in fees, the fund's expense ratio would be 1.0%, or 100 basis points ("bps"). (One basis point is equal to 1/100th of one percent.) The fees deducted from a fund's assets reduce the value of the shares owned by fund investors.

45.     The plan's fiduciaries have control over these expenses. The fiduciaries are responsible for hiring service providers, such as recordkeepers, and negotiating and approving those service providers' compensation. The fiduciaries also have exclusive control over the menu of investment alternatives to which participants may direct the assets in their accounts. Those selections each have their own fees that are deducted from the returns that participants receive on their investments.

46.     These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year

13

career makes a difference of *28%* in savings at retirement.[6] Over a 40-year career, this difference in fees can reduce a participant's retirement savings by almost $500,000, as shown in the following graph.[7]



47.    Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants pay no more than a reasonable level of fees. "[C]ost-conscious management is fundamental to prudence in the investment function." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (*en banc*) (citing Restatement (Third) of Trusts §90 cmt. b). This is particularly true for multi-billion-dollar plans, like the Plan, which have the bargaining power to obtain the highest level of service and the very lowest fees. The

---

[6] U.S. Dept. of Labor, *A Look at 401(k) Plan Fees,* at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf, *archived at* https://perma.cc/8KAR-W4JR.
[7] Michael Bird, *Pandemic Highlights Reasons for Reviewing Plan Fees,* PLANSPONSOR, May 15, 2020, https://www.plansponsor.com/pandemic-highlights-reasons-reviewing-plan-fees/, *archived at*  https://perma.cc/8VCU-E7PC.

fees available to these plans are orders of magnitude lower than the much higher retail fees available to small investors.

48.     The entities that provide services to defined contribution plans have an incentive to maximize their fees by putting their own higher-cost funds in plans, collecting the highest amount possible for recordkeeping. For each additional dollar in fees paid to a service provider, participants' retirement savings are directly reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers through investment returns. The level of diligence used by plan fiduciaries to control, negotiate, reduce the plan's fees, and safeguard plan assets directly affects participants' retirement security.

49.     Fiduciaries must be cognizant of service providers' self-interest in maximizing fees, and cannot simply accede to the providers' desires and recommendations by including proprietary funds that will maximize the provider's fees without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service providers' interest, fiduciaries must conduct their own independent investigation into the merits of a particular investment or service by considering alternatives.

## II.   Multiple employer plans

50.     A "'multiple employer plan' can refer to a variety of different kinds of employee-benefit arrangements" including sponsorship of a defined contribution retirement plan by "a group or association of employers." Definition of "Employer" Under Section 3(5) of ERISA—Association Retirement Plans and Other Multiple-Employer Plans, 84 Fed.Reg. 37508, 37512 (July 31, 2019)  "Grouping small

employers together into a MEP" in this way can "facilitate savings through administrative efficiencies" and "price negotiation." *Id.* at 37533. MEPs such as this achieve economies of scale of large plans that provide a "distinct economic advantage[]" of lower administrative costs for individual employers. *Id.*

51.    MEPs create cost efficiencies in at least two ways: "First, as scale increases, marginal costs for MEPs . . . diminish and MEPs . . . spread fixed costs over a larger pool of member employers and employee participants, creating direct economic efficiencies. Second, larger scale may increase the negotiating power of MEPs." *Id.* Therefore, MEPs operating as a large single plan can secure low-cost administrative services from service providers.

52.    The comments submitted by the public regarding the DOL's proposed regulation referenced above reflect the industry-wide consensus that the MEP structure is desirable in large part because of increased efficiency and ability to obtain lower administrative costs. For example, the American Society of Association Executives and National Association of Manufacturers jointly wrote of the "opportunities under current law for pooled retirement programs, which underscore the benefits of the shared costs and other efficiencies that these plans allow[.]"[8] Likewise, the U.S. Chamber of Commerce wrote that with MEPs, "[c]osts are shared among the adopting employers, regardless of the number. This translates to

---

[8] https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/rules-and-regulations/public-comments/1210-AB88/00009.pdf, *archived at* https://perma.cc/9QBT-CUCA.

substantial economies of scale and cost efficiencies over stand-alone plans for small

businesses."[9]

53.    Pentegra has written in its whitepapers, blog articles, and other

marketing materials of the economies of scale, simplified administration, and

expected cost savings to employers by participating in large MEPs. For example, in

a marketing brochure entitled "The Pentegra Multiple Employer Plan Advantage,"

Pentegra wrote:

> Why Join a MEP?
>
> Economies of Scale
> MEPs make it easy to offer a high-quality retirement program to any size
> employer. By collectively participating, employers are able to leverage their
> combined purchasing power to access institutional quality features in a ***more
> cost-effective manner than single employer plans can access on their
> own***.
>
> Simplified Plan Administration
> MEPs simplify plan administration . . . .

(emphasis added).[10]

54.    Because plans that bundle together employers offer significant cost

efficiencies, they are able to spread costs across a larger participant and asset

base.[11] Plan administration is simplified because administrative tasks are

centralized and automated, and variations in plan design are minimized. Prudently

managed, such plans reduce costs for every participant. The "substantial economies

---

[9] https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/rules-and-regulations/public-comments/1210-AB88/00022.pdf, *archived at* https://perma.cc/BW9V-45H5.

[10] https://www.pentegra.com/wp-content/uploads/2018/05/The-Multiple-Employer-Plan-MEP-Advantage-for-Plan-Sponsors.pdf, *archived at* https://perma.cc/Z5FQ-VREH.

[11] Newport Retirement Services, *The Impact of the Secure Act of Multiple Employer Plans*, https://www.newportgroup.com/NewportGroup/media/Documents/MEPS-PEPS-White-Pape-from-Newport.pdf, *archived at* https://perma.cc/2JQL-QDA4.

of scale and cost efficiencies" include, but are not limited, to a single annual Form 5500 filing, a single periodic IRS qualification filing, and a single annual independent audit.[12]

### DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

**I.   Defendants breached their fiduciary duties and engaged in prohibited transactions by failing to monitor and control the Plan's administrative fees and causing the Plan to pay excessive fees.**

55.   Because Pentegra controlled the administration of the Plan, it exercised discretionary authority and control respecting the management of the Plan and disposition of its assets, and is a Plan fiduciary. 29 U.S.C. § 1002(21)(A)(i). Instead of acting solely in the interest of Plan participants and with the care, skill, and diligence of a prudent expert, as the law requires, Pentegra instead used the Plan to generate greatly excessive administrative fees, to benefit itself. *See* 29 U.S.C. § 1104(a)(1)(A–B).

56.   The Board, including its individual members, is the named Plan fiduciary and is responsible for ensuring reasonable administrative fees. *See* 29 U.S.C. § 1102(a)(2). Instead of carrying out its fiduciary duties, the Board knowingly allowed Pentegra to control Plan administration for the purpose of collecting excessive fees.

57.   Defendants' use of participants' retirement funds for inappropriate expenses is egregious. For example, in 2010, Plan assets were used to make a

---

[12] Transamerica Retirement Services, *Multiple Employer Plans: An Opportunity for Expanding Retirement Plan Coverage,*https://www.ta-retirement.com/resources/5913-1010_final.pdf, *archived at* https://perma.cc/C24Q-6WXK.

$7,370 payment to the Ritz Carlton Naples and $5,015 payment to the New York

Palace Hotel presumably for Defendants' personal benefit..

58.     A systematic pattern of the Plan paying excessive fees shows that the

Board and other Plan fiduciaries failed to follow a reasonable process for

monitoring, evaluating or controlling Plan administrative fees.

**A. Prudent fiduciaries negotiate reasonable administrative fees, monitor all sources of revenue paid to plan recordkeepers, regularly monitor plan fees and compare them to competitive market rates, and diligently negotiate fee reductions to benefit participants.**

59.     Every defined contribution plan requires administrative services, such

as recordkeeping. The recordkeeper keeps track of the amount of each participant's

investments in the various options in the plan, and typically provides each

participant with a quarterly account statement. The recordkeeper often maintains a

plan website or call center that participants can access to obtain information about

the plan and to review their accounts. The recordkeeper may also provide access to

investment education materials or investment advice. These services are largely

commodities, and the market for retirement plan administrative services is highly

competitive.

60.     ERISA allows defined contribution plans to name as a plan

"administrator" a party other than the plan sponsor. 29 U.S.C. § 1002(16) (ERISA

§3(16)).  Pentegra and other retirement plan administration firms market and sell

certain services as "§3(16) plan administration services." A §3(16) plan

administrator "assume[s] most fiduciary responsibilities" for plan administration,

though plan sponsors "retain fiduciary responsibility for choosing and monitoring

19

the arrangement." Definition of "Employer" Under Section 3(5) of ERISA—
Association Retirement Plans and Other Multiple-Employer Plans, 84 Fed.Reg.
37508, 37509 (July 31, 2019). Pentegra admits that one of the responsibilities of a
plan administrator providing 3(16) services is ensuring the "[r]easonableness of
fees."[13]

61.     Numerous retirement plan administrative service providers in the
marketplace are capable of providing high levels of service and will vigorously
compete to win contracts with a jumbo defined contribution plan. These providers
will readily respond to a request for proposal and will tailor their bids based on the
desired services (*e.g.*, recordkeeping, website, call center, etc.). In light of the
commoditized nature of these services, providers primarily differentiate themselves
based on price, and will aggressively bid to offer the best price in an effort to win
the business, particularly for jumbo plans.

62.     The cost of recordkeeping and administrative services depends on the
number of participants (or participant accounts), not on the amount of assets in the
participant's account.[14] Thus, the cost of providing recordkeeping and

---

[13] https://www.pentegra.com/wp-content/uploads/2018/12/2018-Advisor-Survey.pdf, *archived at* https://perma.cc/63NA-8XBW/.

[14] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc*., DC Fee Management—Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013https://www.mercer.com/content/dam/mercer/attachments/global/Retirement/DC%20Fee%20Ma nagement%20-%20Mitigating%20Fiduciary%20Risk%20and%20 Maximizing%20Plan%20Performance.pdf, *archived at* https://perma.cc/25YA-9QG8 ("Conversely, utilizing a pricing model that is dependent on the value of plan assets arbitrarily 'builds in' fee increases that are not linked to the level or quality of the recordkeeper's services.") ("Mercer Best Practices").

administrative services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account. Consequently, prudent fiduciaries negotiate a fixed dollar amount for the recordkeeper's annual compensation, usually based on a rate of a fixed dollar amount per participant. Because of economies of scale, large plans get lower effective rates per participant than smaller plans. Plans with 20,000 participants or more can obtain much lower rates per participant than a plan with 1,000 participants.

63.     A study commissioned by the the DOL in 1998 demonstrates these economies of scale, finding that as the number of plan participants increases, administrative costs per participant decrease.[15] Per the Study, the below expenses were based on quotations "of major 401(k) service providers."[16]

| Number of Participants | Service Provider Cost Per Participant |
|---|---|
| 200 | $42 |
| 500 | $37 |
| 1,000 | $34 |

64.     Because these costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of plan assets.[17] Otherwise, as plan assets increase, such as through participant contributions or investment gains, the

---

[15] U.S. Dept. of Labor, *Study of 401(k) Plan Fees and Expenses* (1998), https://www.dol.gov/sites/default/files/ebsa/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf, *archived at*  https://perma.cc/6HRK-FGA7.
[16] *Id.* at § 4.2.2 ("Recordkeeping and Administration Expenses").
[17] Mercer Best Practices at 3 ("1. Price administrative fees on a per-participant basis.").

21

compensation increases without any change in the services, leading to unreasonable fees.[18]

65.    For example, if a plan has 50,000 participants, a fiduciary could negotiate a plan-level contract to pay the administrator $1,500,000 per year, based on a rate of $30 per participant fee per year. The negotiated $1,500,000 fee then can be assessed to participant accounts pro rata so that smaller accounts pay a smaller portion of the fee. If the plan's assets increase during the contract while the number of participants stays constant, the vendor's compensation does not change, because the services provided have not changed.

66.    A fixed-dollar compensation arrangement does not necessarily mean, however, that every participant in the plan must pay the same $30 administrative fee from his or her account. The fiduciary could reasonably determine that it is equitable to charge each participant the same $30 (for example, through a quarterly charge of $7.50 to each account in the plan). Alternatively, the fiduciary could conclude that assessing the same fee to all investors would discourage participants with relatively small accounts from participating in the plan; and that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge would be best. In that case, the rate of $30 per-participant multiplied by the number of participants would be converted to an asset-based charge, such that

---

[18] *Id.* ("Negotiate a fixed-rate recordkeeping fee, based on the number of participants with account balances in the plan, that is independent of the investment structure (referred to as an 'open investment architecture' model). This approach, unlike an 'asset-based' or 'bundled' model, provides fee transparency and affords fiduciaries a sound basis for documenting the 'reasonableness' of recordkeeping fees. Conversely, utilizing a pricing model that is dependent on the value of plan assets arbitrarily 'builds in' fee increases that are not linked to the level or quality of the recordkeeper's services.").

every participant pays the same percentage of his or her account balance while the plan pays only a fixed amount unrelated to asset size. If the plan in the example had $6 billion in assets, each participant would pay a direct fee of .025% of her account balance annual for recordkeeping ($1,500,000/$6,000,000,000 = .00025). As the plan assets increase thereafter, the *plan* is still paying the same $1,500,000 price that was negotiated at the plan level, but the fees paid by individual participants changes as they are proportionally allocated among participants based on account balance.

67.    To make an informed assessment as to whether a service provider is receiving no more than reasonable compensation for the services provided to a plan, prudent fiduciaries of defined contribution plans monitor *all* sources of compensation received service providers and determine whether the compensation is reasonable.

68.    If a fiduciary decides to use an asset-based fee to pay for administrative services, prudent fiduciaries recognize that it is critical to (1) negotiate a fixed amount of compensation based on a reasonable rate per participant per year; (2) determine all revenue sharing and other sources of compensation the service provider receives from plan investment options; and then (3) recover all revenue sharing payments that exceed the negotiated compensation.

69.    Experts in the field agree that the most certain way to determine the least compensation a plan must pay for a desired level of recordkeeping and administrative services is to put the plan's services out for competitive bidding on a

23

regular basis. Prudent fiduciaries do this every three years.[19] For example, Fiduciary360's Prudent Practices for Investment Stewards, [20] which is widely accepted as the global fiduciary standard of excellence, advised fiduciaries that they must determine "whether the fees are reasonable in light of the services provided" and "[c]onsideration is given to putting vendor contracts back out to bid every three years."[21]

70.     Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years." These Requests for Proposal ("RFPs") were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[22] DOL notes that fiduciaries

---

[19] *See* Donald Stone, *Conducting a Successful Fee Review: How to determine whether plan fees are reasonable,* DEFINED CONTRIBUTION INSIGHTS, Jan./Feb. 2006, at 4 (stating "most reliable way of determining whether fees the plan is paying are reasonable" is through an RFP or an RFI search process); Tyler Polk, *Is it Time for a Change? Best Practice in Retirement Plan Record Keeper Searches,* FIDUCIARY INVESTMENT ADVISORS (April 2015); John Carl, *Including Regular RFPs as Part of a Fiduciary Liability Reduction Strategy,* Jan. 24, 2018 ("The DOL assumes that plan sponsors solicit RFPs for service providers every three to five years as part of their fiduciary duty to monitor plan service providers."), https://www.napa-net.org/news/technical-competence/case-of-the-week/including-regular-rfps-part-fiduciary-liability-reduction-strategy/, *archived at* https://perma.cc/E9SB-XCQ5; Roger Levy, *Selecting Service Providers, Competitive Bidding, & RFP's Importance in a Fiduciary Investment Process,* INHUB, May 18, 2015, https://d1yoaun8syyxxtcloudfront.net/br189-76a8e37a-950c-41a0-b246-47bb6162f4a4-v2, *archived at* https://perma.cc/2QTY-FD3S.

[20] *Prudent Practices for Investment Stewards* handbook defines the Global Fiduciary Standard of Excellence, initially published in April 2003, that was derived from a prior publication (*Prudent Investment Practices*) co-produced by the Foundation for Fiduciary Studies and the American Institute of Certified Public Accountants. This publication was written by Fiduciary 360, the identity brand for three related entities: the Foundation for Fiduciary Studies, the Center for Fiduciary Studies, and Fiduciary Analytics. The Foundation for Fiduciary Studies defines and substantiates specific investment fiduciary practices for trustees and investment committee members, investment advisors and investment managers and is widely used in the industry.

[21] Fiduciary360, *Prudent Practices for Investment Stewards*, Practices S-1.4, S-4.4 (2007).

[22] Rebecca Moore, *Most Recordkeeping RFPs to Benchmark Fees,* PLANSPONSOR, Jan. 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/, *archived at* https://perma.cc/Z47L-BUNB.

24

conduct an RFP to assess the reasonableness of the service provider's fees every three to five years.[23]

### B. Contrary to the practices of prudent fiduciaries, Defendants failed to monitor and control administrative fees, resulting in significant Plan losses.

71.     The Board failed to monitor and control recordkeeping and administration fees collected from Plan assets by Pentegra, which skyrocketed at the same time that fees were declining industrywide. Pentegra failed to monitor and control the Plan's administrative expenses. Pentegra's fees are grossly excessive when compared to the fees charged by other providers for similar services.

72.     Pentegra has been the Plan's recordkeeper and "contract administrator" since at least 2007. In 2007, Pentegra entered into a 5-year agreement to provide administrative services to the Plan. In 2012, Pentegra entered into a new 5-year agreement with the Plan, which expired at the end of the Plan year ending 2017.  The agreement has remained in effect pursuant to automatic one-year renewals. The 2018 Plan Year audit, attached to the Plan's Form 5500, made no mention of a new contract.

73.     Plan participants pay for Plan expenses, including Pentegra's fees, from their retirement savings.

74.     Each Participating Employer pays administrative fees through an agreement with the Plan.  According to fee disclosures for Participating Employers

---

[23] U.S. Dept. of Labor, *Meeting Your Fiduciary Responsibilities*, at 5–6 (2012), https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

a certain percentage of the expense ratio of each of the Plan's investment alternatives is used to pay the Plan's administrative expenses. The percentages vary by employer and by year. For some participating employers, their agreement simply specifies that their administrative expenses will be assessed "pro rata." Pentegra collects additional fees and/or expenses for Plan administration, including directly from Participating Employers. The Plan uses the funds collected in this manner to directly pay Pentegra's fees.

75.     The Plan stated in a November 2019 fee disclosure that plan administrative expenses "are allocated to Plan participants on a pro rata basis" based on participant account balance.

76.     Pentegra assumes fiduciary responsibility over the administration of the Plan. Pentegra publicly admits this fiduciary status.

77.     Because the plan is a MEP, it has uniform features across all its participating employers. It is a single Plan with a single Plan document that all participating employers must agree to and cannot alter. It files a single Form 5500 with the Department of Labor. It provides for eligibility and vesting procedures that are generally the same for all Participating Employers. Any differences can be easily automated. *See* 84 Fed.Reg. at 37533.

78.     The Plan paid Pentegra millions of dollars each year in excessive fees for recordkeeping and administrative services, from at least 2014 until 2018 during a period of decreases in fees across the retirement plan administration services market. According to the Plan's Forms 5500, in 2014, when the Plan had 26,469

participants, the Plan paid Pentegra at least $9.52 million in direct recordkeeping and administration fees, or an average of $359.70 per participant. By 2018, the Plan had grown to 27,227 participants, and Pentegra's fees had grown to $10.58 million, or $388.77 per participant.

79.     Indeed, Pentegra's fees rose every year over a decade, during a time when the retirement plan administration industry generally saw declining fees, and despite the fact that Pentegra's services have remained the same throughout that time period.[24]



80.     If the Board had been monitoring and prudently controlling the costs for the Plan's recordkeeping services, they would not have allowed the Plan to pay

---

[24] Based on data contained in the Plan's Forms 5500 compared to the results of an annual survey of fees of 401(k) plan clients of NEPC, a large retirement plan consulting firm, representing defined contribution plans of various sizes. Pentegra Defined Contribution Plan for Financial Institutions Forms 5500, 2009–2018; NEPC, *Defined Contribution Plan Fees Continue To Decline: 2013 NEPC Plan & Fee Study*; NEPC, *NEPC 2014 Defined Contribution Plan & Fee Survey: What Plan Sponsors Are Doing Now*; NEPC, *Corporate Defined Contribution Plans Report Flat Fees*.

fees that grew in this manner, for the same amount of services, during a time of generally declining fees.

81.     A comparable large corporate 401(k) plan recordkept by Hewitt Associates, LLC (nka Alight) during the relevant period is the Nike Inc.'s 401(k) Plan. With approximately 19,000 to 26,000 participants, the Plan paid $21 per participant for recordkeeping services in 2012 and 2016.[25]

82.     Another large plan, the New Albertson's Inc. 401(k) plan left Fidelity Investments Institutional Operations Company, Inc. ("Fidelity") for Vanguard in 2016. A fee disclosure after this change states that this plan pays a fixed annual fee of $31 per participant for recordkeeping services.[26] The Form 5500 in 2016 confirms that the New Albertson's 401(k) Plan, with approximately 31,000 participants, paid approximately $31 per participant for recordkeeping services.[27] Similarly, the Albertson's LLC 401(k) Plan, with approximately 17,200 plan participants in 2016, paid approximately $29 per participant for recordkeeping services.[28]

83.     Fidelity recently stipulated in litigation that the value of the recordkeeping services it provided to its own 55,000-participant plan was $21 per participant in 2014, $17 per participant in 2015 and 2016, and $14 per participant after 2017. *Moitoso v. FMR LLC*, --- F.Supp.3d ----, 2020 WL 1495938, at *15 (D.

---

[25] Nike, Inc. 2016 Form 5500 with 26,568 participants with an account balance and compensation to recordkeeper, Hewitt. Nike, Inc. 2012 Form 5500 with 19,362 participants with an account balance and compensation to recordkeeper, Hewitt. No additional source of compensation to Hewitt is identified or discernable on the Forms 5500.

[26] New Albertson's Inc. 401(k) Plan Fee Disclosure, *Cates v. Tr. of Columbia Univ.*, No. 16-6524, Doc. 292-6 (S.D.N.Y. July 1, 2019).

[27] Form 5500 for 2016 for New Albertson's Inc. 401(k) Plan and Master Trust Form 5500.

[28] Form 5500 for 2016 for Albertson's LLC 401(k) Plan and Master Trust Form 5500.

Mass. Mar. 27, 2020) ("The parties have stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14–$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper."); *Moitoso v. FMR, LLC*, No. 18-12122, Doc. 138-67 at 3–4 (D. Mass.) (stipulating to the recordkeeping fees discussed above and further stipulating that "[h]ad the Plan been a third-party plan and negotiated a fixed fee for recordkeeping services at arms-length with Fidelity, it could have obtained recordkeeping services for these amounts during the period.").

84.     The Chevron Employee Savings Investment Plan, with approximately 34,000 participants as of December 31, 2018, obtained a $26 per-participant fee for administrative services following an "extensive review of the leading vendors who provide record-keeping services for plan similar to the (Employee Savings Investment Plan)" which led to the replacement of Vanguard with Fidelity as the plan's recordkeeper.[29]

85.     Effective January 2, 2020, ConocoPhillips' Savings Plan, with approximately 15,000 participants, obtained a $33 per-participant fee for

---

[29] Chevron Employee Savings Investment Plan, Participant Disclosure Notice, Jan. 2018, at p. 5; Pensions&Investments, "Chevron taps Fidelity as New 401(k) plan record keeper", Oct. 10, 2017, http://www.pionline.com/article/20171010/ ONLINE/171019992/chevron-taps-fidelity-as-new-401k-plan-record-keeper, *archived at* https://perma.cc/LQ8S-FNKK; *see also* Form 5500 for 2018 for Chevron Employee Savings Investment Plan.

administrative services following a change of its recordkeeper from Vanguard to Fidelity.[30]

86.     These examples demonstrate that if Defendants, instead of acting as alleged herein, had followed a prudent process and otherwise complied with their fiduciary duties, they could have obtained reasonable administrative fees for similar services far lower than those they caused the Plan to pay.

87.     A large MEP comparable in size and function to the Plan is the CBERA Plan A sponsored by the Cooperative Banks Employees Retirement Association.  Like the Plan, CBERA Plan A is a large MEP for employees of financial institutions.[31] It has over 40 participating employers, nearly 5,000 participants, and over $600 million in assets.  Given its smaller asset size and participant count, its ability to negotiate competitive administrative fees is proportionally less than the Plan's. Nonetheless, its Form 5500 for the plan year ending December 31, 2019 shows a payment to its plan administrator of $324,000, or an average of just over $65 per participant.  Unlike Pentegra, CBERA Plan A has hired an outside recordkeeper.  Even combining (1) the fees paid to the "contract administrator" and (2) reported direct and indirect compensation to the plan's outside recordkeeper, CBERA Plan A reportedly paid an average of just $80 per participant in 2019. Despite the Plan's larger size and bargaining leverage,

---

[30] ConocoPhillips Savings Plan Participant Disclosure Notice, Jan. 2020, https://hrcpdocctr.conocophillips.com/Documents/2020_Annual_Enrollment/Fidelity_Transition_Guide.pdf, *archived at* https://perma.cc/TM5P-X7TJ; *see also* Form 5500 for 2018 for ConocoPhillips Savings Plan.
[31] http://cbera.com/index.htm, *archived at* https://perma.cc/7KTR-UZH9.

Pentegra's 2018 average per participant fee of approximately $388 for similar "contract administrator" services was 485% higher.[32]

88.     A prudent and loyal fiduciary would have, on an ongoing basis, monitored the administrative fees charged by Pentegra to ensure reasonableness, periodically performed a thorough and diligent analysis comparing Pentegra's fees to those charged by providers of similar services, and, if necessary, would have retained one or more consultants to help accomplish these tasks. In light of the facts alleged herein, it is evident that the Board failed to engage in any such process. By failing to engage in any process monitoring the reasonableness of Plan administrative fees, Defendants caused the Plan to pay unreasonable administrative fees for the services rendered.

89.     Further, a prudent and loyal fiduciary would have solicited competitive bids from third party services providers to perform the recordkeeping and administrative services performed by Pentegra.  In light of the facts alleged herein, it is evident that from prior to 2014 until at least 2018, Defendants failed to conduct any competitive bidding process for Plan administrative services. A competitive bidding process for the Plan's administrative services would have produced reasonable Plan fees. That is particularly so because plan administration fees have been declining since 2013. Contrary to the principles of prudence, the Board has not thoroughly evaluated whether Pentegra's fees are reasonable for the services provided.

---

[32] 2019 Plan data is not yet available; Pentegra's Plan fees rose every year 2010–2018.

90.     Based on the Plan's features, the nature and type of recordkeeping and administrative services provided by Pentegra, the number of Plan participants, Participating Employers, and the market, a reasonable administrative fee is not more than $1.7 million per year (an average of $65 per-participant). This is significantly greater than the fee other large plans administered by prominent firms were able to obtain after requests for proposal during the period, including those described herein.

91.     Further, this fee approximately reflects, according to one source, median fees for defined contribution plans during the statutory period, overwhelmingly consisting of much smaller and less sophisticated plans than the Plan.  *See* NEPC, *Defined Contribution Plan Fees Continue To Decline: 2013 NEPC Plan & Fee Study*; NEPC, *NEPC 2014 Defined Contribution Plan & Fee Survey: What Plan Sponsors Are Doing Now*; NEPC, *Corporate Defined Contribution Plans Report Flat Fees*. It is therefore a highly conservative estimate of a reasonable fee for a sophisticated large Plan benefiting from MEP efficiencies.

92.     Based on compensation disclosed in the Plan's Form 5500s filed with the Department of Labor, the Plan paid between approximately $9.5 million and $10.5 million (or approximately $360 to $389 per participant) per year from 2014 to 2018, nearly *600%* higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year.

93.     Using the above figures as a basis for calculating damages is conservative, because they represent only a portion of the total recordkeeping and

administrative fees for the Plan that participants paid. As the Plan reported in its 2018 Form 5500, administrative expenses passed on to Plan participants could include, among other things, "board of director expenses." Further, Pentegra received additional compensation, on top of the excessive amounts paid by the Plan, directly from Participating Employers. For example, in 2018, the Plan reported in its Form 5000 that "board of director fees" were paid directly by Participating Employers.

94.   Defendants failed to properly monitor Pentegra's total compensation from all sources in light of the services Pentegra provided and thus caused the Plan to pay unreasonable administrative fees. However, Defendants failed to do so.

95.   The compensation paid to Pentegra was unreasonable for the additional and independent reason that the expenses it charged vastly exceeded the direct expenses that were actually incurred in the administration of the plan, and included costs that are not properly chargeable to the plan, such as overhead.

96.   Because the Plan's administrative expenses are shared pro rata by all Participants, they were directly damaged by the fiduciary failures alleged herein.

97.   Defendants' failure to monitor, control, and ensure that participants were charged only reasonable fees for recordkeeping services caused the Plan to lose over $60 million due to unreasonable recordkeeping fees and lost investment opportunity. This is calculated by multiplying the reasonable fee per participant ($65) in the applicable year by the number of participants, subtracting the reasonable fees from the disclosed direct compensation to Pentegra for "contract

administration" in the Plan's Form 5500 from September 2014 until 2018. The damages are then brought forward yearly by the return of an S&P 500 index fund to account for lost investment opportunity.

## II. Defendants breached their fiduciary duties and engaged in prohibited transactions by unlawfully causing payments to Pentegra from Plan assets.

### A. ERISA's self-dealing and prohibited transactions provisions.

98.  ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan.

99.  Plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. §1103(c)(1).

100.  Supplementing these general fiduciary duties, certain transactions are prohibited *per se* by 29 U.S.C. §1106 because they entail a high potential for abuse. Section 1106(a)(1) [ERISA §406(a)] states, in pertinent part, that the fiduciary

> shall not cause the plan to engage in a transaction, if he knows or
> should know that such transaction constitutes a direct or indirect –
>   (C) furnishing of goods, services, or facilities between the plan and
> party in interest; [or]
>   (D) transfer to, or use by or for the benefit of a party in interest, of
> any assets of the plan[.]

101.  As service provider to the plan, Pentegra is a party in interest. 29 U.S.C. §1002(14)(B).

102.  Under 29 U.S.C. §1106(b) [ERISA §406(b)], fiduciaries are prohibited from engaging in self-dealing with Plan assets. Section 1106(b) provides that the fiduciary

34

shall not—
   (1) deal with the assets of the plan in his own interest or for his own
account, [or]
   (2) in his individual or in any other capacity act in any transaction
involving the plan on behalf of a party (or represent a party) whose
interests are adverse to the interests of the plan or the interests of its
participants or beneficiaries[.]

103.   "Section 406(b) prohibits a plan fiduciary from engaging in various

forms of self-dealing. Its purpose is to 'prevent[] a fiduciary from being put in a

position where he has dual loyalties and, therefore, he cannot act exclusively for the

benefit of a plan's participants and beneficiaries.'" *Reich v. Compton*, 57 F.3d 270,

287 (3d Cir. 1995) (Alito, J., quoting H.R. Rep. No. 93-1280 (1974)); *see also* 29

C.F.R. §2550.408b-2(e)(1).

104.   The DOL explains in 29 C.F.R. § 2550.408b-2(e)(1):

These prohibitions are imposed upon fiduciaries to deter them from
exercising the authority, control, or responsibility which makes such
persons fiduciaries when they have interests which may conflict with
the interests of the plans for which they act. In such cases, the
fiduciaries have interests in the transactions which may affect the
exercise of their best judgment as fiduciaries.

105.   Although ERISA provides for exemptions from §1106(a) prohibited

transactions (as set forth in 29 U.S.C. §1108 and the regulations thereunder), there

are no exemptions from §1106(b) prohibited transactions. 29 C.F.R. §2550.408b-2(a);

29 C.F.R. §2550.408b-2(e); *Lowen v. Tower Asset Mgmt., Inc.*, 653 F. Supp. 1542,

1555 (S.D.N.Y. 1987); *Barboza v. Cal. Ass'n of Prof'l Firefighters*, 799 F.3d 1257,

1269 (9th Cir. 2015)(citing *Patelco Credit Union v. Sahni*, 262 F.3d 897, 910–11 (9th

Cir. 2001)); *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*, 751 F.3d 740,

750 (6th Cir. 2014); DOL Adv. Op. 89-09A (June 13, 1989)(1989 ERISA LEXIS 9).

106.    A fiduciary can avoid transactions prohibited by § 1106(b) only "if the fiduciary does not use any of the authority, control or responsibility which makes such person a fiduciary to cause a plan to pay additional fees for a service furnished by such fiduciary or to pay a fee for a service furnished by a person in which such fiduciary has an interest which may affect the exercise of such fiduciary's best judgment as a fiduciary." 29 C.F.R. § 2550.408b-2(e)(2).

107.    "A fiduciary may not use the authority, control, or responsibility which makes such person a fiduciary to cause a plan to pay an additional fee to such fiduciary (or to a person in which such fiduciary has an interest which may affect the exercise of such fiduciary's best judgment as a fiduciary) to provide a service." 29 C.F.R. § 2550.408b-2(e)(1).

108.    A plan cannot pay for direct expenses that relate to the formation, rather than the management, of a plan. DOL Adv. Op. 97-03A (Jan. 23, 1997), 1997 WL 28100; DOL Adv. Op. 2001-01A (Jan. 18, 2001), 2001 WL 125092.  Such settlor functions "include decisions relating to the establishment, design and termination of plans" and are not fiduciary activities. DOL Adv. Op. 97-03A; DOL Adv. Op. 2001-01A. Expenses for these activities are "for the benefit of the employer and would involve services for which an employer could reasonably be expected to bear the cost in the normal course of its business or operations." DOL Adv. Op. 97-03A; DOL Adv. Op. 2001-01A. Where expenses relate to activities that benefit both the employer and the plan and where one party appears to be acting in both a settlor capacity on behalf of the employer and in a fiduciary capacity on behalf of the plan's

36

participants and beneficiaries, the fiduciary must have an independent fiduciary

determine how to allocate the expenses attributable to those benefits to avoid

violations under § 1106(b)(1) and § 1106(b)(2). DOL Adv. Op. 97-03A, 1997 WL

28100, at *4 ("Where, as here, there are benefits to be derived by both the plan

sponsor (or the estate of the plan sponsor) and the plan, and where one party

appears to be acting in both a settlor capacity on behalf of the plan sponsor (or the

estate of the plan sponsor), and in a fiduciary capacity on behalf of the plan's

participants and beneficiaries, it would generally be necessary, in order to avoid

violations of ERISA sections 406(b)(1) and 406(b)(2), to have an independent

fiduciary determine how to allocate the expenses attributable to those benefits.")

109.   29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil

action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109.

Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any
> of the responsibilities, obligations, or duties imposed upon fiduciaries
> by this subchapter shall be personally liable to make good to such plan
> any losses to the plan resulting from each such breach, and to restore
> to such plan any profits of such fiduciary which have been made
> through use of assets of the plan by the fiduciary, and shall be subject
> to such other equitable or remedial relief as the court may deem
> appropriate, including removal of such fiduciary.

## B. Defendants acted for the purpose of benefiting Pentegra in causing unreasonable and unnecessary amounts for purported administrative services to be paid from Plan assets to Pentegra.

110.   Pentegra, a plan fiduciary, caused the Plan to retain Pentegra as

recordkeeper and "contract administrator," to use Pentegra collective investment

trusts, and to pay Plan assets to Pentegra. Pentegra therefore dealt with the assets

of the Plan in its own interest or for its own account, in violation of 29 U.S.C. §1106(b)(1); acted in a transaction involving the Plan on behalf of a party whose interests were adverse to the interests of the Plan, its participants and beneficiaries, in violation of 29 U.S.C. §1106(b)(2); and received consideration for its own personal account from parties dealing with the Plan in connection with transactions involving the assets of the Plan, in violation of 29 U.S.C. §1106(b)(3).

111.    Defendants caused the Plan to retain Pentegra as recordkeeper and "contract administrator," to use Pentegra collective investment trusts, and to pay Plan assets to Pentegra. Defendants therefore caused the Plan to engage in a transaction that they knew or should have known constituted an exchange of property between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(A); engage in a transaction they knew or should have known constituted the furnishing of services between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(C); and engage in a transaction they knew or should have known constituted a transfer of Plan assets to a party in interest in violation of 29 U.S.C. §1106(a)(1)(D).

112.    The Plan's excessive payments to Pentegra, as outlined above were at the expense of Plan participants and for the purpose of benefiting Pentegra.

113.    In light of the excessive fees and increasing amounts paid while services remained constant, the continued retention of Pentegra as Plan's administrator, and the Board's apparent failure to solicit bids from recordkeepers, providers of contract administrator, or 3(16) services, it is evident that Pentegra,

38

through its employees, controlled the decisions of the Board, causing it to favor Pentegra.

114.    The Board, composed in part of Pentegra employees, acted with the intention to benefit Pentegra, including through the activities of Board delegees who were Pentegra employees, when the Board failed to monitor administrative fees, solicit competitive bids, or otherwise take any action to evaluate whether to continue to use Pentegra as a service provider. The Board, in making its decisions, deferred to Pentegra, and allowed Pentegra's representatives on the Board to drive decisions favoring Pentegra.

115.    All these excess amounts were Plan assets, since they constituted excessive fees generated from participant investments, and should have been restored to the Plan.

116.    From 2014 to 2018, Defendants caused over $50 million in direct payments to be taken from the Plan and paid to Pentegra, in the following amounts per year:

| 2014 | $9,521,031.00 |
|---|---|
| 2015 | $9,923,100.00 |
| 2016 | $10,057,640.00 |
| 2017 | $10,163,370.00 |
| 2018 | $10,584,935.00 |
| Total | **$50,250,076.00** |

117.    Defendants failed to loyally and prudently monitor this purported compensation to ensure that only reasonable and necessary expenses were charged for services actually provided to the Plan.

118.   In light of the excessive fees and increasing amounts paid while services remained constant, it is evident that Defendants did not engage an independent fiduciary to review and approve the arrangement between Pentegra and the Plan. Defendants failed to engage an independent fiduciary to determine whether it was in the interest of Plan participants to engage in this scheme or whether the services the Pentegra employees performed were necessary for the operation of the Plan, whether the amounts charged for those services were reasonable, and whether Pentegra was paid only its direct expenses incurred in providing necessary services to the Plan.

119.   Had Defendants performed their fiduciary duties, the Plan would not have suffered over $70 million in losses from September 2014 through September 2020. This amount is the total of all reported direct compensation paid by the Plan to Pentegra during this period, compounded to account for lost investment opportunity.

120.   Pleading in the alternative, had Defendants performed their fiduciary duties, the Plan would not have suffered over $60 million in damages. This is calculated, as above, by multiplying the reasonable fee per participant ($65) in the applicable year by the number of participants, subtracting the reasonable fees from the disclosed direct compensation to Pentegra for "contract administration" in the Plan's Form 5500 from September 2014 until 2018. The damages are then brought forward yearly by the return of an S&P 500 index fund to account for lost investment opportunity.

III.  **Defendants breached their fiduciary duties by including Plan investments with excessive and unreasonable investment management fees.**

A.  **Prudent retirement plan fiduciaries select the lowest-cost available share classes for retirement plan investment alternatives.**

121.  It is a simple principle of investment management that the larger amount an investor has available to invest, the lower the investment management fees that can be obtained in the market for a given investment vehicle. Large retirement plans have substantial bargaining power to negotiate low fees for investment management services. Multi-billion-dollar defined contribution plans, such as the Plan, have even greater bargaining power.

122.  Mutual funds and collective investment trusts frequently offer multiple share classes. Because the only difference between the share classes is fees, selecting higher-cost shares results in the plan paying wholly unnecessary fees. Accordingly, absent a compelling reason to opt for the higher-cost version, prudent fiduciaries will select the lowest-cost share class available to the plan. The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the "prevailing circumstances"—such as the size of the plan—are a part of a prudent decision making process. The failure to understand these concepts and to know about the alternatives could be a costly fiduciary breach.[33]

---

[33] Fred Reish, *Class–ifying Mutual Funds*, PLANSPONSOR (Jan. 2011)., http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

**B. Contrary to the practices of prudent professionals, Defendants caused investments with excessive investment management fees to be included in the Plan.**

123.    Given the Plan is a mega plan based on its size, the Plan had tremendous bargaining power to obtain share classes with far lower costs than higher-cost shares. Lower-cost share classes of mutual fund and collective investment trust investments were readily available to the Plan. Minimum investment thresholds for the lowest-cost institutional shares are routinely waived by the investment provider even if not reached by a single fund.

> For large 401(k) plans with over a billion dollars in total assets…mutual funds will often waive an investment minimum for institutional share classes. It is also common for investment advisors representing large 401(k) plans to call mutual funds and request waivers of the investment minimums so as to secure the institutional shares.

*Tibble v. Edison Int'l*, No. 07-5359, 2010 WL 2757153, at *9 (C.D. Cal. July 8, 2010), *aff'd* 729 F.3d 1110 (9th Cir. 2013).

124.    During the proposed class period, Defendants had the fiduciary authority or responsibility over the selection and retention of the share class used for each of the Plan's investments.

125.    Mutual funds and collective trusts frequently offer multiple share classes, which are often classified as either "retail" class or "institutional" class. Retail-class shares are identical to institutional class shares in every way, except that retail shares charge higher fees, which reduce the investor's assets. Although institutional share classes typically have minimum investment thresholds, funds will waive the minimums for large institutional investors, even those much smaller

42

than the Plan. Since the only difference between the share classes is cost, a prudent investor will select the lower cost option, because doing so saves money. That did not happen in the Plan. Throughout the relevant time period, the Plan's investment lineup has included higher-cost share classes instead of the identical lower-cost share classes that were available to the Plan.

126.   Despite the fact that lower-cost shares for the exact same investment option were available to the Plan, Defendants selected and continue to retain higher-cost shares for the Plan investment options than were available to the Plan based on its enormous size.

127.   The Plan included the following investments, including up to 9233% more expensive than the available identical lower-cost alternatives:

### Mutual Funds

| Plan Mutual Fund | Plan Fee | Identical Lower Cost Mutual Fund | Identical Lower Cost Fee | Plan's Excess Cost |
|---|---|---|---|---|
| American Beacon Large Cap Value (Inst) (AADEX) | 0.62% | American Beacon Large Cap Value (R6) (AALRX) | 0.58% | 6.90% |
| Principal MidCap (Inst) (PCBIX) | 0.68% | Principal MidCap (R6) (PMAQX) | 0.60% | 13.33% |
| T. Rowe Price Blue Chip Growth (TRBCX) | 0.72% | T. Rowe Price Blue Chip Growth (I) (TBCIX) | 0.58% | 24.14% |

43

**Collective Trusts**

| Plan State Street Collective Trusts | Plan Fee | Identical Lower Cost Collective Trust | Identical Lower Cost Fee | Plan's Excess Cost |
|---|---|---|---|---|
| SSgA Aggressive Strategic Balanced SL CIT | 0.36% | SSgA Aggressive Strategic Balanced SL CIT (I) | 0.02% | 1700% |
| SSgA Cash Series U.S. Government p | 0.35% | SSgA Cash Series U.S. Government (G) | 0.080% | 338% |
| SSgA Conservative Strategic Balanced SL CIT | 0.36% | SSgA Conservative Strategic Balanced SL CIT (I) | 0.02% | 1700% |
| SSgA International Index NL CIT (A) | 0.34% | SSgA International Index NL CIT (A) | 0.025% | 1260% |
| SSgA Moderate Strategic Balanced SL CIT | 0.36% | SSgA Moderate Strategic Balanced SL CIT (I) | 0.02% | 1700% |
| SSgA NASDAQ 100 Index NL CIT (A) | 0.34% | SSgA NASDAQ 100 Index NL CIT (A) | 0.012% | 2733% |
| SSgA REIT Index NL CIT (A) | 0.34% | SSgA REIT Index NL CIT (A) | 0.012% | 2733% |
| SSgA Russell Large Cap Growth Index SL CIT | 0.31% | SSgA Russell Large Cap Growth Index SL CIT (I) | 0.012% | 2483% |
| SSgA Russell Large Cap Value Index SL CIT | 0.31% | SSgA Russell Large Cap Value Index SL CIT (I) | 0.012% | 2483% |
| SSgA Russell Small Cap Index NL CIT (A) | 0.32% | SSgA Russell Small Cap Index NL CIT (A) | 0.012% | 2567% |
| SSgA S&P 500 Index NL CIT (A) | 0.28% | SSgA S&P 500 Index NL CIT (A) | 0.003% | 9233% |
| SSgA S&P Mid Cap Index SL CIT (A) | 0.31% | SSgA S&P Mid Cap Index SL CIT (A) | 0.012% | 2483% |
| SSgA Target Retirement 2010 NL CIT (A) | 0.37% | SSgA Target Retirement 2010 NL CIT (A) | 0.03% | 1133% |
| SSgA Target Retirement 2015 NL CIT (A) | 0.37% | SSgA Target Retirement 2015 NL CIT (A) | 0.03% | 1133% |

| Plan State Street Collective Trusts | Plan Fee | Identical Lower Cost Collective Trust | Identical Lower Cost Fee | Plan's Excess Cost |
|---|---|---|---|---|
| SSgA Target Retirement 2020 NL CIT (A) | 0.37% | SSgA Target Retirement 2020 NL CIT (A) | 0.03% | 1133% |
| SSgA Target Retirement 2025 NL CIT (A) | 0.37% | SSgA Target Retirement 2025 NL CIT (A) | 0.03% | 1133% |
| SSgA Target Retirement 2030 NL CIT (A) | 0.37% | SSgA Target Retirement 2030 NL CIT (A) | 0.03% | 1133% |
| SSgA Target Retirement 2035 NL CIT (A) | 0.37% | SSgA Target Retirement 2035 NL CIT (A) | 0.03% | 1133% |
| SSgA Target Retirement 2040 NL CIT (A) | 0.37% | SSgA Target Retirement 2040 NL CIT (A) | 0.03% | 1133% |
| SSgA Target Retirement 2045 NL CIT (A) | 0.37% | SSgA Target Retirement 2045 NL CIT (A) | 0.03% | 1133% |
| SSgA Target Retirement 2050 NL CIT (A) | 0.37% | SSgA Target Retirement 2050 NL CIT (A) | 0.03% | 1133% |
| SSgA Target Retirement 2055 NL CIT (A) | 0.37% | SSgA Target Retirement 2055 NL CIT (A) | 0.03% | 1133% |
| SSgA Target Retirement 2060 NL CIT (A) | 0.37% | SSgA Target Retirement 2060 NL CIT (A) | 0.03% | 1133% |
| SSgA Target Retirement Income NL CIT (A) | 0.37% | SSgA Target Retirement Income NL CIT (A) | 0.03% | 1133% |
| SSgA U.S. Bond Index NL CIT (A) | 0.32% | SSgA U.S. Bond Index NL CIT (A) | 0.012% | 2567% |
| SSgA U.S. Inflation Protected Bond NL CIT (A) | 0.31% | SSgA U.S. Inflation Protected Bond NL CIT (A) | 0.012% | 2483% |
| SSgA U.S. Long Treasury Index NL CIT (A) | 0.32% | SSgA U.S. Long Treasury Index NL CIT (A) | 0.012% | 2567% |

45

**Stable Value Fund**

| Plan MetLife Fund | Plan Fee | Identical Lower Cost MetLife Fund | Identical Lower Cost Fee | Plan's Excess Cost |
|---|---|---|---|---|
| MetLife Stable Value, Series 25053 (0) | 0.90% | MetLife Stable Value, Series 25053 (0) | 0.62% | 45.16% |

128.    At all relevant times, the Plan's investment options charged unreasonable fees for the services provided to the Plan compared to alternatives that were readily available to the Plan, including lower cost share classes of otherwise identical mutual funds, separately managed accounts, and/or collective trust investments.

129.    By providing Plan participants the more expensive share classes of Plan investment alternatives, the Defendants caused participants to lose over $37 million in retirement savings.[34]

## CLASS ACTION ALLEGATIONS

130.    29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

131.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an

---

[34] Plan losses have been estimated from 2014 to present, carried forward using the investment return of an S&P 500 index fund, the Vanguard Institutional Index (VIIIX), to account for lost investment returns on those assets. Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

alternative to direct individual actions on behalf of the Plan under 29 U.S.C.

§1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all

participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be

appointed as representatives of, the following Class:

> All participants and beneficiaries of the Pentegra Defined Contribution
> Plan for Financial Institutions from September 15, 2014 through the
> date of judgment, excluding Defendants.

132.   This action meets the requirements of Rule 23 and is certifiable as a

class action for the following reasons:

a.   The Class includes over 25,000 members and is so large that

joinder of all its members is impracticable.

b.   There are questions of law and fact common to the Class

because Defendants owed fiduciary duties to the Plan and to all participants

and beneficiaries and took the actions and made omissions alleged herein as

to the Plan and not as to any individual participant. Thus, common questions

of law and fact include the following, without limitation: who are the

fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether

the fiduciaries of the Plan breached their fiduciary duties to the Plan; what

are the losses to the Plan resulting from each breach of fiduciary duty; and

what Plan-wide equitable and other relief the court should impose in light of

Defendants' breaches of duty.

c.     Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d.     Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with any other member of the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.     Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

133.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries

48

is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

134.    Plaintiffs' counsel, Schlichter Bogard & Denton, LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g). Schlichter Bogard & Denton has been appointed as class counsel in over 30 other ERISA class actions regarding excessive fees in large defined contribution plans. Courts in these cases have consistently and repeatedly recognized the firm's unparalleled success in the area of defined contribution excessive fee litigation:

- On November 3, 2016, Judge Michael Ponsor of the United States District Court for the District of Massachusetts found that by securing a $30.9 million settlement, Schlichter Bogard & Denton had achieved an "outstanding result for the class," and "demonstrated extraordinary resourcefulness, skill, efficiency and determination." *Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Doc. 144 at 5 (D. Mass. Nov. 3, 2016).

- As Chief Judge Michael J. Reagan of the Southern District of Illinois recognized in approving a settlement which was reached on the eve of trial after eight years of litigation, resulting in a $62 million monetary recovery and very substantial affirmative relief to benefit the Plans, the firm had shown "exceptional commitment and perseverance in representing employees and retirees seeking to improve their retirement plans," and "demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k)

49

plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 WL 43984750, at *1 (S.D. Ill. July 17, 2015). The court further recognized that the law firm of "Schlichter, Bogard & Denton has had a humongous impact over the entire 401(k) industry, which has benefited employees and retirees throughout the entire country by bringing sweeping changes to fiduciary practices." *Id.* at *3 (internal quotations omitted).

- Other courts have made similar findings:

  - "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 WL 13089487 at *2 (N.D. Ill. June 26, 2012).

  - "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 WL 12242015 at *2 (C.D. Ill. Oct. 15, 2013).

  - "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 WL 375432 at *2 (S.D. Ill. Jan. 31, 2014). The court also emphasized that "the law firm of Schlichter, Bogard & Denton is the leader in 401(k) fee litigation." *Id.* at *8 (internal quotations omitted).

  - U.S. District Judge Harold Baker of the Central District of Illinois acknowledged the significant impact of the firm's work, finding that as of 2013, the nationwide "fee reduction attributed to Schlichter, Bogard & Denton's fee litigation and the Department of Labor's fee disclosure regulations approach *$2.8 billion in annual savings* for American workers and retirees." *Nolte*, 2013 WL 12242015, at *2 (emphasis added).

  - U.S. District Judge David Herndon of the Southern District of Illinois recognized the firm's extraordinary contributions to the retirement industry: "Schlichter, Bogard & Denton and lead attorney Jerome Schlichter's diligence and perseverance, while risking vast amounts of time and money, reflect the finest attributes of a private attorney general. *Beesley*, 2014 WL 375432 at *2.

  - U.S. District Court Judge G. Patrick Murphy similarly recognized the work of Schlichter, Bogard & Denton as exceptional:

50

> "Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees. No case had previously been brought by either the Department of Labor or private attorneys against large employers for excessive fees in a 401(k) plan. Class Counsel performed substantial work[,] investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the participants and beneficiaries of the General Dynamics 401(k) Plans."

*Will v. General Dynamics Corp.*, No. 06-698, 2010 WL 4818174 at *3 (S.D. Ill. Nov. 22, 2010).

- Schlichter, Bogard & Denton handled the first full trial of an ERISA excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the district court concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 WL 5386033 at *3 (W.D. Mo. Nov. 2, 2012). Following remand, the district court again awarded Plaintiffs' attorney's fees, emphasizing the significant contribution Plaintiffs' attorneys have made to ERISA litigation, including educating the Department of Labor and federal courts about the importance of monitoring fees in retirement plans:

> "Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations."

*Tussey v. ABB, Inc.*, No. 06-4305, 2015 WL 8485265 at *2 (W.D. Mo. Dec. 9, 2015).

- In *Spano v. Boeing Co.*, in approving a settlement reached after nine years of litigation which included $57 million in monetary relief and substantial affirmative relief to benefit participants, the court found that "The law firm

51

Schlichter, Bogard & Denton has significantly improved 401(k) plans across the country by bringing cases such as this one, which have educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees." No. 06-cv-743, Doc. 587, at 5–6 (S.D.Ill. Mar. 31, 2016) (Rosenstengel, J.) (internal quotations omitted).

- In approving a settlement including $32 million plus significant affirmative relief, Chief Judge William Osteen in *Kruger v. Novant Health, Inc.*, No. 14-208, Doc. 61, at 7–8 (M.D.N.C. Sept. 29, 2016) found that "Class Counsel's efforts have not only resulted in a significant monetary award to the class but have also brought improvement to the manner in which the Plans are operated and managed which will result in participants and retirees receiving significant savings[.]"

- On January 28, 2020, Judge George L. Russell of the District of Maryland found Schlichter, Bogard & Denton "pioneered this ground-breaking and novel area of litigation" that has "dramatically brought down fees in defined contribution plans" after the firm obtained a $14 million dollar settlement. *Kelly v. Johns Hopkins Univ.*, No. 1:16-CV-2835-GLR, 2020 WL 434473, at *2 (D. Md. Jan. 28, 2020).

- Schlichter, Bogard & Denton is also class counsel in and handled *Tibble v. Edison International*, 135 S. Ct. 1823 (2015), the first and only Supreme Court case to address the issue of excessive fees in a defined contribution plan—in which the Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Id*. at 1829. Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

- The firm's work in ERISA excessive fee class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, Wall St. J. (May 15, 2016);[35] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. Times (Mar. 29, 2014);[36] Liz Moyer, *High Court*

---

[35] http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601, *archived at* https://perma.cc/T4KY-QVCT.

[36] http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0, *archived at* https://perma.cc/5ZGL-XCJY.

*Spotlight Put on 401(k) Plans*, Wall St. J. (Feb. 23, 2015);[37] Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. Times (Oct. 16, 2014);[38] Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, Wall St. J. (Aug. 25, 2015);[39] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, Wall St. J. (May 18, 2015); [40] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[41] Mark Miller, *Are 401(k) Fees Too High? The High-Court May Have an Opinion*, Reuters (May 1, 2014);[42] Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, Bloomberg (Oct. 2, 2014).[43]

## COUNT I: BREACH OF FIDUCIARY DUTIES RELATED TO EXCESSIVE ADMINISTRATIVE FEES (29 U.S.C. §1104(a)(1))

135.   Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

136.   This Count alleges breach of fiduciary duties against all Defendants.

137.   Defendants were required to discharge their duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

---

[37] http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527, *archived at* https://perma.cc/Z878-LH5R.

[38] http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0, *archived at* https://perma.cc/RN8S-9ARU.

[39] http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/, *archived at* https://perma.cc/GPR3-2K8F.

[40] http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139, *archived at* https://perma.cc/2B5A-D4GQ.

[41] http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial, *archived at* https://perma.cc/4ANG-CYJS.

[42] http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501, *archived at* https://perma.cc/WP3H-YJ3H.

[43] http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal, *archived at* https://perma.cc/DR9Y-3VJN.

138.   If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798–99 (7th Cir. 2011).

139.   Separately, failing to "monitor and control recordkeeping fees" and "paying excessive revenue sharing" as a result of failures to "calculate the amount the Plan was paying . . . through revenue sharing," to "determine whether [the recordkeeper's] pricing was competitive," and to "leverage the Plan's size to reduce fees," while allowing the "revenue sharing to benefit" a third-party recordkeeper "at the Plan's expense" is a breach of fiduciary duties. *Tussey,* 746 F.3d at 336.

140.   Defendants used a flawed fiduciary process for monitoring and controlling the Plan's administrative fees. In contrast to the actions of hypothetical and real-world prudent fiduciaries of similar defined contribution plans, Defendants failed to: monitor the amount of the fees received by the Plan's service providers, determine if those amounts were competitive or reasonable for the services provided to the Plan, use the Plan's size to reduce fees, or obtain sufficient rebates to the Plan for the excessive fees paid by participants. Moreover, Defendants failed to solicit bids from competing providers, which is the surest way to determine the market rate for the Plan's services. This conduct was a breach of fiduciary duties.

141.   Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

142.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

143.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT II: PROHIBITED TRANSACTIONS
### (29 U.S.C. §1106(A)(1)(A), (A)(1)(B)–(D); (B)(1)–(2); 29 U.S.C. §1132(A)(3))

144.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

145.    This Count is asserted against all Defendants.

146.    Section 1106(b) prohibits transactions between a plan and a fiduciary. 29 U.S.C. §1106(b).

147.    Pentegra is a fiduciary, and caused the plan to retain Pentegra as recordkeeper and "contract administrator," to use Pentegra collective investment trusts, and to pay Plan assets to Pentegra. Pentegra therefore dealt with the assets of the Plan in its own interest or for its own account, in violation of 29 U.S.C. §1106(b)(1); acted in a transaction involving the Plan on behalf of a party whose interests were adverse to the interests of the Plan, its participants and

beneficiaries, in violation of 29 U.S.C. §1106(b)(2); and received consideration for its own personal account from parties dealing with the Plan in connection with transactions involving the assets of the Plan, in violation of 29 U.S.C. §1106(b)(3).

148.   Section 1106(a) prohibits transactions between a plan and a party in interest. 29 U.S.C. §1106(a).

149.   Pentegra is a party in interest because it is a Plan fiduciary, and an entity providing services to the Plan. 29 U.S.C. §1002(14)(A) and (B). Defendants caused the Plan to retain Pentegra as recordkeeper and "contract administrator," to use Pentegra collective investment trusts, and to pay Plan assets to Pentegra. Defendants therefore caused the Plan to engage in a transaction that they knew or should have known constituted an exchange of property between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(A); engage in a transaction they knew or should have known constituted the furnishing of services between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(C); and engage in a transaction they knew or should have known constituted a transfer of Plan assets to a party in interest in violation of 29 U.S.C. §1106(a)(1)(D).

150.   Even if Pentegra were not a fiduciary (which it is), pleading in the alternative, it is liable as a knowing party-in-interest participant in a prohibited transaction.

151.   Under 29 U.S.C. §1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. A defendant may be liable under that section regardless of whether it is a fiduciary. A

nonfiduciary transferee of ill-gotten proceeds is subject to equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

152.   Pentegra knew or should have known that the act or practice of using proprietary Pentegra recordkeeping and contract administrator services allowed Pentegra to benefit financially through excessive fees paid by the Plan and at the expense of the Plan's participants.

153.   Pentegra knew or should have known that the act or practice of using Pentegra-subadvised investments in the Plan that generated additional fees for Pentegra allowed Pentegra to benefit financially through excessive fees paid by the Plan and at the expense of the Plan's participants.

154.   Each Defendant knew or should have known that the act or practice of using Pentegra-subadvised investments and Pentegra proprietary recordkeeping services in the Plan constituted a direct or indirect furnishing of services between the Plan and a party in interest for more than reasonable compensation or a transfer of assets of the Plan to a party interest.

155.   Each Defendant knew or should have known that the act or practice of using Pentegra-subadvised investments and Pentegra proprietary recordkeeping services in the Plan constituted transactions in which Plan fiduciaries dealt with the assets of the Plan in their own interest or for their own account, transactions involving the Plan on behalf of parties whose interests were adverse to the interests of the Plan, its participants and beneficiaries, or transactions in which a Plan

fiduciary received consideration for its own personal account from parties dealing with the Plan in connection with transactions involving the assets of the Plan.

156.    Accordingly, Pentegra participated in the prohibited transactions described above and knowingly received excessive fees paid from Plan assets.

157.    To the extent any proceeds from those transactions and the profits Pentegra made through the use of Plan assets are not otherwise recovered, the Court should order restitution and disgorgement under 29 U.S.C. §1132(a)(3) to restore those funds to the Plan.

158.    Pentegra has not dissipated the entirety of the proceeds on nontraceable items, and the proceeds can be traced to particular funds or property in Pentegra's possession.

159.    Total losses to the Plan will be determined after complete discovery in this case and are continuing.

160.    Under 29 U.S.C. §1109(a), each Defendant is personally liable to make good to the Plan any losses resulting from the breaches of fiduciary duties and prohibited transactions alleged in this Count, and to restore all profits through their use of Plan assets, and is subject to other appropriate equitable or remedial relief, including removal as a Plan fiduciary.

161.    Each Defendant knowingly participated in these transactions with knowledge that the transactions were a breach, enabled the other Defendants to cause the Plan to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy or

discontinue the transaction. Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

### COUNT III: BREACH OF FIDUCIARY DUTIES RELATED TO UNREASONABLE INVESTMENT MANAGEMENT FEES (29 U.S.C. §1104(a)(1))

162.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

163.    This Count alleges breach of fiduciary duties against all Defendants.

164.    Defendants breached their duties of loyalty and prudence under 29 U.S.C. §1104(a)(1)(A) and (B) by selecting and retaining as Plan investment options higher-cost shares of mutual funds and collective investment trusts, including proprietary Pentegra investments, that charged unreasonable investment management fees relative to other investment options that were available to the Plan at all relevant times, including separately managed accounts, collective investment trusts, and lower-cost share classes for the Plan's mutual fund and collective investment trust investments with the identical investment manager and investments.

165.    Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

166.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to

59

commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT IV: FAILURE TO MONITOR FIDUCIARIES
## (AGAINST THE BOARD)

167.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

168.   This Count is asserted against the Board and its individual members, including John E. Pinto, Sandra L. McGoldrick, Lisa A. Schlehuber, Michael N. Lussier, William E. Hawkins, Jr., Brad Elliott, George W. Hermann (collectively "Individual Defendants").

169.   The Board is the named fiduciary with the overall responsibility for the control, management and administration of the Plan, in accordance with 29 U.S.C. §1102(a).

170.   The Individual Defendants are or were members of the Board during the relevant time period.

171.   The Board had ultimate responsibility for the Pentegra's decisions with respect to the Plan, and was responsible for monitoring Pentegra's performance, as well as the performance of Board members and taking any necessary corrective actions, including removing Board members who failed to fulfil their fiduciary duties.

172.    The Board had ultimate responsibility for the decisions of consultants and/or delegees with respect to the Plan, and were responsible for monitoring their performance and taking any necessary corrective actions, including removing delegees who failed to fulfil their fiduciary duties.

173.    A monitoring fiduciary must ensure that the person to whom it delegates fiduciary duties is performing its fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the delegate fails to discharge its duties.

174.    To the extent any of the fiduciary responsibilities of the Board were delegated to another fiduciary, their monitoring duties included an obligation to ensure that any delegated tasks were being performed in accordance with ERISA's fiduciary standards.

175.    The Board breached its fiduciary monitoring duties by, among other things:

176.    Failing to monitor their appointees, including the Board and its members, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

177.    Failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative fees in violation of ERISA;

178.   Failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeeper; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan;

179.   Failing to remove appointees whose performance was inadequate in that they continued to allow excessive administrative fees.

180.   Had the Board discharged its fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, the Plaintiffs, and the other Class members lost tens of millions of dollars of retirement savings.

## JURY TRIAL DEMANDED

181.   Pursuant to Fed. R. Civ. P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that Defendants have breached their fiduciary duties as described above;

- find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of

fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under §1109(a);

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- reform the Plan to include only prudent investments;

- reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

- reform the Plan to obtain bids for managed account services and to pay only reasonable managed account service fees if the fiduciaries determine that managed account services is a prudent alternative to target date or other asset allocation funds;

- certify the Class, appoint Plaintiffs as class representatives, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

September 15, 2020                    Respectfully submitted,

/s/ Andrew D. Schlichter
SCHLICHTER BOGARD & DENTON LLP
Andrew D. Schlichter, Bar No. 4403267
Jerome J. Schlichter*
Troy A. Doles*
Alexander L. Braitberg*
100 South Fourth Street, Suite 1200
St. Louis, Missouri 63102
Telephone: (314) 621-6115
Facsimile: (314) 621-5934
aschlichter@uselaws.com
jschlichter@uselaws.com
tdoles@uselaws.com
abraitberg@uselaws.com
*Pro Hac Vice forthcoming

64