# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IMRAN KHAN, JOAN BULLOCK, and PAMELA JOY WOOD, individually and as representatives of a class of participants and beneficiaries on behalf of the Pentegra Defined Contribution Plan for Financial Institutions, | No. 7:20-cv-07561 |
| *Plaintiffs*, | CLASS ACTION |
| v. | |
| BOARD OF DIRECTORS OF PENTEGRA DEFINED CONTRIBUTION PLAN, PENTEGRA SERVICES, INC., JOHN E. PINTO, SANDRA L. MCGOLDRICK, LISA A. SCHLEHUBER, MICHAEL N. LUSSIER, WILLIAM E. HAWKINS, JR., BRAD ELLIOTT, GEORGE W. HERMANN, AND JOHN DOES 1–12, | |
| *Defendants*. | |
| RICHARD GREENBERG, GREGORY S. DIGSBY, LINDSEY CLARK, and CHRYSTAL LEWIS, individually and as representatives of a class of participants and beneficiaries on behalf of the Pentegra Defined Contribution Plan for Financial Institutions, | No. 7:20-cv-08503 |
| *Plaintiffs*, | CLASS ACTION |
| v. | |
| BOARD OF DIRECTORS OF PENTEGRA DEFINED CONTRIBUTION PLAN, PENTEGRA SERVICES, INC., AND JOHN DOES 1–20, | |
| *Defendants*. | |

## AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1. Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Pentegra Defined Contribution Plan for Financial Institutions (the "Plan"), bring these actions under 29 U.S.C. §1132(a)(2) and (a)(3) on behalf of the Plan against the Board of Directors of Pentegra Defined Contribution Plan, Pentegra Services, Inc., John E. Pinto, Sandra L. McGoldrick, Lisa A. Schlehuber, Michael N. Lussier, William E. Hawkins, Jr., Brad Elliott, George W. Hermann, and John Does 1–20 (collectively the "Defendants"), for breach of fiduciary duties and prohibited transactions under ERISA.[1]

2. As the Plan's fiduciaries, Defendants are obligated to act for the exclusive benefit of Plan participants and beneficiaries and to ensure that Plan expenses are reasonable. These duties are the "highest known to the law", and must be discharged with "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). Instead of acting in the exclusive best interest of participants, Defendants acted to enrich themselves, including Pentegra Services, Inc., by allowing unreasonable expenses to be charged to the Plan and its participants. To remedy these breaches of duty, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan profits made through Defendants' use of Plan assets. In addition, Plaintiffs seek equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

3. **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2).

4. **Venue.** This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district where the Plan is administered, where at least one of the alleged breaches took place, and where at least one defendant resides.

5. **Standing.** An action under §1132(a)(2) allows recovery only for a plan, and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id*. at 254. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of a plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and prohibited transactions and remains exposed to harm and continued future losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, each Plaintiff has suffered such an injury. Each named Plaintiff's individual account in the Plan suffered losses because each participant's account was assessed an excessive amount of administrative and investment management fees, which would not have been incurred had Defendants discharged their fiduciary duties to the Plan and reduced those fees to a reasonable level.

**PARTIES**

## I.     The Pentegra Defined Contribution Plan for Financial Institutions

6.     The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34), established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1).

7.     The Plan is intended to be a multiple employer plan ("MEP") pursuant to 26 U.S.C. §413(c). Plan participants consist of employees of financial institutions, such as banks, who participate in the Plan. As of December 31, 2018, the Plan had nearly 250 participating employers ("Participating Employers").

8.     The Plan provides retirement benefits for employees of the Participating Employers. Under the Plan, participants are responsible for investing their individual accounts from investments selected by Defendants and will receive in retirement only the current value of that account, which will depend on contributions made on behalf of each employee by his or her Participating Employer, deferrals of employee compensation and Participating Employer matching contributions, and on the performance of investment options net of fees and expenses. Plan fiduciaries control what investment options are provided in the Plan and the Plan's fees and expenses.

9.     As of December 31, 2014, the Plan reported 26,469 participants with account balances and $1.9 billion in assets. By December 31, 2018, those numbers had grown to 27,227 participants with account balances and $2.1 billion in assets. As such, the Plan is among the largest 0.07% of all defined contribution plans in the United States based on plan assets. Professionals commonly refer to plans of such great size as "jumbo plans" or "mega plans." The Plan's massive size gives it enormous bargaining power to command very low recordkeeping and administrative fees for its participants.

**II.    Plaintiffs**

10.    Imran Khan resides in Monmouth Junction, New Jersey and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are eligible to receive benefits under the Plan.

11.    Joan Bullock resides in Colonial Beach, Virginia and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

12.    Pamela Joy Wood resides in Midlothian, Texas and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

13.    Richard Greenberg resides in Whippany, New Jersey and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are eligible to receive benefits under the Plan.

14.    Gregory S. Digsby resides in Marietta, Georgia and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are eligible to receive benefits under the Plan.

15.    Lindsey Clark resides in Des Moines, Iowa and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

16.    Chrystal Lewis resides in Charlotte, North Carolina and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

## III. Defendants

### A. The Board of Directors of the Pentegra Defined Contribution Plan

17.     The Board of Directors of the Pentegra Defined Contribution Plan ("Board") is the Plan sponsor under 29 U.S.C. §1102(a)(1). The Board conducts its business regarding the Plan in White Plains, New York. The Board consists of executives of Participating Employers who are participants in the Plan, including the President and CEO of Pentegra Services, Inc. ("Pentegra").

18.     The Plan designates the Board and its individual members as named fiduciaries under 29 U.S.C. §1102(a)(2). Under Article IX, §1(A) of the Plan, the Board has "general administration" and "general responsibility for carrying out the provisions of the Plan." However, the Board may delegate to any committee, officer, employee or agent to perform any act pertaining to the Plan or the administration thereof, including investment management and administrative services for the Plan. Article IX, §1(C). As alleged *infra*, the Board delegated the vast majority of its fiduciary responsibilities to Pentegra and its executives, officers, employees and agents.

19.     Defendant John E. Pinto is President and CEO of Pentegra and is a member of the Board. Mr. Pinto also serves as the "President of the Plan" and the "chief administrative officer" of the Plan. *Id.,* §1(A).

20.     Defendant Sandra L. McGoldrick is President & CEO of Winter Hill Bank in Somerville, Massachusetts, and is Chair of the Board.

21.     Defendant Lisa A. Schlehuber is CEO of Elements Financial in Indianapolis, Indiana, and is Vice Chair of the Board.

22.     Defendant Michael N. Lussier is President & CEO of Webster First Federal Credit Union in Worcester, Massachusetts, and is a member of the Board.

6

23.     Defendant William E. Hawkins, Jr. is President & CEO of Tensas State Bank in Newellton, Louisiana, and is a member of the Board.

24.     Defendant Brad Elliott is Chairman & CEO of Equity Bancshares in Wichita, Kansas, and is a member of the Board.

25.     Defendant George W. Hermann is President & CEO of Windsor Federal Savings & Loan Association in Windsor, Connecticut, and is a member of the Board.

26.     The Board and its individual members are fiduciaries to the Plan because they are named fiduciaries under 29 U.S.C. §1102(a), and exercise discretionary authority or discretionary control respecting the management of the Plan or exercise authority or control respecting the management or disposition of its assets, and have discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

**B.     Pentegra Services, Inc.**

27.     Pentegra Services, Inc. is a corporation organized under Delaware law with its principal place of business in White Plains, New York. Pentegra is a Participating Employer in the Plan. Pentegra serves in several different fiduciary roles to the Plan, including as the Plan administrator, a functional fiduciary over the administration and management of the Plan, and as a Plan investment adviser. Pentegra also serves as a party-in-interest to the Plan. As indicated *supra,* Pentegra's President is Defendant John E. Pinto.

**1.     Pentegra is a fiduciary because it is the Plan administrator.**

28.     Pentegra, acting through its executives, officers and employees, is a fiduciary to the Plan because it serves as the Plan administrator under 29 U.S.C. §1002(16). "Persons who hold" the position of "plan administrator" will "therefore be fiduciaries". 29 C.F.R. §2509.75-8 (D-3). In fact, a plan administrator "assume[s] most fiduciary responsibilities" for plan

administration.[2] The Plan's Forms 5500 confirms this fiduciary role. Pentegra's President, Senior Vice President, General Counsel, and Vice President of Human Resources have all signed the Forms 5500, under penalty of perjury, as the "Plan administrator". As the Plan administrator, and as alleged herein, Pentegra was delegated and carried out a wide variety of fiduciary functions with respect to the Plan.

29.     As a plan administrator, Pentegra represents it is "one of the most experienced plan fiduciaries" in the United States and represents itself as the plan sponsor of two of the largest multiple employer plans in the country.[3] As Mr. Pinto admitted, "Pentegra embraces an advanced level of fiduciary responsibility" "due to [Pentegra's] experience running multiple employer plans, which require a principal fiduciary."[4]

30.     Offering "[u]nmatched fiduciary protection", Pentegra states:

> With a legacy built serving as an institutional fiduciary, Pentegra offers a level of fiduciary protection that is unmatched in the industry. We deliver an unrivaled level of oversight and accept a higher level of responsibility. Our fiduciary heritage shapes our culture.[5]

31.     As the Plan administrator for the Plan, Pentegra assumed an "extremely broad responsibility" over the Plan, including "operational compliance".[6] Pentegra describes this role as "a catch-all term covering nearly everything that can go wrong in a retirement plan."[7] Pentegra also assumed "selection and oversight" responsibilities over Plan service providers, which included "review[ing] vendor fee disclosures and ensur[ing] reasonableness of fees" of

---

[2] Definition of "Employer'' Under Section 3(5) of ERISA—Association Retirement Plans and Other Multiple-Employer Plans, 84 Fed.Reg. 37508, 37509 (July 31, 2019).
[3] "Pentegra Retirement Services to Celebrate 70 Years in July," June 24, 2013.
[4] *Id.*
[5] About Pentegra Retirement Services, "Our Difference. Your Advantage", 2019.
[6] "The Pentegra 3(16) Administrator Advantage."
[7] *Id.*

those vendors and "regular monitoring" of those "service providers to ensure they remain prudent and fees remain reasonable."[8]

32.     Notably, Pentegra assumed fiduciary "**[r]esponsibility for the reasonableness of Pentegra's own fees**" and was responsible for establishing an annual Plan governance process and checklist reviewing "service provider performance and fees."[9]

33.     The Plan's Investment Policy Statement ("IPS") confirms Pentegra's fiduciary status over the Plan. The IPS governs the selection, monitoring and removal of Plan investments and services providers. It is a governing plan document within the meaning of 29 U.S.C. §1104(a)(1)(D). 29 C.F.R. §2509.94-2. The IPS also specified that Pentegra (through its President) is the "plan administrator" as defined by ERISA.

34.     The IPS specified that the Board and Pentegra (through its President) were fiduciaries "responsible for the operation and interpretation of the Plan…for [the] purpose of the Employee Retirement Income Security Act of 1974." The Plan's IPS also specifies that "Management of [Pentegra] will assist the Board with the investment monitoring, selection and replacement process and will also report to the Board on a regular basis so the Board can make informed decisions."

35.     For these reasons, Pentegra, acting through its President, officers, executives, employees and agents, is a fiduciary to the Plan under 29 U.S.C. §1102(16), and also because it exercises discretionary authority or discretionary control respecting the management of the Plan or exercises authority or control respecting the management or disposition of its assets, and has

---

[8] *Id.*
[9] *Id.*

discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).[10]

> **2. Separate from its fiduciary responsibilities as the Plan administrator, Pentegra functioned as a fiduciary to the Plan and is an admitted party-in-interest.**

36.     Since at least 2007, the Board has retained Pentegra to provide recordkeeping and administrative services to the Plan for a period of five years. In 2013, with no competitive bidding, and all the time while Pentegra was serving as the fiduciary Plan administrator, the Board and Mr. Pinto again retained Pentegra to provide recordkeeping and administrative services to the Plan for a period of five years. After expiration of that five-year agreement, the Board "automatic[ally]" renews the agreement with Pentegra for a one-year period each subsequent year.

37.     On February 16, 2021, the Court ordered Defendants to produce the services agreements governing Pentegra's provision of services to the Plan. There were two separate services agreements in effect during the statutory period. The first is effective as of an undefined date in 2013,[11] and the second is effective December 1, 2018. These documents are referred to herein as the "Services Agreements". Each agreement is between the Plan and Pentegra. The Services Agreements were not the result of arm's-length bargaining. Mr. Pinto, who was a named fiduciary and Board member *prior* to the execution of the Services Agreement, executed the Services Agreements not on behalf of the Plan *but rather on behalf of Pentegra* as Pentegra's President and CEO.

---

[10] A plan administrator, by the nature of this position, will have "discretionary authority or discretionary responsibility in the administration" of the plan within the meaning of section 3(21)(A)(iii) of ERISA. 29 C.F.R. §2509.75-8 (D-3).

[11] According to the Plan's Form 5500, a new five-year agreement was purportedly entered into effective December 31, 2012.

38.    In accordance with these Services Agreements, Pentegra provides standard recordkeeping and administrative services to the Plan, such those related to enrollment, participant administration, preparation of required filings and participant communications. In providing these services to the Plan, as noted in public filings, Pentegra is a party-in-interest as defined by 29 U.S.C. §1002(14).

39.    In addition, Pentegra provides the Board with information to "assist the Plan in satisfying its fiduciary responsibility", including providing "necessary information to facilitate the initial selection and ongoing monitoring of plan investment funds, including quarterly performance reporting", "[o]versight of quarterly Plan Board meetings", and "preparation of minutes and documentation of deliberations of, and decisions by, the Plan Board." Pentegra also is responsible for "[b]enchmarking" Plan participant and Participating Employer fees. Further, as indicated *supra*, in a post-contract exercise of discretion, Pentegra assumed fiduciary responsibility to assess the reasonableness of its own fees. In assisting the Board in making decisions on behalf of the Plan, Pentegra is compensated for providing investment advice regarding the selection, monitoring and removal of Plan investments and service providers as defined by 29 U.S.C. §1002(21)(A)(ii) and is therefore a fiduciary to the Plan.

40.    Through the actions of its officers, employees and agents, Pentegra, as alleged herein, is a fiduciary under 29 U.S.C. §1002(21)(A) because it exercises discretionary authority or discretionary control respecting management of the Plan, exercises authority or control respecting management or disposition of Plan assets, or has discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii). Pentegra's executives, officers, employees and agents who undertook the acts alleged herein did so for the benefit of and as agents for Pentegra.

41.     Defendants did not negotiate a fixed Plan-level fee for the provision of recordkeeping and administrative services provided to the Plan or ensure that any amounts paid to Pentegra in excess of a reasonable negotiated fee were returned to the Plan or participant accounts. Rather, Pentegra received an uncapped, asset-based fee ranging from 28 basis points ("bps") to as high as 60 bps applied to the account balance of each Participating Employer's plan or subaccount (One basis point is equal to 1/100th of one percent). In addition to these asset-based fees, Plan participants paid an annual $75 per participant fee and Participating Employers also paid an annual base administrative fee of $1,950. Pentegra also was compensated through ancillary service fees, such as for distributions, participant loans, withdrawals from the Plan, and for the self-directed brokerage account.

42.     As a member of the Board, and far from an arm's-length relationship with a disinterested, third-party vendor, Pentegra's agent, its President and CEO participated in the persistent retention of Pentegra to provide recordkeeping, administrative, and investment advisory services to the Plan. As a result of its continued retention as a Plan service provider, from 2014 through the present, Pentegra has taken over $50 million in Plan assets as compensation for putative services rendered on behalf of the Plan.

43.     As reported in the Plan's Forms 5500, Pentegra's wholly owned subsidiary, Pentegra Trust Company, acts as a sub-advisor to certain proprietary collective investment trusts in the Plan called the Pentegra Advantage Asset Allocation Strategies. Pentegra Trust Company therefore served as an investment manager under 29 U.S.C. §1002(38).

44.     As the sub-advisor over these investments, Pentegra's wholly owned subsidiary receives asset-based investment management fees from the Plan. As of December 31, 2018, the Plan invested over $33 million in assets in these proprietary Pentegra investments.

45. In this role, Pentegra, acting through its wholly owned subsidiary, is a party-in-interest under 29 U.S.C. §1002(14).

## C. Unknown Plan fiduciaries

46. John Does 1–20 are unknown members of the Board and/or other Pentegra employees who exercise or exercised discretionary authority or discretionary control respecting the management of the Plan or exercise or exercised authority or control respecting the management or disposition of its assets, or have or had discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i)(ii) and (iii).

47. On May 13, 2020, the *Khan* Plaintiffs requested documents from the Plan administrator related to the operation and administration of the Plan. On June 22, 2020, the Plan administrator responded to that request but refused to provide documents related to the process that Defendants employed in making decisions on behalf of the Plan, such as Board meeting minutes and materials presented to the Board during those meetings. The Plan administrator also refused to provide the agreement between Pentegra and the Plan for services Pentegra provided to the Plan. A similar request for documents was made by the *Greenberg* Plaintiffs on June 12, 2020 which was met by a similar response from the Plan administrator on July 14, 2020 (*i.e.*, the refusal to provide documents related to Defendants' decision-making process).

## ERISA'S FIDUCIARY STANDARDS

48. ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a), states, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A) for the exclusive purpose of

(i) providing benefits to participants and their beneficiaries; and

>       (ii)   defraying reasonable expenses of administering the plan;

>   [and]

>       (B)   with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

49.    Under ERISA, fiduciaries that exercise any authority or control over plan assets, including, but not limited to, the selection of plan investments and service providers, must act prudently and for the *exclusive* benefit of participants in the plan, monitor the funds in the plan and remove imprudent or excessively expensive funds. Fiduciaries cannot act for the benefit of third parties, including service providers to the plan such as recordkeepers, affiliated businesses, brokerage firms, or managed account service providers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to service providers is no more than reasonable. 29 U.S.C. §1104(a)(1)(A)(ii); *see also* 29 U.S.C. §1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

50.    An ERISA fiduciary has a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828–29 (2015). Prudence requires a review at "regular intervals." *Id.* at 1828. When making investment decisions, an ERISA fiduciary "is duty-bound 'to make such investments and only such investments as a prudent [person] would make of his own property[.]'" *In re Unisys*, 74 F.3d 420, 434 (3d Cir. 1996) (quoting Restatement (Second) of Trusts §227 (1959)). "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *Id.* at 435.

51.     A defined contribution plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Instead, fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original); *see also* 29 C.F.R. §2550.404a-1; DOL Adv. Op. 98-04A; DOL Adv. Op. 88-16A. Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones" within a reasonable time. *Tibble*, 135 S. Ct. at 1828–29.

52.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
>
> (2)     if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

### BACKGROUND FACTS

## I.     Defined contribution retirement plan fees

53.     "Defined contribution plans dominate the retirement plan scene today." *LaRue v.*

*DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). In the private sector, such plans have largely replaced the defined benefit pension plans that were America's retirement system when ERISA was enacted in 1974. The consulting firm Towers Watson studied Fortune 100 companies from 1985 to 2012 and found that the type of retirement plan offered by the companies has essentially flipped over the last three decades.[12] The survey found that whereas in 1985, 89 of the Fortune 100 companies offered a traditional defined benefit plan, in 2012, only 11 of the Fortune 100 companies offered defined benefit plans to newly hired employees. Defined contribution plans have become America's retirement system.

54.     A fundamental difference between traditional pension plans and defined contribution plans is that in the former, the employer's assets are at risk. Because the employer is responsible for funding the pension plan to satisfy its commitments to employees, it bears all investment risks. In a defined contribution plan, the employees and retirees bear all investment risks.

55.     Each participant in a defined contribution plan has an individual account and directs plan contributions into one or more investment alternatives in a lineup chosen by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. Expenses, such as those for plan administration, "can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.*

56.     The fees of mutual funds and other investment alternatives are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the fund deducts

[12] Towers Watson, *Retirement Plan Types of Fortune 100 Companies in 2012*, TOWERS WATSON RESEARCH INSIDER, Oct. 2012.

1.0% of fund assets each year in fees, the fund's expense ratio would be 1.0%, or 100 basis points ("bps"). The fees deducted from a fund's assets reduce the value of the shares owned by fund investors.

57. The plan's fiduciaries have control over these expenses. The fiduciaries are responsible for hiring service providers, such as recordkeepers, and negotiating and approving those service providers' compensation. The fiduciaries also have exclusive control over the menu of investment alternatives to which participants may direct the assets in their accounts. Those selections each have their own fees that are deducted from the returns that participants receive on their investments.

58. These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of *28%* in savings at retirement.[13] Over a 40-year career, this difference in fees can reduce a participant's retirement savings by almost $500,000.[14]

59. Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for multi-billion-dollar plans, like the Plan, which have the bargaining power to obtain the highest level of service and the very lowest fees. The fees available to these plans are orders of magnitude lower than the much higher retail fees available to small investors.

---

[13] U.S. Dept. of Labor, *A Look at 401(k) Plan Fees,* at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf, *archived at* https://perma.cc/8KAR-W4JR.

[14] Michael Bird, *Pandemic Highlights Reasons for Reviewing Plan Fees,* PLANSPONSOR, May 15, 2020, https://www.plansponsor.com/pandemic-highlights-reasons-reviewing-plan-fees/, *archived at* https://perma.cc/8VCU-E7PC.

60.    The entities that provide services to defined contribution plans have an incentive to maximize their fees by putting their own higher-cost funds in plans, collecting the highest amount possible for recordkeeping. For each additional dollar in fees paid to a service provider, participants' retirement savings are directly reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers through investment returns. The level of diligence used by plan fiduciaries to control, negotiate, reduce the plan's fees, and safeguard plan assets directly affects participants' retirement security.

61.    Fiduciaries must be cognizant of service providers' self-interest in maximizing fees, and cannot simply accede to the providers' desires and recommendations by including proprietary funds that will maximize the provider's fees without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service providers' interest, fiduciaries must conduct their own independent investigation into the merits of a particular investment or service by considering alternatives.

## II.    Multiple employer plans experience substantial cost efficiencies for plan administration.

62.    A "'multiple employer plan' can refer to a variety of different kinds of employee-benefit arrangements" including sponsorship of a defined contribution retirement plan by "a group or association of employers." Definition of "Employer'' Under Section 3(5) of ERISA—Association Retirement Plans and Other Multiple-Employer Plans, 84 Fed.Reg. 37508, 37512 (July 31, 2019). "Grouping small employers together into a MEP" in this way can "facilitate savings through administrative efficiencies" and "price negotiation." *Id*. at 37533. MEPs such as this achieve economies of scale of large plans that provide a "distinct economic advantage[]" of lower administrative costs for individual employers. *Id*.

63.     MEPs create cost efficiencies in at least two ways: "First, as scale increases, marginal costs for MEPs . . . diminish and MEPs . . . spread fixed costs over a larger pool of member employers and employee participants, creating direct economic efficiencies. Second, larger scale may increase the negotiating power of MEPs." *Id*. Therefore, MEPs operating as a large single plan can secure low-cost administrative services from service providers.

64.     The comments submitted by the public regarding the DOL's proposed regulation referenced above reflect the industry-wide consensus that the MEP structure is desirable in large part because of increased efficiency and ability to obtain lower administrative costs. For example, the American Society of Association Executives and National Association of Manufacturers jointly wrote of the "opportunities under current law for pooled retirement programs, which underscore the benefits of the shared costs and other efficiencies that these plans allow[.]"[15] Likewise, the U.S. Chamber of Commerce wrote that with MEPs, "[c]osts are shared among the adopting employers, regardless of the number. This translates to substantial economies of scale and cost efficiencies over stand-alone plans for small businesses."[16]

65.     Because plans that bundle together employers offer significant cost efficiencies, they are able to spread costs across a larger participant and asset base.[17] Plan administration is simplified because administrative tasks are centralized and automated, and variations in plan design are minimized. Prudently managed, such plans reduce costs for every participant. The "substantial economies of scale and cost efficiencies" include, but are not limited, to a single

[15] https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/rules-and-regulations/public-comments/1210-AB88/00009.pdf, *archived at* https://perma.cc/9QBT-CUCA.

[16] https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/rules-and-regulations/public-comments/1210-AB88/00022.pdf, *archived at* https://perma.cc/BW9V-45H5.

[17] Newport Retirement Services, *The Impact of the Secure Act of Multiple Employer Plans*, https://www.newportgroup.com/NewportGroup/media/Documents/MEPS-PEPS-White-Pape-from-Newport.pdf, *archived at* https://perma.cc/2JQL-QDA4.

annual Form 5500 filing, a single periodic IRS qualification filing, and a single annual

independent audit.[18]

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

**I.**     **Defendants breached their fiduciary duties and engaged in prohibited transactions by failing to monitor and control the recordkeeping and administrative fees charged by Pentegra.**

    **A.**     **Prudent fiduciaries negotiate reasonable recordkeeping and administrative fees, monitor all sources of revenue paid to plan recordkeepers, regularly monitor plan fees and compare them to competitive market rates, and diligently negotiate fee reductions to benefit participants.**

       66.     Every defined contribution plan requires administrative services, such as

recordkeeping. The recordkeeper keeps track of the amount of each participant's investments in

the various options in the plan, and typically provides each participant with a quarterly account

statement. The recordkeeper often maintains a plan website or call center that participants can

access to obtain information about the plan and to review their accounts. The recordkeeper may

also provide access to investment education materials or investment advice. These services are

largely commodities, and the market for retirement plan administrative services is highly

competitive.

       67.     Numerous retirement plan administrative service providers in the marketplace are

capable of providing high levels of service and will vigorously compete to win and renew

contracts with a jumbo defined contribution plan. These providers will readily respond to a

request for proposal and will tailor their bids based on the desired services (*e.g*., recordkeeping,

website, call center, etc.). In light of the commoditized nature of these services, providers

---

    [18] Transamerica Retirement Services, *Multiple Employer Plans: An Opportunity for Expanding Retirement Plan Coverage*, https://www.ta-retirement.com/resources/5913-1010_final.pdf, *archived at* https://perma.cc/C24Q-6WXK.

primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for jumbo plans.

68. The cost of recordkeeping and administrative services depends on the number of participants (or participant accounts), not on the amount of assets in the participant's account.[19] Thus, the cost of providing recordkeeping and administrative services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account. Consequently, prudent fiduciaries negotiate a fixed dollar amount for the recordkeeper's annual compensation, usually based on a rate of a fixed dollar amount per participant. Because of economies of scale, large plans get lower effective rates per participant than smaller plans. Plans with 20,000 participants or more can obtain much lower rates per participant than a plan with 1,000 participants.

69. A study commissioned by the DOL in 1998 demonstrates these economies of scale, finding that as the number of plan participants increases, administrative costs per participant decrease.[20] Per the Study, the below expenses were based on quotations "of major 401(k) service providers."[21]

---

[19] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management—Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/attachments/global/Retirement/DC%20Fee%20Management%20-%20Mitigating%20Fiduciary%20Risk%20and%20 Maximizing%20Plan%20Performance.pdf, *archived at* https://perma.cc/25YA-9QG8 ("Conversely, utilizing a pricing model that is dependent on the value of plan assets arbitrarily 'builds in' fee increases that are not linked to the level or quality of the recordkeeper's services.") ("Mercer Best Practices").

[20] U.S. Dept. of Labor, *Study of 401(k) Plan Fees and Expenses* (1998), https://www.dol.gov/sites/default/files/ebsa/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf, *archived at* https://perma.cc/6HRK-FGA7.

[21] *Id.* at § 4.2.2 ("Recordkeeping and Administration Expenses").

| Number of Participants | Service Provider Cost Per Participant |
| --- | --- |
| 200 | $42 |
| 500 | $37 |
| 1,000 | $34 |

70.     Because these costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of plan assets.[22] Otherwise, as plan assets increase, such as through participant contributions or investment gains, the compensation increases without any change in the services, leading to unreasonable fees.[23]

71.     For example, if a plan has 50,000 participants, a fiduciary could negotiate a plan-level contract to pay the administrator $1,500,000 per year, based on a rate of $30 per participant fee per year. The negotiated $1,500,000 fee then can be assessed to participant accounts pro rata so that smaller accounts pay a smaller portion of the fee. If the plan's assets increase during the contract while the number of participants stays constant, the vendor's compensation does not change, because the services provided have not changed.

72.     A negotiated fixed-dollar compensation arrangement does not necessarily mean, however, that every participant in the plan must pay the same $30 administrative fee from his or her account. The fiduciary could reasonably determine that it is equitable to charge each participant the same $30 (for example, through a quarterly charge of $7.50 to each account in the plan). Alternatively, the fiduciary could conclude that assessing the same fee to all investors would discourage participants with relatively small accounts from participating in the plan; and

---

[22] Mercer Best Practices at 3 ("1. Price administrative fees on a per-participant basis.").

[23] *Id.* ("Negotiate a fixed-rate recordkeeping fee, based on the number of participants with account balances in the plan, that is independent of the investment structure (referred to as an 'open investment architecture' model). This approach, unlike an 'asset-based' or 'bundled' model, provides fee transparency and affords fiduciaries a sound basis for documenting the 'reasonableness' of recordkeeping fees. Conversely, utilizing a pricing model that is dependent on the value of plan assets arbitrarily 'builds in' fee increases that are not linked to the level or quality of the recordkeeper's services.").

that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge would be best. In that case, the rate of $30 per-participant multiplied by the number of participants would be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance while the plan pays only a fixed amount unrelated to asset size. If the plan in the example had $6 billion in assets, each participant would pay a direct fee of .025% of her account balance annual for recordkeeping ($1,500,000/$6,000,000,000 = .00025). As the plan assets increase thereafter, the *plan* is still paying the same $1,500,000 price that was negotiated at the plan level, but the fees paid by individual participants changes as they are proportionally allocated among participants based on account balance.

73.     To make an informed assessment as to whether a service provider is receiving no more than reasonable compensation for the services provided to a plan, prudent fiduciaries of defined contribution plans monitor *all* sources of compensation received by service providers and determine whether the compensation is reasonable.

74.     If a fiduciary decides to use an asset-based fee to pay for administrative services, prudent fiduciaries recognize that it is critical to (1) negotiate a fixed amount of compensation based on a reasonable rate per participant per year; (2) determine all asset-based fees, such as revenue sharing, and other sources of compensation the service provider receives from plan investment options; and then (3) recover all revenue sharing payments that exceed the negotiated compensation.

75.     Experts in the field agree that the most certain way to determine the least compensation a plan must pay for a desired level of recordkeeping and administrative services is to put the plan's services out for competitive bidding on a regular basis. Prudent fiduciaries do

this every three years.[24] For example, Fiduciary360's Prudent Practices for Investment Stewards is widely accepted as the global fiduciary standard of excellence.[25] The publication advised fiduciaries that they must determine "whether the fees are reasonable in light of the services provided" and "[c]onsideration is given to putting vendor contracts back out to bid every three years."[26]

76.     Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years." These Requests for Proposal ("RFPs") were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[27] DOL notes that fiduciaries conduct an RFP to assess the reasonableness of the service provider's fees every three to five years.[28]

---

[24] *See* Donald Stone, *Conducting a Successful Fee Review: How to determine whether plan fees are reasonable*, DEFINED CONTRIBUTION INSIGHTS, Jan./Feb. 2006, at 4 (stating "most reliable way of determining whether fees the plan is paying are reasonable" is through an RFP or an RFI search process); Tyler Polk, *Is it Time for a Change? Best Practice in Retirement Plan Record Keeper Searches*, FIDUCIARY INVESTMENT ADVISORS (April 2015); John Carl, *Including Regular RFPs as Part of a Fiduciary Liability Reduction Strategy*, Jan. 24, 2018 ("The DOL assumes that plan sponsors solicit RFPs for service providers every three to five years as part of their fiduciary duty to monitor plan service providers."), https://www.napa-net.org/news/technical-competence/case-of-the-week/including-regular-rfps-part-fiduciary-liability-reduction-strategy/, *archived at* https://perma.cc/E9SB-XCQ5; Roger Levy, *Selecting Service Providers, Competitive Bidding, & RFP's Importance in a Fiduciary Investment Process*, INHUB, May 18, 2015, https://d1yoaun8syyxxtcloudfront.net/br189-76a8e37a-950c-41a0-b246-47bb6162f4a4-v2, *archived at* https://perma.cc/2QTY-FD3S.

[25] *Prudent Practices for Investment Stewards* handbook defines the Global Fiduciary Standard of Excellence, initially published in April 2003, that was derived from a prior publication (*Prudent Investment Practices*) co-produced by the Foundation for Fiduciary Studies and the American Institute of Certified Public Accountants. This publication was written by Fiduciary 360, the identity brand for three related entities: the Foundation for Fiduciary Studies, the Center for Fiduciary Studies, and Fiduciary Analytics. The Foundation for Fiduciary Studies defines and substantiates specific investment fiduciary practices for trustees and investment committee members, investment advisors and investment managers and is widely used in the industry.

[26] Fiduciary360, *Prudent Practices for Investment Stewards*, Practices S-1.4, S-4.4 (2007).

[27] Rebecca Moore, *Most Recordkeeping RFPs to Benchmark Fees*, PLANSPONSOR, Jan. 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/, *archived at* https://perma.cc/Z47L-BUNB.

[28] U.S. Dept. of Labor, *Meeting Your Fiduciary Responsibilities*, at 5–6 (2012), https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

**B. Defendants caused the Plan to pay excessive and prohibited fees to Pentegra.**

77.     As the Plan administrator and by participating as a member of the Board in the repeated retention of Pentegra to provide services to the Plan, along with performing the fiduciary functions delegated to it by the Board, Pentegra exerted control over the Board's decisions with respect to the Plan. This interrelationship between Pentegra and the Board allowed Pentegra to exercise discretionary authority and control over the retention of itself as a Plan service provider without market competition, and enabled Pentegra to set its own compensation for Plan services. As described *infra*, Pentegra used the Plan to generate excessive recordkeeping and administrative fees to benefit itself. By repeatedly retaining Pentegra, and failing to negotiate and obtain a reasonable fee for Plan services, the Board in turn allowed Pentegra to receive excessive compensation for Plan administration, all to the detriment of Plan participants' retirement savings.

78.     Since at least 2007, and separate from serving as the Plan administrator, Pentegra has been the Plan's recordkeeper and "contract administrator". Each Participating Employer enters into an agreement to pay for services provided by Pentegra. As part of this arrangement, Plan participants pay Pentegra for recordkeeping and administrative expenses through an asset-based fee applied to each Plan investment. The asset-based fee represents a percentage of the fund's total expense ratio. According to the fee disclosure for the Plan dated November 4, 2019, "administration expenses" "are allocated to Plan participants on a pro rata basis" based on a participant's account balance. In addition to the asset-based fees paid from the Plan's investments, Participating Employers pay direct fees to Pentegra for administrative services.

79.     The Services Agreements confirm that the Board and Pentegra did not negotiate a fixed annual amount for the provision of Plan recordkeeping and administrative services provided by Pentegra. Rather, the Services Agreements specify uncapped asset-based fees

applied to each Participating Employer's account balance in the Plan and other direct charges to Plan participant accounts and their employers. These payments were not based on the actual cost of providing recordkeeping and administrative services because such cost is based on the number of participant accounts Pentegra is required to recordkeep in the Plan.

80.     Because the Services Agreements did not include a Plan-level fixed annual fee for Pentegra's compensation, Defendants never negotiated for the return of any amounts paid to Pentegra above a reasonable negotiated fee to the Plan or participant accounts. Rather, despite assuming fiduciary responsibility to ensure that its own fees were reasonable, Pentegra subsequently retained all amounts that exceeded a reasonable recordkeeping and administrative fee regardless of the actual cost to provide those services. By doing so, Pentegra had complete control over its total compensation from all sources, and therefore is a fiduciary over those fees.

81.     Defendants engaged in a systematic pattern of causing the Plan to pay unnecessary and unreasonable expenses to Pentegra and using Plan participants' retirement assets for their own benefit. For instance, in 2010, Plan assets were also used to make a $7,370 payment to the Ritz Carlton Naples and $5,015 payment to the New York Palace Hotel presumably for Defendants' personal benefit. In addition, Plan participants paid for "board of director expenses", among other expenses, which were included in the total administrative fee charged to Plan participants' accounts.

82.     From 2014 through 2018, Defendants caused the Plan to pay Pentegra asset-based compensation of over $50 million for recordkeeping and administrative services. As reported by the Plan's Forms 5500, these amounts are reflected in the following table by year:

| Year | Amount |
|-------|----------------|
| 2014 | $9,521,031.00 |
| 2015 | $9,923,100.00 |
| 2016 | $10,057,640.00 |
| 2017 | $10,163,370.00 |
| 2018 | $10,584,935.00 |
| **Total** | **$50,250,076.00** |

83.     Defendants allowed Pentegra to exercise complete control over its compensation. This is shown by Pentegra's ever increasing asset-based compensation each year for Plan services even though the services Pentegra provided to the Plan remained the same. The Services Agreements confirm that the services provided by Pentegra remained the same from 2013 through the present. Exhibit 1 to the Services Agreement outlines the services Pentegra provided to Participating Employers and Plan participants. The services itemized therein are *verbatim* between the two agreements with one minor and immaterial exception.[29]

84.     With no negotiated fixed fee for these services, Defendants failed to recover excess fees paid to Pentegra and rebate them back the Plan or participant accounts. The increase in the amounts paid per participant confirms that Defendants took no action to monitor or control Pentegra's compensation. According to the Plan's Forms 5500, in 2014, the Plan had $1.9 billion in assets and 26,469 participants with account balances. During that year, the Plan paid Pentegra at least $9.52 million in direct recordkeeping and administration fees, or $359.70 per participant. By 2018, the Plan had grown to $2.1 billion in assets and 27,227 participants with account balances. This resulted in the Plan paying Pentegra at least $10.58 million in recordkeeping and administrative fees, or $388.77 per participant.

---

[29] In the 2018 Services Agreement (§1.2), Pentegra contracted to provide mid-year compliance testing. However, Pentegra already performed such testing annually.

85.     Pentegra's increasing compensation each year since 2009 is also graphically depicted below. This increase in compensation occurred during a period when recordkeeping and administrative fees charged to defined contribution plans were declining in the industry.[30]



86.     Defendants failed to loyally and prudently monitor and control the Plan's recordkeeping and administrative fees. Although the Plan's assets and number of participants with account balances increased from 2013 through the present, thereby dramatically increasing the total compensation to Pentegra, Defendants never negotiated a reduction in the recordkeeping and administrative fees paid to Pentegra and subsequently Pentergra retained the excess. The Services Agreements specify the *same* asset-based fees and administrative fees that were effective January 1, 2014 and December 1, 2018. In fact, the only changes that occurred in 2018 were to increase the amounts paid to Pentegra for certain ancillary services.

---

[30] Pentegra Defined Contribution Plan for Financial Institutions Forms 5500 (2009–2018); NEPC, *Defined Contribution Plan Fees Continue To Decline: 2013 NEPC Plan & Fee Study*; NEPC, *NEPC 2014 Defined Contribution Plan & Fee Survey: What Plan Sponsors Are Doing Now*; NEPC, *Corporate Defined Contribution Plans Report Flat Fees*.

87. Although Pentegra had the fiduciary responsibility to monitor the reasonableness of its own compensation, Pentegra failed to lawfully perform this duty. Pentegra was under a profound conflict of interest between acting in the exclusive best interest of Plan participants while also seeking to maximize its revenue from the fees it derived from Plan services. This conflict of interest prevented Pentegra from properly assessing the reasonableness of its own compensation. By failing to act prudently and solely in the interest of the Plan and its participants when monitoring the Plan's recordkeeping and administrative fees, Pentegra caused the Plan pay unreasonable compensation to itself. The Board allowed this to occur given its conflicted relationship with Pentegra.

88. Defendants' and Pentegra's failure to monitor and control Pentegra's compensation is shown by a comparison of the Plan's fees to the fees charged to other defined contribution plans for the same or similar services. A comparable large corporate 401(k) plan recordkept by Hewitt Associates, LLC (nka Alight) during the relevant period is Nike Inc.'s 401(k) Plan. With approximately 19,000 to 26,000 participants, the Plan paid $21 per participant for recordkeeping services in 2012 and 2016.[31]

89. Another large plan, the New Albertson's Inc. 401(k) plan left Fidelity Investments Institutional Operations Company, Inc. ("Fidelity") in 2016 and contracted with the Vanguard Group, Inc. for recordkeeping and administrative services at a fixed annual fee of $31 per participant.[32] In 2016, this plan had approximately 31,000 participants.[33] Similarly, the

---

[31] Nike, Inc. 2016 Form 5500 with 26,568 participants with an account balance and compensation to recordkeeper, Hewitt. Nike, Inc. 2012 Form 5500 with 19,362 participants with an account balance and compensation to recordkeeper, Hewitt. No additional source of compensation to Hewitt is identified or discernable on the Forms 5500.

[32] New Albertson's Inc. 401(k) Plan Fee Disclosure, *Cates v. Tr. of Columbia Univ.*, No. 16-6524, Doc. 292-6 (S.D.N.Y. July 1, 2019); Form 5500 for 2016 for New Albertson's Inc. 401(k) Plan and Master Trust Form 5500.

[33] Form 5500 for 2016 for New Albertson's Inc. 401(k) Plan and Master Trust Form 5500.

Albertson's LLC 401(k) Plan, with approximately 17,200 plan participants in 2016, paid approximately $29 per participant for recordkeeping services.[34]

90.     Fidelity recently stipulated in litigation that the value of the recordkeeping services it provided to its own 55,000-participant plan was $21 per participant in 2014, $17 per participant in 2015 and 2016, and $14 per participant after 2017. *Moitoso v. FMR LLC*, --- F.Supp.3d ----, 2020 WL 1495938, at *15 (D. Mass. Mar. 27, 2020) ("The parties have stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14–$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper."); *Moitoso v. FMR, LLC*, No. 18-12122, Doc. 138-67 at 3–4 (D. Mass.) (stipulating to the recordkeeping fees discussed above and further stipulating that "[h]ad the Plan been a third-party plan and negotiated a fixed fee for recordkeeping services at arms-length with Fidelity, it could have obtained recordkeeping services for these amounts during the period.").

91.     The Chevron Employee Savings Investment Plan, with approximately 34,000 participants as of December 31, 2018, obtained a $26 per-participant fee for administrative services following an "extensive review of the leading vendors who provide record-keeping services for plan similar to the (Employee Savings Investment Plan)," which led to the replacement of Vanguard with Fidelity as the plan's recordkeeper.[35] And effective January 2, 2020, the ConocoPhillips Savings Plan, with approximately 15,000 participants, obtained a $33

---

[34] Form 5500 for 2016 for Albertson's LLC 401(k) Plan and Master Trust Form 5500.

[35] Chevron Employee Savings Investment Plan, Participant Disclosure Notice, Jan. 2018, at p. 5; Pensions&Investments, "Chevron taps Fidelity as New 401(k) plan record keeper", Oct. 10, 2017, http://www.pionline.com/article/20171010/ ONLINE/171019992/chevron-taps-fidelity-as-new-401k-plan-record-keeper, *archived at* https://perma.cc/LQ8S-FNKK; *see also* Form 5500 for 2018 for Chevron Employee Savings Investment Plan.

per-participant fee for administrative services following a change of its recordkeeper from Vanguard to Fidelity.[36]

92.     These examples demonstrate that Defendants could have obtained a reasonable fee for similar recordkeeping and administrative services at far lower rates had they discharged their fiduciary obligations.

93.     The amount Pentegra was paid for recordkeeping and administrative services was not justified by the Plan's MEP structure. That is particularly so because the Plan, as an MEP, had substantial economies of scale and cost efficiencies to secure low-cost recordkeeping and administrative services. For instance, the Plan had uniform features across all its participating employers and the operation and administration of the Plan are governed by a single Plan document. The Plan also contains eligibility and vesting procedures that are generally the same for all Participating Employers. Any differences between Participating Employers regarding these provisions can be easily automated.

94.     Pentegra concedes that the Plan's pooled administrative structure should have enabled the Plan to obtain low-cost recordkeeping and administrative fees. Pentegra has written about the economies of scale, simplified administration, and expected cost savings to employers by participating in large MEPs. For example, in a marketing brochure entitled "The Pentegra Multiple Employer Plan Advantage," Pentegra wrote:

> Why Join a MEP?
>
> Economies of Scale
> MEPs make it easy to offer a high-quality retirement program to any size employer. By collectively participating, employers are able to leverage their combined purchasing power to access institutional quality features in a ***more cost-effective manner than single employer plans can access on their own***.

---

[36] ConocoPhillips Savings Plan Participant Disclosure Notice, Jan. 2020, https://hrcpdocctr.conocophillips.com/Documents/2020_Annual_Enrollment/Fidelity_Transition_Guide.pdf, *archived at* https://perma.cc/TM5P-X7TJ; *see also* Form 5500 for 2018 for ConocoPhillips Savings Plan.

Simplified Plan Administration
MEPs simplify plan administration . . . .

(emphasis added).[37]

95.     The excessive fees Pentegra charged to the Plan are further demonstrated based on a comparison to similarly situated MEP plans. A large MEP comparable in size and function to the Plan is the CBERA Plan A sponsored by the Cooperative Banks Employees Retirement Association. Like the Plan, CBERA Plan A is a large MEP for employees of financial institutions.[38] It has over 40 participating employers, nearly 5,000 participants, and over $600 million in assets. Given its size relative to the Plan, the CBERA Plan A had substantially less bargaining power than the Plan to demand low recordkeeping and administrative fees. Nevertheless, based on the CBERA Plan A's Form 5500 for 2019, the plan paid the outside plan administrator $65 per participant (or $324,000). Even combining (1) the fees paid to the "contract administrator" and (2) the reported direct and indirect compensation to the plan's outside recordkeeper, the CBERA Plan A reportedly paid an average of just $80 per participant in 2019. In contrast, the Plan paid Pentegra $388 per participant for similar services in 2018, which was 485% higher.

96.     As a Plan fiduciary with control over the administration of the Plan, Pentegra, through its executives, officers, employees and agents, and through its direct participation on the Board, caused the Plan to retain Pentegra as the Plan's recordkeeper and contract administrator, thereby causing the Plan to pay Plan assets to Pentegra. The Board, which included the President of Pentegra, acted to benefit Pentegra by renewing and continuing Pentegra's relationship with

---

[37] https://www.pentegra.com/wp-content/uploads/2018/05/The-Multiple-Employer-Plan-MEP-Advantage-for-Plan-Sponsors.pdf, *archived at* https://perma.cc/Z5FQ-VREH**.**
[38] http://cbera.com/index.htm, *archived at* https://perma.cc/7KTR-UZH9.

the Plan each year with no competitive bidding from competing vendors, and ensured that Pentegra continued to receive increasing asset-based compensation despite the services Pentegra rendered remaining the same.

97.　　The payments made to Pentegra were excessive relative to the market rate for Pentegra's services. Based on the Plan's features, the nature and type of recordkeeping and administrative services provided by Pentegra, the number of Plan participants and Participating Employers, and the recordkeeping market, the outside limit of a reasonable recordkeeping and administrative fee in the time frame from 2014 through the present would have been $1.7 million per year (or at most $65 per participant with an account balance). This is significantly greater than the fee other large plans administered by prominent firms were able to obtain after requests for proposal during the period, including those described herein.

98.　　This fee also approximately reflects the median fee for defined contribution plans during the statutory period.[39] This median fee is a conservative estimate of a reasonable fee for the Plan because it was derived from a survey of much smaller plans than the Plan. These smaller plans would have paid higher fees than mega or jumbo defined contribution plans because they did not have equivalent economies of scale and substantial bargaining power to obtain low recordkeeping and administrative fees.

99.　　Based on compensation disclosed in the Plan's Form 5500s filed with the Department of Labor, the Plan paid approximately $9.5 million to $10.5 million (or approximately $360 to $389 per participant) per year from 2014 to 2018, nearly *600%* higher

---

[39] *See* NEPC, *Defined Contribution Plan Fees Continue To Decline: 2013 NEPC Plan & Fee Study*; NEPC, *NEPC 2014 Defined Contribution Plan & Fee Survey: What Plan Sponsors Are Doing Now*; NEPC, *Corporate Defined Contribution Plans Report Flat Fees.*

than a reasonable fee for the services rendered by Pentegra. This resulted in millions of dollars in excessive fees each year.

100.     The foregoing facts demonstrate that Defendants failed to engage in a loyal and prudent process to ensure that only reasonable fees were charged for recordkeeping and administrative services. In light of the excessive payments the Plan made to Pentegra each year, it is evident that Defendants failed to engage an independent fiduciary to review and approve the arrangement between Pentegra and the Plan. Defendants failed to take action to determine whether Pentegra's services were necessary for the administration of the Plan, that the charges were reasonable and that the quality of the services and the amount of the charges were equivalent to what an independent third party would charge, and that Pentegra was paid only its direct expenses incurred in providing necessary services to the Plan.

101.     In light of the systematic pattern of Pentegra using Plan assets to benefit itself, coupled with the extreme disparity between reasonable compensation for Plan administration and the compensation Pentegra received for those services, it is also evident that Pentegra charged Plan participants expenses unrelated to the operation and administration of the Plan, such as for marketing and soliciting Participating Employers to adopt the Plan. In marketing the Plan to Participating Employers, Pentegra employs a dedicated sales staff to sell its retirement plan services and grow its business. Pentegra regularly publishes and distributes marketing materials to encourage employers to adopt the Plan. Plan participants derive no benefit from any expenses they may incur to fund Pentegra's marketing efforts.

102.     As further shown by the consistent increase in compensation paid to Pentegra despite the fact that Pentegra provided the same services to the Plan each year, it is readily apparent that Defendants failed to conduct a competitive bidding process for the Plan's

recordkeeping and administrative services. Their actions are contrary to industry practices and the recommendation of the Department of Labor. A competitive bidding process for the Plan's recordkeeping and administrative services would have produced a reasonable fee for the Plan.

103.    By failing to discharge their fiduciary obligations, Defendants caused the Plan to pay over $50 million in total payments to Pentegra. That has caused over $70 million in losses, accounting for the lost investment gains on those assets. As measured by a reasonable market rate for Plan services rendered by Pentegra, Defendants caused the Plan to suffer over $60 million in losses through unreasonable fees.[40]

## II.    Defendants breached their fiduciary duties by causing the Plan to invest in higher-cost shares of the Plan's investments.

104.    When providing investments to plan participants, the importance of fees cannot be overstated. Indeed, "the duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule" under the common law of trusts, which informs ERISA's fiduciary duties. RESTATEMENT (THIRD) OF TRUSTS ch. 17, intro. note (2007); *see Tibble*, 135 S. Ct. at 1828 (citing RESTATEMENT (THIRD) OF TRUSTS §90 in finding a continuing duty to monitor under ERISA). As the Restatement explains, "cost-conscious management is fundamental to prudence in the investment function." RESTATEMENT (THIRD) OF TRUSTS §90 cmt. b.

105.    It is a simple principle of investment management that the larger amount an investor has available to invest, the lower the investment management fees that can be obtained in the market for a given investment vehicle. Large retirement plans have substantial bargaining power to negotiate low fees for investment management services. Multi-billion-dollar defined contribution plans, such as the Plan, have even greater bargaining power.

---

[40] Plan losses have been carried forward using the investment return of an S&P 500 index fund, the Vanguard Institutional Index (VIIIX), to account for lost investment returns on those assets.

106.     Mutual funds and collective trusts frequently offer multiple share classes, which are often classified as either "retail" class or "institutional" class. Retail share classes are marketed to individuals with small amounts to invest. Institutional share classes are offered to investors with large amounts to invest, such as large retirement plans. The different share classes of a given mutual fund or collective trust have the identical investment manager, are managed identically, invest in the same portfolio of securities, and allocate their assets the same. The only difference is that retail shares charge significantly higher fees, resulting in retail class investments receiving lower returns. The share classes are otherwise identical in all respects.

107.     Because the only difference between the share classes is fees, selecting higher-cost shares results in the plan paying wholly unnecessary fees. Accordingly, absent a compelling reason to opt for the higher-cost version, prudent fiduciaries will select the lowest-cost share class available to the plan. The fiduciaries must consider the size and purchasing power of their plan and select the share classes that a fiduciary who is knowledgeable about such matters would select under the circumstances.[41]

108.     Given the Plan is a mega plan based on its size, the Plan had tremendous bargaining power to obtain share classes with far lower costs than higher-cost shares. Lower-cost share classes of mutual fund and collective investment trust investments were readily available to the Plan. To the extent the Plan's investments advertised minimum investment thresholds for the lowest-cost institutional shares, the investment provider would have waived those requirements based on the Plan's size, if Defendants had requested such waiver. *Tibble v. Edison Int'l*, No. 07-5359, 2010 WL 2757153, at *9 (C.D. Cal. July 8, 2010), *aff'd* 729 F.3d 1110 (9th Cir. 2013).

---

[41] Fred Reish, *Class–ifying Mutual Funds*, PLANSPONSOR (Jan. 2011), http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

109.    Defendants had the fiduciary authority or responsibility over the selection, retention and monitoring of the share class used for each of the Plan's investments. Despite the fact that lower-cost shares for the exact same investment option were available to the Plan, Defendants selected and continue to retain higher-cost shares for the Plan investment options than were available to the Plan based on its enormous size. The Plan included the following higher-cost investments, which were up to 9,233% more expensive than the identical lower-cost alternatives:

**Mutual Funds**

| Plan Mutual Fund | Plan Fee | Identical Lower Cost Mutual Fund | Identical Lower Cost Fee | Plan's Excess Cost |
|---|---|---|---|---|
| American Beacon Large Cap Value (Inst) (AADEX) | 0.62% | American Beacon Large Cap Value (R6) (AALRX) | 0.58% | 6.90% |
| Principal MidCap (Inst) (PCBIX) | 0.68% | Principal MidCap (R6) (PMAQX) | 0.60% | 13.33% |
| T. Rowe Price Blue Chip Growth (TRBCX) | 0.72% | T. Rowe Price Blue Chip Growth (I) (TBCIX) | 0.58% | 24.14% |

**Collective Trusts**

| Plan State Street Collective Trusts | Plan Fee | Identical Lower Cost Collective Trust | Identical Lower Cost Fee | Plan's Excess Cost |
|---|---|---|---|---|
| SSgA Aggressive Strategic Balanced SL CIT | 0.36% | SSgA Aggressive Strategic Balanced SL CIT (I) | 0.02% | 1700% |
| SSgA Cash Series U.S. Government p | 0.35% | SSgA Cash Series U.S. Government (G) | 0.080% | 338% |
| SSgA Conservative Strategic Balanced SL CIT | 0.36% | SSgA Conservative Strategic Balanced SL CIT (I) | 0.02% | 1700% |
| SSgA International Index NL CIT (A) | 0.34% | SSgA International Index NL CIT (A) | 0.025% | 1260% |

| Plan State Street Collective Trusts | Plan Fee | Identical Lower Cost Collective Trust | Identical Lower Cost Fee | Plan's Excess Cost |
|---|---|---|---|---|
| SSgA Moderate Strategic Balanced SL CIT | 0.36% | SSgA Moderate Strategic Balanced SL CIT (I) | 0.02% | 1700% |
| SSgA NASDAQ 100 Index NL CIT (A) | 0.34% | SSgA NASDAQ 100 Index NL CIT (A) | 0.012% | 2733% |
| SSgA REIT Index NL CIT (A) | 0.34% | SSgA REIT Index NL CIT (A) | 0.012% | 2733% |
| SSgA Russell Large Cap Growth Index SL CIT | 0.31% | SSgA Russell Large Cap Growth Index SL CIT (I) | 0.012% | 2483% |
| SSgA Russell Large Cap Value Index SL CIT | 0.31% | SSgA Russell Large Cap Value Index SL CIT (I) | 0.012% | 2483% |
| SSgA Russell Small Cap Index NL CIT (A) | 0.32% | SSgA Russell Small Cap Index NL CIT (A) | 0.012% | 2567% |
| SSgA S&P 500 Index NL CIT (A) | 0.28% | SSgA S&P 500 Index NL CIT (A) | 0.003% | 9233% |
| SSgA S&P Mid Cap Index SL CIT (A) | 0.31% | SSgA S&P Mid Cap Index SL CIT (A) | 0.012% | 2483% |
| SSgA Target Retirement 2010 NL CIT (A) | 0.37% | SSgA Target Retirement 2010 NL CIT (A) | 0.03% | 1133% |
| SSgA Target Retirement 2015 NL CIT (A) | 0.37% | SSgA Target Retirement 2015 NL CIT (A) | 0.03% | 1133% |
| SSgA Target Retirement 2020 NL CIT (A) | 0.37% | SSgA Target Retirement 2020 NL CIT (A) | 0.03% | 1133% |
| SSgA Target Retirement 2025 NL CIT (A) | 0.37% | SSgA Target Retirement 2025 NL CIT (A) | 0.03% | 1133% |
| SSgA Target Retirement 2030 NL CIT (A) | 0.37% | SSgA Target Retirement 2030 NL CIT (A) | 0.03% | 1133% |
| SSgA Target Retirement 2035 NL CIT (A) | 0.37% | SSgA Target Retirement 2035 NL CIT (A) | 0.03% | 1133% |
| SSgA Target Retirement 2040 NL CIT (A) | 0.37% | SSgA Target Retirement 2040 NL CIT (A) | 0.03% | 1133% |

| Plan State Street Collective Trusts | Plan Fee | Identical Lower Cost Collective Trust | Identical Lower Cost Fee | Plan's Excess Cost |
|---|---|---|---|---|
| SSgA Target Retirement 2045 NL CIT (A) | 0.37% | SSgA Target Retirement 2045 NL CIT (A) | 0.03% | 1133% |
| SSgA Target Retirement 2050 NL CIT (A) | 0.37% | SSgA Target Retirement 2050 NL CIT (A) | 0.03% | 1133% |
| SSgA Target Retirement 2055 NL CIT (A) | 0.37% | SSgA Target Retirement 2055 NL CIT (A) | 0.03% | 1133% |
| SSgA Target Retirement 2060 NL CIT (A) | 0.37% | SSgA Target Retirement 2060 NL CIT (A) | 0.03% | 1133% |
| SSgA Target Retirement Income NL CIT (A) | 0.37% | SSgA Target Retirement Income NL CIT (A) | 0.03% | 1133% |
| SSgA U.S. Bond Index NL CIT (A) | 0.32% | SSgA U.S. Bond Index NL CIT (A) | 0.012% | 2567% |
| SSgA U.S. Inflation Protected Bond NL CIT (A) | 0.31% | SSgA U.S. Inflation Protected Bond NL CIT (A) | 0.012% | 2483% |
| SSgA U.S. Long Treasury Index NL CIT (A) | 0.32% | SSgA U.S. Long Treasury Index NL CIT (A) | 0.012% | 2567% |

**Stable Value Fund**

| Plan MetLife Fund | Plan Fee | Identical Lower Cost MetLife Fund | Identical Lower Cost Fee | Plan's Excess Cost |
|---|---|---|---|---|
| MetLife Stable Value, Series 25053 (0) | 0.90% | MetLife Stable Value, Series 25053 (0) | 0.62% | 45.16% |

110. At all relevant times, the Plan's investment options also charged unreasonable investment management fees relative to alternatives that were readily available to the Plan, including separately managed accounts and collective trust investments.

111.     By providing Plan participants the more expensive share classes of the Plan's investments, Defendants caused Plan participants to lose over $37 million of their retirement savings.[42]

## CLASS ACTION ALLEGATIONS

112.     29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

113.     In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the Pentegra Defined Contribution Plan for Financial Institutions from September 15, 2014 through the date of judgment, excluding Defendants.

114.     This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.     The Class includes over 25,000 members and is so large that joinder of all its members is impracticable.

b.     There are questions of law and fact common to the Class because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and made omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following,

---

[42] Plan losses have been carried forward using the investment return of an S&P 500 index fund, the Vanguard Institutional Index (VIIIX), to account for lost investment returns on those assets.

without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breaches of duty.

      c.     Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

      d.     Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with any other member of the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

      e.     Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

115.     A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

## COUNT I: BREACH OF FIDUCIARY DUTIES RELATED TO EXCESSIVE RECORDKEEPING AND ADMINISTRATIVE FEES (29 U.S.C. §1104(a)(1))

116.     Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

117.     This Count alleges breach of fiduciary duties against all Defendants.

118.     Defendants were required to discharge their duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

119.     If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798–99 (7th Cir. 2011).

120.     Separately, failing to "monitor and control recordkeeping fees" and "paying excessive revenue sharing" as a result of failures to "calculate the amount the Plan was paying . . . through revenue sharing," to "determine whether [the recordkeeper's] pricing was competitive," and to "leverage the Plan's size to reduce fees," while allowing the "revenue sharing to benefit"

a third-party recordkeeper "at the Plan's expense" is a breach of fiduciary duties. *Tussey,* 746 F.3d at 336.

121.    Defendants used a flawed and conflicted fiduciary process for monitoring and controlling the Plan's recordkeeping and administrative fees. In contrast to the actions of hypothetical and real-world prudent fiduciaries of similar defined contribution plans, Defendants failed to: monitor the amount of the fees received by the Plan's service providers, determine if those amounts were competitive or reasonable for the services provided to the Plan, use the Plan's size to reduce fees, or obtain sufficient rebates to the Plan for the excessive fees paid by participants. Moreover, Defendants failed to solicit bids from competing providers, which is the surest way to determine the market rate for the Plan's services. This conduct was a breach of fiduciary duties.

122.    Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

123.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

124.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

125.     As a result of the actions as described above, including the execution of the Services Agreements by its President John Pinto, Pentegra is further liable for the breaches of duties by its President, officers, employees and agents. The acts of Pentegra's executives, officers, employees and agents were committed within the scope of their employment and their conduct is the natural consequence of their employment. As a result of the above, and under the laws of agency, including *respondeat superior*, Pentegra, through the acts of its President, officers, and employees is responsible for the losses caused to the Plan.

## COUNT II: PROHIBITED TRANSACTIONS
### (29 U.S.C. §1106(A)(1)(A), (A)(1)(B)–(D); (B)(1)–(2); 29 U.S.C. §1132(A)(3))

126.     Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

127.     This Count is asserted against all Defendants.

128.     Section 1106(b) prohibits transactions between a plan and a fiduciary. 29 U.S.C. §1106(b).

129.     Defendants are fiduciaries and caused the Plan to retain Pentegra as recordkeeper and "contract administrator," to use Pentegra collective investment trusts called the Pentegra Advantage Asset Allocation Strategies, and to pay Plan assets to Pentegra. Defendants therefore dealt with the assets of the Plan in their own interest or for their own account, in violation of 29 U.S.C. §1106(b)(1); acted in a transaction involving the Plan on behalf of a party whose interests were adverse to the interests of the Plan, its participants and beneficiaries, in violation of 29 U.S.C. §1106(b)(2); and received consideration for their own personal account from parties dealing with the Plan in connection with transactions involving the assets of the Plan, in violation of 29 U.S.C. §1106(b)(3).

130. Section 1106(a) prohibits transactions between a plan and a party in interest. 29 U.S.C. §1106(a).

131. Pentegra is a party in interest because it is an entity providing services to the Plan. 29 U.S.C. §1002(14)(A) and (B). Defendants caused the Plan to retain Pentegra as recordkeeper and "contract administrator," to use Pentegra collective investment trusts, and to pay Plan assets to Pentegra. Defendants therefore caused the Plan to engage in a transaction that they knew or should have known constituted an exchange of property between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(A); engage in a transaction they knew or should have known constituted the furnishing of services between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(C); and engage in a transaction they knew or should have known constituted a transfer of Plan assets to a party in interest in violation of 29 U.S.C. §1106(a)(1)(D).

132. Even if Pentegra were found not to be a fiduciary of the Plan, it is still liable as a non-fiduciary "party in interest" who knowingly participated in a prohibited transaction. Under 29 U.S.C. §1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. A defendant may be liable under that section regardless of whether it is a fiduciary. A nonfiduciary transferee of ill-gotten proceeds is subject to equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

133. Pentegra had actual or constructive knowledge that the Plan using Pentegra's proprietary services and payment of Plan assets to Pentegra were unlawful. Pentegra knew or should have known that the Board's conflicted decision to use proprietary Pentegra recordkeeping and contract administrator services and Pentegra-subadvised investments for the

Plan allowed Pentegra to benefit financially through excessive fees paid by the Plan and at the expense of the Plan's participants. Pentegra had such actual or constructive knowledge because the President of Pentegra was a member of the Board.

134. Each Defendant knew or should have known that the act or practice of using Pentegra-subadvised investments and Pentegra proprietary recordkeeping and administrative services in the Plan constituted a direct or indirect furnishing of services between the Plan and a party in interest for more than reasonable compensation or a transfer of assets of the Plan to a party in interest.

135. Each Defendant knew or should have known that the act or practice of using Pentegra-subadvised investments and Pentegra proprietary recordkeeping and administrative services in the Plan constituted transactions in which Plan fiduciaries dealt with the assets of the Plan in their own interest or for their own account, transactions involving the Plan on behalf of parties whose interests were adverse to the interests of the Plan, its participants and beneficiaries, or transactions in which a Plan fiduciary received consideration for its own personal account from parties dealing with the Plan in connection with transactions involving the assets of the Plan.

136. Pentegra participated in the prohibited transactions described above and knowingly received excessive fees paid from Plan assets.

137. To the extent any proceeds from those transactions and the profits Pentegra made through the use of Plan assets are not otherwise recovered, the Court should order restitution and disgorgement under 29 U.S.C. §1132(a)(3) to restore those funds to the Plan.

138. Pentegra has not dissipated the entirety of the proceeds on nontraceable items, and the proceeds can be traced to particular funds or property in Pentegra's possession.

139.     Total losses to the Plan will be determined after complete discovery in this case and are continuing.

140.     Under 29 U.S.C. §1109(a), each Defendant is personally liable to make good to the Plan any losses resulting from the breaches of fiduciary duties and prohibited transactions alleged in this Count, and to restore all profits through their use of Plan assets, and is subject to other appropriate equitable or remedial relief, including removal as a Plan fiduciary.

141.     Each Defendant knowingly participated in these transactions with knowledge that the transactions were a breach, enabled the other Defendants to cause the Plan to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy or discontinue the transaction. In particular, the Board and its individual members as named fiduciaries, their delegations of fiduciary duties to Pentegra, and signatory to the services agreement with Pentegra were knowledgeable and aware that the transactions were a breach. Pentegra, as Plan administrator, the role of its president as a Board member, and its role as a service provider receiving the benefits from those transactions was knowledgeable and aware that the transactions were a breach. Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

142.     As a result of the actions as described above, Pentegra is further liable for engaging in the transactions alleged herein by its president, officers, employees and agents. The acts of Pentegra's executives, officers, employees and agents were committed within the scope of their employment and their conduct is the natural consequence of their employment. As a result of the above, and under the laws of agency, including *respondeat superior*, Pentegra, through the acts of its President, officers, and employees is liable for restoring all proceeds and losses attributable to these transactions.

## COUNT III: BREACH OF FIDUCIARY DUTIES RELATED TO UNREASONABLE INVESTMENT MANAGEMENT FEES
## (29 U.S.C. §1104(a)(1))

143.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

144.    This Count alleges breach of fiduciary duties against all Defendants.

145.    Defendants breached their duties of loyalty and prudence under 29 U.S.C. §1104(a)(1)(A) and (B) by selecting and retaining as Plan investment options higher-cost shares of mutual funds and collective investment trusts, including proprietary Pentegra investments, that charged unreasonable investment management fees relative to other investment options that were available to the Plan at all relevant times, including separately managed accounts, collective investment trusts, and lower-cost share classes for the Plan's mutual fund and collective investment trust investments with the identical investment manager and investments.

146.    Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

147.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

148.    As a result of the actions as described above, Pentegra is further liable for the breaches of duties by its president, officers, employees and agents. The acts of Pentegra's

executives, officers, employees and agents were committed within the scope of their employment and their conduct is the natural consequence of their employment. As a result of the above, and under the laws of agency, including *respondeat superior*, Pentegra, through the acts of its President, officers, and employees is responsible for the losses caused to the Plan.

## COUNT IV: FAILURE TO MONITOR FIDUCIARIES

149. Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

150. This Count is asserted against the Board and its individual members, including John E. Pinto, Sandra L. McGoldrick, Lisa A. Schlehuber, Michael N. Lussier, William E. Hawkins, Jr., Brad Elliott, and George W. Hermann.

151. The Board and its individual members were named fiduciaries with the overall responsibility for the control, management and administration of the Plan, which included the duty to monitor the performance of other Plan fiduciaries, including Pentegra. To the extent any of the fiduciary responsibilities of the Board and its individual members were delegated to another fiduciary, their monitoring duties included an obligation to ensure that any delegated tasks were being performed in accordance with ERISA's fiduciary standards.

152. A monitoring fiduciary must ensure that the person to whom it delegates fiduciary duties is performing its fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the delegate fails to discharge its duties.

153. The Board and its individual members breached their fiduciary monitoring duties by, among other things:

> a. failing to monitor their appointees and delegees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered

49

enormous losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

b. failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative fees in violation of ERISA;

c. failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeeper; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan; and

d. failing to remove appointees whose performance was inadequate in that they continued to allow excessive administrative fees.

154.    As a direct result of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses. Had the Board and its individual members discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan would not have suffered these losses.

## JURY TRIAL DEMANDED

155.    Pursuant to Fed. R. Civ. P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

50

- find and declare that Defendants have breached their fiduciary duties as described above;

- find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under §1109(a);

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- reform the Plan to include only prudent investments;

- reform the Plan to obtain bids for recordkeeping and administrative services and to pay only reasonable expenses for these services;

- certify the Class, appoint appropriate Plaintiffs as class representatives, and appoint appropriate counsel as Class Counsel;

- award to the Plaintiffs and the Class their attorneys' fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

February 25, 2021               Respectfully submitted,

/s/ Jerome J. Schlichter
SCHLICHTER BOGARD & DENTON LLP
Andrew D. Schlichter, Bar No. 4403267
Jerome J. Schlichter*
Troy A. Doles*
Kurt C. Struckhoff*
Alexander L. Braitberg*
100 South Fourth Street, Suite 1200
St. Louis, Missouri 63102
Telephone: (314) 621-6115
Facsimile: (314) 621-5934
aschlichter@uselaws.com
jschlichter@uselaws.com
tdoles@uselaws.com
kstruckhoff@uselaws.com
abraitberg@uselaws.com
*admitted *pro hac vice*

*Interim Class Counsel for All Plaintiffs*

**CAPOZZI ADLER, P.C.**
Mark K. Gyandoh*
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
(610) 890-0200
Fax (717) 233-4103

**CAPOZZI ADLER, P.C.**
Donald R. Reavey*
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com
(717) 233-4101
Fax (717) 233-4103
*admitted *pro hac vice*

*Counsel for Plaintiffs Greenberg, Digsby, Clark, and Lewis*

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 25, 2021, a copy of the foregoing was filed

electronically using the Court's CM/ECF system, which will provide notice of the filing to all

counsel of record.

By: /s/ Jerome J. Schlichter
Jerome J. Schlichter