## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IMRAN KHAN, JOAN BULLOCK, and
PAMELA JOY WOOD, et al.,
individually and as representatives of a
class of participants and beneficiaries on
behalf of the Pentegra Defined Contribution
Plan for Financial Institutions,

        *Plaintiffs,*

v.

BOARD OF DIRECTORS OF PENTEGRA
DEFINED CONTRIBUTION PLAN,
PENTEGRA SERVICES, INC., JOHN E.
PINTO, SANDRA L. MCGOLDRICK, LISA
A. SCHLEHUBER, MICHAEL N.
LUSSIER, WILLIAM E. HAWKINS, JR.,
BRAD ELLIOTT, GEORGE W. HERMANN,
AND JOHN DOES 1–12,

        *Defendants.*

No. 7:20-cv-07561-PMH

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.      BACKGROUND ................................................................................................2

III.      STANDARD OF REVIEW ...............................................................................4

IV.      ARGUMENT .....................................................................................................5

    1.      PSI Was Not A Fiduciary With Respect To Its Own Retention and Compensation ......................................................................................................................5

       a.      Whether PSI's president was a Plan Board member is irrelevant .................7

       b.      Whether PSI is the Plan administrator is irrelevant .......................................9

       c.      Whether PSI was an investment adviser or manager is irrelevant...............10

    2.      Plaintiffs Have Failed to State a Claim For Any Breach of Fiduciary Duty .........12

       a.      Plaintiffs' Administrative Fees Claim Fails...................................................12

          i.     Apples-to-oranges comparisons to dissimilar benefit plans cannot state a breach of prudence claim ............................................................................13

          ii.    Plaintiffs prop up their prudence allegations with discredited theories..16

       b.      Plaintiffs' Excessive Investment Fees Claim Fails.......................................18

    3.      Plaintiffs Do Not Plausibly Allege Any Facts Supporting a Disloyalty Claim .....20

    4.      Plaintiffs Have Failed to Plead a Prohibited Transaction Claim ..........................22

    5.      Plaintiffs Have Failed to State a Claim for Breach of the Duty to Monitor ..........25

V.      CONCLUSION...............................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Group, Inc.*, 99 F. Supp. 3d 1110 (C.D. Cal. 2015) ................................................................................................................. 10

*Anderson v. Intel Corp.*, No. 19-CV-04618-LHK, 2021 WL 229235 (N.D. Cal. Jan. 21, 2021). 15

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ......................................................... 3, 4, 10

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ......................................... 10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................... 4

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009) .................................................. 26

*Cottrill v. Sparrow, Johnson & Ursillo, Inc.*, 74 F.3d 20 (1st Cir. 1996) .................................... 12

*Cunningham v. Cornell Univ.*, No. 16-cv-6525 (PKC), 2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017) ................................................................................................................. 22, 26

*Danza v. Fid. Mgmt. Tr. Co.*, 533 F. App'x 120, 125 (3d Cir. 2013) .......................................... 28

*Danza v. Fidelity Mgmt. Trust Co.*, 533 F. App'x 120, 124 (3d Cir. 2013) ................................... 6

*Divane v. Nw. Univ.*, 953 F.3d 980, 990–91 (7th Cir. 2020) ...................................................... 17

*Ellis v. Rycenga Homes, Inc.*, 484 F. Supp. 2d 694, 712 (W.D. Mich. 2007) .............................. 21

*F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250 (2d Cir. 1987) .............. 7, 8, 9, 11

*F.W. Webb Co. v. State St. Bank & Tr. Co.*, No. 09 CIV. 1241 RJH, 2010 WL 3219284 (S.D.N.Y. Aug. 12, 2010) ...................................................................................................... 13

*Ferguson v. Ruane Cunniff & Goldfarb Inc.*, No. 17-CV-6685 (ALC), 2019 WL 4466714 (S.D.N.Y. Sept. 18, 2019) ..................................................................................................... 20

*Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014) ................................................. 5

*George v. Kraft Foods Global, Inc.*, 641 F.3d 786 (7th Cir. 2011) .............................................. 15

*Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009) ......................................................... 17

*In re Am. Int'l Grp., Inc. ERISA Litig. II*, No. 08 CIV. 5722 LTS KNF, 2011 WL 1226459 (S.D.N.Y. Mar. 31, 2011) .................................................................................................... 25

*In re Constellation Energy Grp.*, 738 F. Supp. 2d 602 (D. Md. 2010) ....................................... 21

*In re Fid. Erisa Fee Litig.*, No. CV 19-10335-LTS, 2020 WL 759542 (D. Mass. Feb. 14, 2020). 7

*In re M&T Bank Corp. ERISA Litig.*, No. 16-CV-375 FPG, 2018 WL 4334807 (W.D.N.Y. Sept. 11, 2018) ............................................................................................................................. 10

*In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d 345, 355 (S.D.N.Y. 2009) ........................ 11

*In re Nokia Erisa Litig.*, No. 10 CV 03306, 2011 WL 7310321 (S.D.N.Y. Sept. 6, 2011) ............ 2

*In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 758 (S.D.N.Y. 2012) .............................................. 24

*Johnson v. Providence Health & Servs.*, No. C17-1779-JCC, 2018 WL 1427421 (W.D. Wash. Mar. 22, 2018) ................................................................................................................... 22

*Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) ................................................. 10

*Leber v. Citigroup, Inc.*, No. 07 Civ. 9329 (SHS), 2010 WL 935442 (S.D.N.Y. Mar. 16, 2010) 26, 27

*Loomis v. Exelon*, 658 F.3d 667 (7th Cir. 2011) ........................................................................... 20

*Mangiafico v. Blumenthal*, 471 F.3d 391 (2d Cir. 2006) ............................................................. 10

*Marks v. Trader Joe's Co.*, No. CV1910942PAJEMX, 2020 WL 2504333 (C.D. Cal. Apr. 24, 2020) ............................................................................................................................ 20

*Moitoso v. FMR LLC*, 2020 WL 1495938 (D. Mass. Mar. 27, 2020) ......................................... 19

*Patrico v. Voya Fin., Inc.*, No. 16-cv-7070, 2018 WL 1319028 (S.D.N.Y. Mar. 13, 2018) ........ 29

*Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).......................................................................... 1, 9

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) ...................................................... 5

*Pizarro v. Home Depot, Inc.*, No. 1:18-CV-01566-WMR, 2019 WL 11288656 (N.D. Ga. Sept. 20, 2019) ...................................................................................................................... 6

*Renfro v. Unisys Corp.*, 671 F.3d 314 (3d Cir. 2011) ............................................................. 8, 19

*Rinehart v. Akers*, 722 F.3d 137 (2d Cir. 2013)......................................................................... 29

*Rinehart v. Lehman Bros. Holdings, Inc.*, 817 F.3d 56 (2d Cir. 2016)........................................ 30

*Santomenno v. Transamerica Life Ins. Co.*, 883 F.3d 833 (9th Cir. 2018).................................... 6

*Sellers v. Anthem Life Ins. Co.*, 316 F. Supp. 3d 25 (D.D.C. 2018) ............................................ 28

*Skin Pathology Assocs. Inc. v. Morgan Stanley & Co.*, 27 F. Supp. 3d 371 (S.D.N.Y. 2014)..... 27

*Troudt v. Oracle Corp.*, No. 16-CV-00175-REB-SKC, 2019 WL 1006019 (D. Colo. Mar. 1, 2019) ............................................................................................................................. 8

*Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014) ..................................................................... 15

*White v. Chevron Corp.*, No. 16-CV-0793-PJH, 2017 WL 2352137 (N.D. Cal. May 31, 2017) 19, 30

*Winfield v. Citibank, N.A.*, 842 F. Supp. 2d 560 (S.D.N.Y. 2012) ............................................. 10

*Young v. Gen. Motors Inv't Mgmt. Corp.*, 325 F. App'x 31 (2d Cir. 2009) ................................ 17

## Statutes

29 U.S.C. § 1106(a) & (b)............................................................................................................... 5

29 U.S.C. § 1106(b) ...................................................................................................................... 24

29 U.S.C. § 1108(b)(2) ................................................................................................................... 2

29 U.S.C. § 1109(a)(1) ........................................................................ 5

ERISA § 3(21)(A)(ii) ......................................................................... 11

ERISA § 404(a)(1)(A) ........................................................................ 20

ERISA § 406(a)(1)(C) ........................................................................ 24

ERISA § 406(a)(1)(D) ........................................................................ 24

**Regulations**

29 C.F.R. § 2550.404a-5(h)(5)(ii)(C) ............................................... 23

29 C.F.R. § 2550.408c-2(b)(3) ......................................................... 24

# I.    INTRODUCTION

This case is the latest volley in a nationwide barrage of lawsuits—many brought by interim lead class counsel in this case—targeting retirement plan fiduciaries for allegedly paying too much to plan service providers.[1]  This time, the target is the Pentegra Defined Contribution Plan for Financial Institutions ("Plan"), which is a multiple employer plan, or MEP—large pooled plans with lots of assets at stake.  Plaintiffs allege that Defendants—the Plan's Board, along with Pentegra Services, Inc. ("PSI"), a service provider to the Plan—violated the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA") in various ways.  The gist of Plaintiffs' claims, however, is that the Plan and its participants paid too much for PSI's services.  The Amended Consolidated Complaint (Dkt. 92, "ACC") lacks the factual allegations necessary to sustain this claim and must be dismissed for four reasons.

First, PSI was not a Plan fiduciary with respect to negotiation of its own retention and compensation.  The "threshold question" for any fiduciary claim is whether the defendant "was acting as a fiduciary (that is, performing a fiduciary function) *when taking the action subject to complaint*."  *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) (emphasis added).  Courts routinely hold that service providers such as PSI are not fiduciaries with respect to their own retention and compensation, here the "action subject to complaint."  Counts I, II, and III all depend on an allegation of fiduciary status, and therefore all three fail as to PSI.

Second, prudence claims focus on *how* fiduciaries make decisions.  ERISA plaintiffs must plausibly allege either that fiduciaries employed a flawed process or that the process

---

[1] *See* John Manganaro, *Second ERISA Lawsuit Targets ADP Multiple Employer Plan*, PLANSPONSOR, May 11, 2020, perma.cc/LJY6-L8G4 (noting the "numerous" lawsuits against fiduciaries "that have been filed by the highly active law firm Schlichter, Bogard & Denton" and that the firm has "clearly signaled an intent to continue with this litigation push").

produced an outcome so striking that a court can reasonably infer a defective process. The Amended Consolidated Complaint satisfies neither standard. Meanwhile, Plaintiffs do not plausibly allege that Defendants intended to benefit anyone other than Plan participants, a requirement for a claim loyalty claims. Counts I and III therefore fail.

Third, ERISA exempts from its prohibited transaction rules reasonable payments for necessary services, such as those made by the Plan to PSI. *See* 29 U.S.C. § 1108(b)(2). Plaintiffs' prohibited transaction claims under ERISA § 406 must be dismissed on that basis alone. Plaintiffs also have not adequately pleaded the elements of any variety of prohibited transaction encompassed by § 406's subsections. Count II must therefore be dismissed.

Finally, Plaintiffs' duty-to-monitor allegations are boilerplate recitations that courts routinely dismiss as "conclusory." *See In re Nokia Erisa Litig.*, No. 10 CV 03306, 2011 WL 7310321, at *5 (S.D.N.Y. Sept. 6, 2011) ("[T]he Complaint does not allege any specific factual basis to support Plaintiffs' conclusory allegation of a lack of legally sufficient monitoring by Defendants."). In any event, a failure-to-monitor claim is derivative of a fiduciary breach claim, which Plaintiffs have not adequately pleaded. Count IV must therefore be dismissed.

Despite misrepresenting facts, misreading Plan-related documents, and misunderstanding ERISA, Plaintiffs cannot articulate a viable claim. Rather than "unlock the doors of discovery," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), the Court should dismiss the Amended Consolidated Complaint for all these reasons and as set forth below.

## II.     BACKGROUND

The Plan is a type of retirement savings plan known as a multiple employer plan, or MEP. As its name suggests, a MEP comprises multiple employers, but ERISA and the Internal Revenue Code treat them as single plans for certain reporting and auditing purposes. MEPs thus

allow businesses (often small ones)—known as adopting employers—to share the burdens of offering their employees retirement plans that they otherwise may be unable to afford. Entities called plan sponsors organize and manage MEPs. In the Plan's case, that entity is its Board of Directors, the voting members of which include six executive officers from adopting employers. ACC ¶¶ 20-25. The Plan currently has over 250 adopting employers, more than 27,000 participants, and roughly $2.4 billion in net assets. *See* Declaration of Robert Alin ("Alin Decl.") Ex. A.

PSI provides services to many retirement plans, including the Plan. Its services range from traditional third-party administration (*e.g.*, recordkeeping and administrative support) to full-fledged fiduciary outsourcing (*i.e.*, acting as a named fiduciary and administrator under ERISA, or serving as its trustee), and variations in between. The Plan's Board, through decisions of its voting members, controls the Plan's engagement with PSI, including what services PSI provides and what fees the Plan pays. Alin Decl. Ex. B at 76. Yet each adopting employer selects its own Plan features from a menu of dozens of options, including employee eligibility, vesting requirements, and employer matching contributions. The Plan thus operates uniquely for each adopting employer.

PSI assesses the fees for its services in four ways: (1) on an asset basis; (2) on a per-participant basis; (3) on a transaction basis (that is, payment for the performance of a particular plan service); and (4) as a flat-rate charge (for example, an annual base administration fee). Alin Decl. Ex. C at 1. PSI's fees do not come solely from participants, though. Employers generally pay some fees (for example, an annual $1,950 base administration fee), Alin Decl. Ex. D at 19, employers and participants often share others (for example, a $75 per participant account maintenance fee), *id.*, and still other fees are paid only by those participants who use a particular

3

Plan service (for example, a $75 fee for loans). *See* Alin Decl. Ex. C at 7. Thus, a participant likely pays far less in fees than a per capita share of the Plan's total expenses.

## III.    STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). Although the Court must take the allegations in a plaintiff's pleadings as true and make all reasonable inferences in favor of the plaintiff, "formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (internal quotation marks omitted). Rather, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).

Courts must take "particular care" in applying these standards to ERISA claims. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013). That is because "a suit claiming breach of fiduciary duty . . . elevates the possibility that a plaintiff with a largely groundless claim [will] simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value." *Id.* at 719 (internal quotation marks omitted). Reinforcing this concern, the Supreme Court has identified motions to dismiss as an "important mechanism for weeding out meritless [ERISA] claims." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).

# IV.    ARGUMENT

**1.    PSI Was Not A Fiduciary With Respect To Its Own Retention and Compensation.**

All of Plaintiffs' claims against PSI depend on an allegation of fiduciary status—that PSI had responsibility to oversee the Plan's expenses or the discretionary control to cause the Plan to enter into transactions, including engaging service providers.  *See* Counts I & III (alleging PSI is liable for breaches of fiduciary duty under 29 U.S.C. § 1109(a)(1), which applies to "[*a*] *fiduciary* with respect to a plan") (emphasis added); Count II (alleging PSI is liable for causing prohibited transactions under 29 U.S.C. § 1106(a) & (b), which apply to "[*a*] *fiduciary* with respect to a plan") (emphasis added).

The "threshold question" for any fiduciary claim is whether the defendant "was acting as a fiduciary (that is, performing a fiduciary function) *when taking the action subject to complaint*."  *Pegram*, 530 U.S. at 226 (2000) (emphasis added).  That is, if a defendant bears other fiduciary duties with respect to a plan that are *not* the duties alleged in the complaint to have been breached, the fact of fiduciary status is of no moment.  Moreover, as relevant here, a service provider does not become a fiduciary simply by bargaining with plan fiduciaries for its retention and compensation.  *See Pizarro v. Home Depot, Inc.*, No. 1:18-CV-01566-WMR, 2019 WL 11288656, at *6 (N.D. Ga. Sept. 20, 2019); *see also Danza v. Fidelity Mgmt. Trust Co.*, 533 F. App'x 120, 124 (3d Cir. 2013) (affirming dismissal of claims because "at the point that [the service provider] was negotiating its fees … it was not a fiduciary of the plan and . . . had no fiduciary duty to Plaintiff that could have been breached").  Any other principle would be absurd.  If service providers owed fiduciaries duties to a plan while negotiating their own compensation, ERISA would require them to negotiate "solely in the interest" of plan participants and to accept "fees no higher than those of any competitor."  *See Santomenno v.*

*Transamerica Life Ins. Co.*, 883 F.3d 833, 838 (9th Cir. 2018). Such a result is nonsensical, and sure to drive service providers out of the retirement plan business.

The critical inquiry for assigning fiduciary responsibility for a service provider's retention and compensation, then, is who controlled the "decision whether or not, and on what terms, to enter into [the] agreement." *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1259 (2d Cir. 1987). Here, that decision-maker was the voting members of the Plan's Board of Directors, who were executives of six adopting employers. As Plaintiffs admit, the Plan's Board—*not* PSI—"exercised discretionary authority or discretionary control respecting the management of the Plan." ACC ¶ 26. The Plan's Board exercised this authority by, among other things, "retain[ing PSI] to provide administrative services for the Plan." *Id*. ¶ 36. Simply put, it is the Plan's Board—*not* PSI—that decided "whether or not, and on what terms, to enter into an agreement" with PSI. *F.H. Krear & Co.*, 810 F.2d at 1259.

Because a person is a fiduciary only "to the extent" that he possesses or exercises the requisite discretionary authority or control, "fiduciary status is not an all or nothing proposition." *In re Fid. Erisa Fee Litig.*, No. CV 19-10335-LTS, 2020 WL 759542, at *5 (D. Mass. Feb. 14, 2020). Thus, while a service provider such as PSI may be a fiduciary for other purposes, it becomes a fiduciary as to its own retention and compensation *only* if its agreement with the plan "give[s] it control over factors that determine the actual amount of its compensation." *F.H. Krear*, 810 F.2d at 1259.

Plaintiffs are not within shouting distance of such an allegation here. Plaintiffs allege that PSI's "complete control over its compensation . . . is shown by [its] ever increasing asset-based compensation each year for Plan services even though the services [PSI] provided the Plan remained the same." ACC ¶ 68. This makes no sense. As Plaintiffs admit, PSI's compensation

is, in part, asset-based.  Thus, when assets go up, so too does PSI's compensation.  Indeed, assets have gone up—from $1.9 billion in 2014 to $2.1 billion in 2018.  ACC ¶ 9; *see also Troudt v. Oracle Corp.*, No. 16-CV-00175-REB-SKC, 2019 WL 1006019, at *6–7 (D. Colo. Mar. 1, 2019) (rejecting claim that asset-based compensation "resulted in unwarranted and excessive increases to [service provider's] compensation as the Plan grew in size, without a corresponding increase in the services rendered").  If Plaintiffs believe fees cannot rise (or fall) with compensation, then ERISA must per se prohibit asset-based compensation—a theory courts have routinely rejected. *See, e.g.*, *Renfro v. Unisys Corp.*, 671 F.3d 314, 327-28 (3d Cir. 2011).

The inquiry should end there.  Yet Plaintiffs persist, contending that PSI was a fiduciary with respect to its own retention and compensation because its president was also a member of the Plan's Board, ACC ¶ 77, because it publicly "embrace[d] an advanced level of fiduciary responsibility" as plan administrator, ACC ¶¶ 28-35, and because it was an investment adviser or manager to the Plan.  *Id*. ¶ 39.  These allegations are red herrings, and—even if they were true, which they are not—they fail to establish that PSI was a fiduciary with respect to its own retention and compensation.

### a.  Whether PSI's president was a Plan Board member is irrelevant.

Plaintiffs insinuate that PSI's president's service as a Plan Board member is somehow inappropriate—and that such impropriety somehow creates fiduciary duties where they do not otherwise exist.  *See* ACC ¶ 37.  In Plaintiffs' view, "[t]his interrelationship between [PSI] and the Board allowed [PSI] to exercise discretionary authority and control over the retention of itself as a Plan service provider."  ACC ¶ 77.  This argument disregards one of the most fundamental principles of ERISA:  that a person may wear multiple hats, so long as they "wear only one at a time, and wear the fiduciary hat when making fiduciary decisions."  *Pegram*, 530 U.S. at 225.

By Plaintiffs' own allegation, PSI's president was wearing his non-fiduciary hat when he "executed the Services Agreements not on behalf of the Plan but rather on behalf of [PSI] as [PSI's] President and CEO." ACC ¶ 37.

The question Plaintiffs must answer is not who controlled PSI's decision to contract with the Plan, but who controlled *the Plan's decision* to contract with PSI. *F.H. Krear & Co.*, 810 F.2d at 1259. The foundational documents governing the relationships at issue here specify that the Plan's president (who is also PSI's president) is an *ex officio* member of the Plan's Board, Alin Decl. Ex. B, Art. IX § 1(A), and that **he did *"not have the right to vote"* in Board decisions**. Alin Decl. Exs. E & F, Art. I, § 1 (emphasis added).[2] Instead, as the Services Agreements between the Plan and PSI establish, a voting member authorized to act on behalf of the *entire Board*—not the Plan's president—executed the Services Agreements for the Plan. Plaintiffs do not explain how a single, non-voting *ex officio* member on a Plan Board with six voting members "exercises discretionary authority and control" over the Board and its fiduciary decisions. ACC ¶ 77. Such "bare assertions" are "conclusory and not entitled to be assumed true." *Iqbal*, 556 U.S. 681.

In any event, even if PSI's president breached some duty he owed to the Plan arising from his service on its Board (and, to be clear, he did not), that breach is not attributable to PSI. The Second Circuit rejects *respondeat superior* liability under ERISA. *See In re M&T Bank*

---

[2] A court may consider "facts stated in the complaint," materials "incorporated in the complaint by reference," or "matters of which judicial notice may be taken under Fed. R. Evid. 201." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). A court may also consider "documents possessed by or known to the plaintiff and upon which it relied in bringing the suit," *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007), and any document "where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006). Consistent with these standards, courts routinely rely on formal plan documents and disclosures required by statute when resolving motions to dismiss in ERISA cases. *Winfield v. Citibank, N.A.*, 842 F. Supp. 2d 560, 568 n.3 (S.D.N.Y. 2012) (plan document and summary plan description are integral to ERISA cases); *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Group, Inc.*, 99 F. Supp. 3d 1110, 1126 (C.D. Cal. 2015) (DOL Form 5500 subject to judicial notice); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991) (prospectuses subject to judicial notice).

*Corp. ERISA Litig.*, No. 16-CV-375 FPG, 2018 WL 4334807, at *3 (W.D.N.Y. Sept. 11, 2018)

(quoting *In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d 345, 355 (S.D.N.Y. 2009)

("[F]iduciary responsibility . . . based on *respondeat superior* theory is not established.").

**b. Whether PSI is the Plan administrator is irrelevant.**

Plaintiffs allege that PSI is a fiduciary because it is the Plan administrator, and, by

definition, plan administrators are fiduciaries. ACC ¶ 33. Even if true—and it is not[3]—this

allegation is irrelevant. Again, the question is not whether PSI is a fiduciary *for any purpose*, but

whether it is a fiduciary with respect *to its own retention and compensation*. By itself, being

Plan administrator says nothing about whether PSI had "control over factors that determine the

actual amount of its compensation." *F.H. Krear*, 810 F.2d at 1259.

Plaintiffs insist PSI had this discretion because it publicly assumed "[r]esponsibility for

the reasonableness of [its] own fees." ACC ¶ 32. Plaintiffs badly distort the statement's

meaning by truncating the quotation. The full quotation reads: "Responsibility for the

reasonableness of Pentegra's own fees (*though only the employer can make the final*

*determination*.") The Pentegra 3(16) Administrator Advantage at 3, https://www.pentegra.com/

wp-content/uploads/2016/12/316-TPA.pdf (last visited Mar. 15, 2021) (emphasis added). A

person is not a fiduciary where "ultimate decision-making authority rests elsewhere." *Cottrill v.*

---

[3] ERISA defines "plan administrator" as "the person specifically so designated by the terms of the instrument under which the plan is operated." 29 U.S.C. § 1002(16)(A). The Plan document designates the "President *of the Plan*"— not PSI—as the "plan administrator." Alin Decl. Ex. B at Art. IX, § (A) (emphasis added). Whether some PSI employees signed the Plan's Forms 5500 is immaterial, ACC ¶ 28, and does not transform them into fiduciaries. DOL Interpretive Bulletin 75–8, 29 C.F.R. § 2509.75–8 (1988). In any event, people other than plan administrators can sign and file Forms 5500. *See* FAQs on EFAST2 Electronic Filing System, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/faqs/efast2-form-5500-processing.pdf, (last visited Mar. 12, 2021) (an authorized service provider can sign a Form 5500 on plan administrator's behalf). Even if signing a Form 5500 conferred fiduciary status, it would do so only in relation to signing the form—which is not the action subject to complaint.

*Sparrow, Johnson & Ursillo, Inc.*, 74 F.3d 20, 22 (1st Cir. 1996). Read properly, the quote confirms that PSI was not a fiduciary with respect to its own retention and compensation.

Moreover, Plaintiffs have not supported their (incorrect) assumption that this statement pertains to the services PSI provided this Plan. Plaintiffs plucked this supposed admission from generic marketing materials highlighting the wide array of possible services PSI *can* provide *if* engaged as a particular type of service provider called a "3(16) plan administrator."[4] Plaintiffs do not allege PSI is an ERISA § 3(16) administrator to the Plan, and it is not. In fact, *none* of the statements Plaintiffs tout as admissions of PSI's fiduciary duties to the Plan as its administrator, *id.* ¶¶ 29-32, refer specifically to PSI's engagement with this specific Plan. The only way to know what services PSI provides to this Plan—from the wide array of services it offers to its customers—is by reading the Services Agreements that govern the parties' relationship. *See* Exs. D & G. Ensuring the "reasonableness of [its] own fees" is not one of them. *Id.*

Stripping away the selective quotations and blatant distortions, Plaintiffs' allegation that PSI is the Plan administrator says nothing about who decided to engage PSI and on what terms. It thus does not warrant departure from the bedrock principle that service providers are not fiduciaries with respect to their own retention and compensation.

**c. Whether PSI was an investment adviser or manager is irrelevant.**

It is not clear what Plaintiffs intend by alleging that PSI is a functional fiduciary either as an investment adviser under ERISA § 3(21)(A)(ii), ACC ¶ 39, or an investment manager under

---

[4] It is evident from its content that the source is no more than generic marketing material. Most tellingly, after describing the availability of PSI to serve as a specific type of fiduciary defined by ERISA § 3(16), the document encourages readers to "[l]earn more about [PSI's services by]. . . [c]ontacting the Pentegra Solutions Center."), and provides a toll-free number to call. The Pentegra 3(16) Administrator Advantage at 6. This is known in the marketing profession as a "call to action," or a prompt designed to provoke an immediate purchase. *See* https://en.wikipedia.org/wiki/Call_to_action_(marketing) (last visited Mar. 31, 2021). If the reader already were a PSI customer, as Plaintiffs suggest, there would be no need to prompt it to make a purchase.

§ 3(38). ACC ¶ 44. If Plaintiffs mean these roles make PSI a fiduciary with respect to its own retention and compensation, they are wrong. Like all service providers, investment advisers and managers are fiduciaries with respect to their own compensation only if they control the "factors that determine the actual amount of [their] compensation." *F.H. Krear*, 810 F.2d at 1259. Plaintiffs have not alleged that PSI controlled the decision to engage it in either role, or that, once engaged, PSI had any control over the amount of its compensation. Whether PSI is an investment adviser or manager is thus irrelevant.

Plaintiffs are also wrong if they meant that, as either an investment adviser or manager, PSI was a fiduciary for "the selection, monitoring and removal of Plan investments," ACC ¶ 39, or for the disposition of Plan assets. *Id.* ¶ 44. With respect to investment advising, the conduct Plaintiffs allege constitutes "providing investment advice"—for example, providing the Plan's Board with information about investment funds and documenting the Board's decisions, ACC ¶ 39—amounts to "assisting the Board in making decisions on behalf of the Plan." *Id.* To qualify as an investment adviser, however, a service provider must do more than assist a fiduciary's investment decision-making. *See F.W. Webb Co. v. State St. Bank & Tr. Co.*, No. 09 CIV. 1241 RJH, 2010 WL 3219284, at *8 (S.D.N.Y. Aug. 12, 2010) ("Urging a plan fiduciary to purchase one financial product or another does not qualify as 'investment advice' unless the parties have come to a[n agreement] that the provider will offer advice as a remunerated service and that the plan will rely on the advice as a primary basis for its investment decisions."). Plaintiffs have not alleged that the Plan paid PSI for advice that served as the primary basis for the Plan's investment decisions. PSI therefore was not an investment adviser under ERISA § 3(21)(A)(ii).

Neither was PSI an investment manager under ERISA § 3(38). To qualify for that role, a person must have "the power to manage, acquire, or dispose of any asset of a plan." 29 U.S.C. § 1002(38)(A). Plaintiffs contend that PSI was an investment manager because a subsidiary was sub-adviser to "certain proprietary collective investment trusts in the Plan called the Pentegra Advantage Asset Allocation Strategies." ACC ¶ 43. Plaintiffs do not allege—let alone explain how—the subsidiary meets ERISA § 3(38)(A)'s requirement that it controls the disposition of Plan assets. Once again, it is the Plan's voting members of the Board that selects—and bears fiduciary responsibility for—the Plan's investment options, and it is participants who choose where to "direct their investments." Alin Decl. Ex. B Art. IV §1.

As with the faulty allegation that PSI was the Plan administrator, Plaintiffs have failed to support their allegation that PSI is either an investment adviser or an investment manager. In any event, fulfilling those functions would not make PSI a fiduciary with respect to its own retention and compensation. PSI must thus be dismissed from Counts I, II, and III.

## 2. Plaintiffs Have Failed To State A Claim For Any Breach Of Fiduciary Duty.

### a. Plaintiffs' Administrative Fees Claim Fails.

In Count I, Plaintiffs allege that Defendants breached their fiduciary duty of prudence to the Plan by failing to manage and control the Plan's administrative expenses related to recordkeeping. Plaintiffs allege that PSI and the Plan's Board failed to act with the prudence ERISA requires by, among other things, not "solicit[ing] bids" from other recordkeepers, ACC ¶ 119 (citing *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798–99 (7th Cir. 2011)), and by failing to "determine whether [the recordkeeper's] pricing was competitive" and "leverage[ing] the Plan's size to reduce fees." *Id.* ¶ 119 (citing *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

Claims for breach of the duty of prudence must either refer directly to defendants' knowledge, methods, or conduct, or make "circumstantial factual allegations" from which a court "may reasonably infer from what is alleged that the process is flawed." *Morgan Stanley*, 712 F.3d at 718 (internal quotation marks omitted). Plaintiffs do not refer directly to any imprudent process, and, indeed, the Amended Consolidated Complaint omits *any* reference to the Board's decision-making process. Thus, Plaintiffs must instead provide sufficient factual allegations from which this Court can reasonably infer that the Board's process was flawed. They have failed to do so.

   **i. Apples-to-oranges comparisons to dissimilar benefit plans cannot state a breach of prudence claim.**

A claim that a Plan's fees are too high cannot rest on the bare allegation that other plans paid less—particularly where those other plans are not suitable comparators. *See Anderson v. Intel Corp.*, No. 19-CV-04618-LHK, 2021 WL 229235, at *9 (N.D. Cal. Jan. 21, 2021) ("Comparing apples and oranges is not a way to show that one is better or worse than the other."). That, however, is exactly what Plaintiffs do.

The sole basis for the allegation that PSI's fees are excessive is—purportedly—a comparison "to the fees charged to other defined contribution plans for the same or similar services." ACC ¶ 88. As examples of other plans' allegedly lower fees, however, Plaintiffs cite the Forms 5500 of "large corporate 401(k) plan[s]" such as Nike, Albertson's, Chevron, and ConocoPhillips. *Id.* ¶¶ 88-91. Plaintiffs offer no basis for their assumption that these plans are "the same or similar" to the Plan, ACC ¶ 88, and they are not. *Each of these is a single-employer plan*. Although a key benefit of a MEP is the possibility of gaining *some* economy of scale as compared to that achieved by each individual employer, a MEP does not enjoy the same economy of scale as a single-employer plan with the same amount of assets. For example, plans

must pass annual tests to confirm they do not disproportionately benefit highly compensated employees or exceed IRS contribution limits. *See* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview (last visited Mar. 31, 2021) ("[T]he employer must perform annual tests . . . to verify that [the plan does] not discriminate in favor of highly compensated employees."). Single-employer plans must conduct these yearly tests just once. MEPs, on the other hand, must conduct a test for *each adopting employer*. That is one reason why "the scale efficiencies of MEPs catering to small businesses [is] still likely be *smaller than the scale efficiencies enjoyed by very large single-employer plans*." Multiple Employer Plans, 84 Fed. Reg. at 31,784 (emphasis added). Thus, all Plaintiffs have shown is that the Plan's apples are more expensive than some other plans' oranges. That is not enough. *Intel*, 2021 WL 229235, at *9 ("Absent [factual allegations establishing a meaningful benchmark for comparison], Plaintiffs' allegations regarding excessive fees are insufficient to state a claim for breach of the duty of prudence.").[5]

Plaintiffs commit yet another error: they do not identify the services PSI provides the Plan and those offered by any alleged comparator. Simply put, it is impossible to know whether the Plan's fees were excessive without knowing what the Plan got for those fees. *See Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009) (upholding dismissal of excessive fee claims and noting that "the complaint is silent about the services Deere participants received from the company sponsored plans"); *Young v. Gen. Motors Inv't Mgmt. Corp.*, 325 F. App'x 31, 33 (2d

---

[5] Plaintiffs do compare the Plan to a single other MEP, CBERA Plan A. ACC ¶ 95. The allegation that CBERA Plan A paid less than the Plan for "similar services," ACC¶ 95, however, means only that the Plan is not the absolute cheapest plan of the thousands of MEPs in the country. This cannot support a prudence claim, as "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible" option. *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009); *see also Divane v. Nw. Univ.*, 953 F.3d 980, 990–91 (7th Cir. 2020) ("[Pla]n not required to search for a recordkeeper willing to take $35 per year per participant as plaintiffs would have liked."). Plaintiffs also have alleged no facts sufficient to show what services CBERA Plan A receives for its fees, or that those services are sufficiently similar to those PSI provides the Plan for useful comparison. *See Young*, 325 F. App'x at 33.

Cir. 2009) (complaint defective where plaintiff "fail[ed] to allege that the fees were excessive relative 'to the actual services rendered'"); *see also* U.S. Dept. of Labor, Meeting Your Fiduciary Responsibilities, at 5–6 (2012), https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource center/publications/meeting-your-fiduciary-responsibilities.pdf ("Fees are just one of several factors fiduciaries need to consider in deciding on service providers and plan investments. . . . Compare all services to be provided with the total cost for each provider."). According to Plaintiffs, all service providers should have the same fee structure, no matter what services they provide. Under this view, a Mercedes should cost no more than a Toyota, which should cost no more than a Kia—after all, they all have four wheels and an engine.

Worse yet, Plaintiffs compare the Plan's *total* administrative fees to the *partial* administrative fees paid by other plans. For example, Plaintiffs allege that by 2018 the Plan paid PSI at least "$10.58 million in recordkeeping and administrative fees, or $388.77 per participant." ACC ¶ 84. Plaintiffs arrive at the purported per-participant fee simply by dividing the total amount disclosed on line i(2) of the Plan's 2018 Form 5500—titled "Contract administrator fees," Alin Decl. Ex. H at 2—by the number of Plan participants.[6] Yet the Department of Labor defines such fees to include "expenses for basic administrative services— such as plan recordkeeping, accounting, legal and trustee services."[7] In other words,

---

[6] Plaintiffs' math is deceptively simplistic. That is because, while participants pay some Plan fees, employers generally pay others with assets outside the ERISA Plan, as the Services Agreements make clear. One example of the latter is the yearly $1,950 "Base Administrative Fee" that Plaintiffs specifically allege *employers*—not participants—pay. ACC ¶ 41; *see also* Alin Decl. Ex. D at 19. Another example is the $75 per participant fee, which Plaintiffs allege participants alone pay, ACC ¶ 41, but in fact the governing agreements make clear employers often pay, or split with participants. Alin Decl. Ex. D at 19. There are also fees for individual services, such as taking a loan from the Plan, which only those participants who use the service pay. *See id.* at 20. Given the hundreds of employers and tens of thousands of participants in the Plan, Plaintiffs' allegation that *participants alone* paid more than $10 million in fees overinflates the true amount by hundreds of thousands—if not millions—of dollars.

[7] https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/ understanding-retirement-plan-fees-and-expenses.pdf.

recordkeeping is just one of the many services in the broader category of administrative services that PSI provides to the Plan. *See also* Exs. D & G (Services Agreements) (listing array of PSI's services to the Plan). Yet Plaintiffs compare the Plan's *all-in* "administrator fees" to just the *recordkeeping fees* paid by large single-employer plans. *See, e.g.*, ACC ¶ 89 ("Albertson's Inc 401(k) plan . . . paid approximately $29 per participant for *recordkeeping services*.") (emphasis added); *id.* ¶ 89 ("Nike Inc,'s 401(k) Plan . . . paid $21 per participant *for record keeping services* in 2012 and 2016.") (emphasis added). Similarly, Plaintiffs allege that Fidelity admitted in recent litigation that the cost of its services ranged from "$14-$21 per person," ACC ¶ 90, but the disputed fees were for "*recordkeeping services*" only. *Moitoso v. FMR LLC*, 2020 WL 1495938, at *15 (D. Mass. Mar. 27, 2020) (emphasis added).

Plaintiffs' conflation of the Plan's overall administrative fees with specific subcategories of fees paid by other incomparable plans is precisely the type of "apples-to-oranges comparison" that is "[not] suggestive of imprudent action." *White*, 2016 WL 4502808, at *12.[8]

### ii. Plaintiffs prop up their prudence allegations with discredited theories.

Unable to show that Defendants must have acted imprudently based on numbers alone, Plaintiffs grasp at arguments already rejected by other courts.

For example, Plaintiffs suggest that it was imprudent for the Plan to pay asset-based fees rather than the "fixed dollar amount per participant" fee that "prudent fiduciaries negotiate." ACC ¶ 68. Courts have rejected the theory that a plan "should have paid per-participant fees rather than fees based on a percentage of assets in the plan." *Renfro v. Unisys Corp.*, 671 F.3d

---

[8] Interim lead class counsel should be familiar with *White v. Chevron*, as it served the same role in that case. There, plaintiffs alleged that Chevron's recordkeeping fee ranged between $167 and $181 per participant. *White v. Chevron Corp.*, No. 16-CV-0793-PJH, 2017 WL 2352137, at *15 (N.D. Cal. May 31, 2017). The lawsuit was dismissed in part because plaintiffs "lumped [all of Chevron's administrative] fees together and labeled them 'recordkeeping' fees," *id.* at *16, a mistake repeated here.

314, 327-28 (3d Cir. 2011) (affirming dismissal of fiduciary breach claim).  Indeed, it is not even evident that participants "would view a [flat] as a gain.  A flat-fee structure might be beneficial for participants with the largest balances, but, for younger employees and others with small investment balances, a [flat] fee could work out to be more" than an asset-based fee.  *Loomis v. Exelon*, 658 F.3d 667, 672 (7th Cir. 2011).  For this reason, courts are rightly unwilling to decide for plans whether an asset-based fee or a per-participant fee is appropriate, leaving that decision to the plan's fiduciaries who know best.  The Court should follow suit here.

Courts have likewise rejected Plaintiffs' theory that a prudent fiduciary always would "conduct a competitive bidding process for the Plan's recordkeeping and administrative services."  ACC ¶ 102; *see, e.g.*, *White*, 2016 WL 4502808, at *14 ("[T]he allegation that the Plan fiduciaries were required to solicit competitive bids on a regular basis has no legal foundation . . . [as] nothing in ERISA compels periodic bidding."); *Ferguson v. Ruane Cunniff & Goldfarb Inc.*, No. 17-CV-6685 (ALC), 2019 WL 4466714, at *8 (S.D.N.Y. Sept. 18, 2019) ("ERISA does not require plan fiduciaries to obtain competitive bids from plan service providers.").[9]

Stripped of these discredited theories, Plaintiffs' sole allegation about PSI's administrative fees is that they must be excessive because they appear higher than the fees paid

---

[9] The "expert" authorities Plaintiffs cite in support of this position are not to the contrary.  For example, Plaintiffs allege that "prudent fiduciaries [solicit competitive bidding] every three years."  ACC ¶ 75.  Yet, Fiduciary360's Prudent Practices for Investment Stewards handbook—according to Plaintiffs, "the global fiduciary standard of excellence," ACC ¶ 75—says only that "[*c*]*onsideration* [should be] given to putting vendor contracts back out to bid every three years," not that fiduciaries *must* solicit competitive bids every three years.  Fiduciary360, Prudent Practices for Investment Stewards, Practices S-1.4, S-4.4 (2011) (emphasis added).  Similarly, Cerulli Associates reported nine years ago that "more than half of plan sponsors" (54.9 percent, to be exact) were "likely to conduct a search for [a] recordkeeper within the next two years."  Rebecca Moore, "Most Recordkeeping RFPs to Benchmark Fees," PlanSponsor (Jan. 8, 2013).  Of course, this necessarily means that slightly less than half of plan sponsors *were unlikely* to search for a new recordkeeper within two years—tepid support, at best, for Plaintiffs' position.  In any event, Plaintiff's allegations about the recordkeeping fees the Plan and other plans pay are "pure guess[es]," and are insufficient to state a claim.  *Marks v. Trader Joe's Co.*, No. CV1910942PAJEMX, 2020 WL 2504333, at *5 (C.D. Cal. Apr. 24, 2020).

for different services by incomparable plans. Such an allegation cannot state a claim for a breach of the fiduciary duty of prudence, and Count I must therefore be dismissed.[10]

### b. Plaintiffs' Excessive Investment Fees Claim Fails.

The sole basis for Plaintiffs' claim that the Plan's investment options "were up to 9,233% more expensive than the identical lower-cost alternatives," ACC ¶ 10, is a chart comparing the Plan's purported investment fees with the fees of allegedly similar funds. Plaintiffs do not disclose the sources of either set of purported fees. Nor do they allege the basis for the funds' supposed similarity. Instead, they describe the funds as "the exact same" and "identical" to the Plan's investment options. ACC ¶ 109. Similarly deficient allegations prevented the court in *Intel* from "discern[ing] whether Plaintiffs are comparing funds that have different aims, different risks, and different potential rewards that cater to different investors." No. 19-CV-04618-LHK, 2021 WL 229235, at *9 (N.D. Cal. Jan. 21, 2021). Just so here.

Even assuming the similarity of Plaintiffs' alternative funds and the accuracy of their statement of fees, Plaintiffs have wildly overstated the Plan's investment management fees, as shown by the following excerpt from a PSI fee disclosure:[11]

---

[10] Plaintiffs tack on co-fiduciary liability claims to Counts I and III but simply parrot the language of ERISA § 405(a), fail even to identify which subsection of section 405(a) is supposed to apply, and do not allege the proper elements under any subsection. This is insufficient. *See Ashcroft*, 556 U.S. at 678. Even if Plaintiffs had adequately pleaded the co-fiduciary claims, the claims still fail because they are derivative of the fiduciary breach claims, which Plaintiffs have not adequately alleged. *See In re Constellation Energy Grp.*, 738 F. Supp. 2d 602, 614 (D. Md. 2010) ("The plaintiffs' remaining claims [for co-fiduciary liability] . . . depend on a finding that the defendants breached the underlying duties of prudence and loyalty. As the plaintiffs' prudence and loyalty claims fail, the remaining derivative claims also must be dismissed"). Neither have Plaintiffs alleged in anything but a conclusory fashion that Defendants had actual knowledge of one another's breaches, as required for co-fiduciary claims. *See Ellis v. Rycenga Homes, Inc.*, 484 F. Supp. 2d 694, 712 (W.D. Mich. 2007). For these reasons, the co-fiduciary allegations must be dismissed.

[11] Alin Decl. Ex. C at 6. Exhibit C is a participant fee disclosure required by and made in accordance with ERISA § 408(b)(2). The Amended Consolidated Complaint extensively references the Plan's investment options and their expense ratios, which are integral to Plaintiffs' claims and which Defendants disclosed in § 408(b)(2) fee disclosures distributed to adopting employers and participants during the time covered by this lawsuit. Plaintiffs cannot reasonably dispute their accuracy. Thus, the Court may consider the attached example. *See Johnson v. Providence Health & Servs.*, No. C17-1779-JCC, 2018 WL 1427421, at *3 (W.D. Wash. Mar. 22, 2018) (taking judicial notice

| Investment Fund | Investment Management Fee | Investment Management (Received by PSI and Paid to SSgA) | RTC Minimum | PSI Minimum Fee | Total Expense Ratio |
|---|---|---|---|---|---|
| Metlife Stable Value Fund (25053 CI0) | 0.620% | 0.000% | 0.030% | 0.240% | 0.890% |
| SSgA Aggressive Balanced SL | 0.020% | 0.074% | 0.030% | 0.240% | 0.364% |
| SSgA Cash Series US Govt G | 0.080% | 0.000% | 0.030% | 0.240% | 0.350% |

Taking just one example, Plaintiffs allege that the Plan's fee for State Street's SSgA Aggressive Balanced Fund is 0.36%. ACC ¶ 91. They seem to have confused the investment option's *total expense ratio* (the final column above) with its *investment management fee* (column two). The latter is a component of the former, along with other items such as a trustee fee paid to Reliance Trust Company (an unaffiliated third party) and PSI's administrative fees. *See* Alin Decl. Ex. C at 1 ("[B]undled . . . trustee, custodial, administrative, and fund management services *are incorporated in an all-inclusive fee structure*.") (emphasis added).

Moreover, investment management fees for collective investment trusts such as State Street's SSgA Aggressive Balanced Fund themselves typically have two or more components. One component is its operating expenses. Another component is "externally negotiated [investment management] fees." 29 C.F.R. § 2550.404a-5(h)(5)(ii)(C). Again taking State Street's SSgA Aggressive Balanced Fund as an example, a publicly available fact sheet makes this distinction clear.[12] The fact sheet discloses a "Total Annual Operating Expense Ratio," or "TAOER," of 0.02%—exactly what Plaintiffs claim the fund's investment management fee should be. ACC ¶ 109. The fact sheet says, however, that State Street's SSgA Aggressive Balanced Fund's "investment management fee . . . *is not included* in the TAOER." *Id.* (emphasis

---

of fee disclosure summaries); *Cunningham v. Cornell Univ.*, No. 16-cv-6525 (PKC), 2017 WL 4358769, at *3-4 (S.D.N.Y. Sept. 29, 2017) (taking judicial notice of plan disclosures).

[12] *See* Fact Sheet: State Street Aggressive Strategic Balanced Securities Lending Series Fund Class I, https://publix401k.voya.com/static/epweb/pdf/ffs/CH5U.PDF (last visited Mar. 31, 2021).

added).  In other words, Plaintiffs seem to have mistaken the Fund's operating expense (0.02%)

for its investment management fee.  Crucially, the former is fixed and does not vary from plan to

plan, while the latter is subject to negotiation and thus "may vary."  *Id*.  Participants pay a

combination of the two.  That is why State Street encourages them to "contact [their] Plan

Administrator for a complete description of the fees and expenses applicable" to the Fund.  *Id.*

This error pervades Plaintiffs' comparison between the Plan's investment options and

allegedly lower-cost options.  Each allegation about the Plan's investment management fees

mistakenly includes other items like trustee and administrative fees.  Meanwhile, each allegation

about lower cost fees *excludes* the investment alternative's negotiated investment management

fees.  The essence of Count III is that Defendants selected higher-cost funds when lower-cost

options were available.  Yet on closer inspection, Plaintiffs have alleged *no facts* about what the

Plan's investment management fees were, and have misleadingly alleged what the alternative

fees should be.  Count III must therefore be dismissed.

**3.      Plaintiffs Do Not Plausibly Allege Any Facts Supporting A Disloyalty Claim.**

ERISA § 404(a)(1)(A) imposes on plan fiduciaries a duty to act "solely in the interest of

the participants and beneficiaries."  Because PSI is not a proper defendant to any fiduciary

claims, *supra* at 5-12, Plaintiffs must plausibly allege that the remaining Defendants—members

of the Plan's Board—somehow acted self-interestedly, or to further a third party's interests, and

thereby failed to "act with an 'eye single' to the interest of the Plan beneficiaries."  *In re*

*WorldCom, Inc.*, 263 F. Supp. 2d 745, 758 (S.D.N.Y. 2012).

Plaintiffs' theory of disloyalty is that a few thousand dollars in hotel fees plus some

unspecified amount of "expenses," ACC ¶ 81, motivated the Plan's Board members—chief

executives at reputable financial institutions unaffiliated with PSI—to sell out the Plan by

directing tens of millions of dollars in excessive fees to PSI.  That theory is implausible, made

even more so by Plaintiffs' alleged timeline. The only payments Plaintiffs have identified

occurred in 2010, well outside both ERISA's six-year limitations period and the putative class

period, ACC ¶ 113. Yet Plaintiffs allege that the Board members' disloyalty continues to this

very day, more than a decade later. ACC ¶ 113 (putative class period runs "through the date of

judgment"). It is hard to fathom how such modest payments, made so long ago, could tempt

Defendants to breach their duties so flagrantly.

Moreover, Plaintiffs' theory assumes the payments were made for an illicit reason. Yet

ERISA allows the Plan to pay reasonable expenses incurred in service to the Plan. *See* 29 C.F.R.

§ 2550.408c-2(b)(3). Without alleging what services incurred the expenses, Plaintiffs cannot say

whether the expenses are unreasonable. An example of such service is attending the meetings

that the Plan's Board must hold at least annually. Alin Decl. Ex. B Art. IX, § 1(A). Around

$6,000 per Board meeting for conference space, rooms, meals, and so forth for the Plan's Board

and necessary support staff hardly seems shockingly unreasonable for a hotel in the area of

White Plains where PSI's headquarters is located. In short, Plaintiffs have alleged no facts that

tell a plausible story of self-dealing.

Furthermore, Plaintiffs' loyalty claims piggyback on their prudence claims. *See*

*Sacerdote*, 2017 WL 3701482, at *5-6 (plaintiffs "simply recast purported breaches of the duty

of prudence as disloyal acts"). CIV 5722 LTS, 2011 WL 1226459, at *10 (S.D.N.Y. Mar. 31,

2011) (dismissing loyalty claims). For example, Plaintiffs allege that Defendants acted

disloyally by failing to "monitor and control the Plan's recordkeeping and administrative fees,"

ACC ¶ 86, failing "to engage in a loyal . . . process to ensure that only reasonable fees were

charged," ACC ¶ 100, and "selecting and retaining [high-cost] investment options." ACC ¶ 145.

These are all different ways of saying Defendants employed an imprudent process. Plaintiffs

identify no "actual and specific conflict" or any facts "that would support an inference of disloyalty, as opposed to imprudence." *In re Am. Int'l Grp., Inc. ERISA Litig. II*, No. 08 CIV. 5722 LTS KNF, 2011 WL 1226459, at *10 (S.D.N.Y. Mar. 31, 2011). Plaintiffs' claims for breach of the fiduciary duty of loyalty must therefore be dismissed. *See White*, 2016 WL 4502808, at *5 (dismissing loyalty claim undifferentiated from prudence claim).

**4. Plaintiffs Have Failed to Plead A Prohibited Transaction Claim.**

In Count II, Plaintiffs allege that PSI's provision of administrative services to the Plan violates ERISA's prohibited transaction rules in *seven* ways. *See* ACC ¶¶ 129 & 131 (advancing claims under ERISA §§ 406(a)(1)(A)-(D) and 406(b)(1)-(3)). These allegations defy common sense. Accepting them would mean that ERISA per se prohibits a retirement plan's engagement of a third-party service provider. That was the fear in *Cunningham v. Cornell University*, No. 16-cv-6525, 2017 WL 4358769, at *10 (S.D.N.Y. Sept. 29, 2017)—a lawsuit brought by interim lead class counsel—where this Court warned that creating a pleading standard coextensive with the basic elements of § 406 "would transform [it] . . . into a statutory provision that proscribes retirement pension plan's most basic operations." That is why ERISA § 408(b)(2) creates a safe harbor from ERISA § 406's prohibitions for transactions involving reasonable arrangements with a party in interest for services necessary to operate a plan and payment of reasonable compensation for those services.

Plaintiffs will likely tell the Court that ERISA § 408(b)(2) is an affirmative defense that defendants ordinarily cannot raise on a motion to dismiss. That may be true in some circuits, *see, e.g.*, *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009), but not in the Second Circuit. Here, Plaintiffs "must allege conduct that is plausibly actionable under the relevant statute and must go beyond creating a 'sheer possibility that a defendant has acted

unlawfully.'" *Leber v. Citigroup, Inc.*, No. 07 Civ. 9329 (SHS), 2010 WL 935442, at *9

(S.D.N.Y. Mar. 16, 2010) (quoting *Iqbal*, 556 U.S. at 678).  Thus, a complaint alleging violations

of ERISA § 406(a) must also allege facts sufficient to support a plausible inference that

§ 408(b)(2)'s exemption does not apply.  *Leber*, 2010 WL 935442, at *9; *see also Skin*

*Pathology Assocs. Inc. v. Morgan Stanley & Co.*, 27 F. Supp. 3d 371, 374-78 (S.D.N.Y. 2014)

(dismissing complaint based on ERISA § 408(b)(2) and DOL regulations).  Because they have

failed to allege *any* facts about the services that PSI provided to the Plan, Plaintiffs have not

plausibly alleged that the Plan's payments to PSI in exchange for those services were

unreasonable and thus have not stated a claim for any kind of prohibited transaction.  *Leber*,

2010 WL 935442, at *10; *Skin Pathology*, 27 F. Supp. 3d at 378 (requiring a plaintiff to

plausibly allege that defendant's conduct fell outside statutory exemption).  Simply put, "a

payment for services rendered cannot be a prohibited transaction."  *Sacerdote*, 2017 WL

3701482, at *13.

Turning to the individual prohibited transactions provisions cited by Plaintiffs,[13] ERISA

§ 406(a)(1)(C) prohibits the "furnishing of . . . services . . . between the plan and a party in

interest."  29 U.S.C. § 1106(a)(1)(C).  It would be circular if a service provider, which becomes a

party in interest by providing services to a plan, 29 U.S.C. § 1002(14)(B), engages in a

prohibited transaction simply by agreeing to furnish those services.  *Sellers v. Anthem Life Ins.*

*Co.*, 316 F. Supp. 3d 25, 34 (D.D.C. 2018) ("Section 406(a)(1) does not admit of Plaintiffs'

---

[13] Plaintiffs advance half-hearted claims under ERISA § 406(a)(1)(A) and (B).  They do not allege that any
transaction involved the "sale or exchange, or leasing, of any property between the plan and a party in interest"
under § 406(a)(1)(A).  *See Sacerdote*, 2017 WL 3701482, at *13 ("[T]he statute is not equating 'property' with
compensation payments simply paid by plan investments to plan recordkeepers for workaday recordkeeping
transactions.").  And while ERISA § 406(a)(1)(B) appears in the caption of Count II, *see* ACC at 44, it is never
mentioned again.  At any rate, that subsection requires the lending of money or extension of credit between a plan
and a party in interest, 29 U.S.C. § 1106(a)(1)(B), which Plaintiffs have not alleged.  Both claims therefore fail.

interpretation, which is . . . grounded in circular reasoning: the transactions were prohibited because [the service provider] was a party in interest, and [the service provider] was a party in interest because it engaged in the prohibited transactions."); *see also Danza v. Fid. Mgmt. Tr. Co.,* 533 F. App'x 120, 125 (3d Cir. 2013) ("While Fidelity is currently a party in interest as a service provider to the plan, it was not 'providing services' and was not a fiduciary when [it was engaged to provide services], so that transaction did not fall within a prohibited category."). Moreover, because Plaintiffs have alleged no facts about the services PSI provided, they have not adequately pleaded that PSI's compensation for those services was unreasonable under § 408(b)(2). Plaintiffs' prohibited transaction claim under ERISA § 406(a)(1)(C) therefore fails.

Plaintiffs' claim under ERISA § 406(a)(1)(D), which prohibits the "transfer to, or use by or *for the benefit of* a party in interest, of any assets of the plan," 29 U.S.C. § 1106(a)(1)(D) (emphasis added), is also doomed. "For the benefit of" requires a showing of "subjective intent to benefit a party in interest." *Reich v. Compton*, 57 F.3d 270, 279 (3d Cir. 1995). In other words, it is not enough that a transaction has the "unintended effect" of benefiting a party in interest; to violate ERISA, it must have been done for that reason. *Id.* Plaintiffs make no showing of subjective intent, and their prohibited transaction claim under ERISA § 406(a)(1)(D) therefore fails.

As for ERISA § 406(b), the only allegedly prohibited transaction Plaintiffs identify was "pay[ment of] Plan assets to [PSI]." ACC ¶ 129. Section 406(b) applies only to fiduciary actions, and prohibits only "transactions between a plan and a fiduciary." 29 U.S.C. § 1106(b). As shown above, PSI was not a fiduciary as to its own retention and compensation. *Supra* at 5-12. What is more, § 406(b)(2) specifically applies only to transactions with a fiduciary whose interests are adverse to the plan's. 29 U.S.C. 1106(b)(2). Plaintiffs have alleged no facts

24

showing that PSI's interests were adverse to the Plan, and adversity cannot arise from "merely providing service to the Plan for a fee." *Patrico v. Voya Fin., Inc.*, No. 16-cv-7070, 2018 WL 1319028, at *5-6 (S.D.N.Y. Mar. 13, 2018). For these reasons, Plaintiffs' prohibited transaction claims under ERISA § 406(b) fail.

**5.    Plaintiffs Have Failed To State A Claim For Breach Of The Duty To Monitor.**

Plaintiffs' remaining allegations are that Defendants breached their duty to monitor in several ways. ACC ¶ 153. Plaintiffs' duty-to-monitor claims are derivative of their other claims; accordingly, because their duty-of-loyalty and duty-of-prudence claims fail, their duty-to-monitor claims fail as well. *See, e.g.*, *Rinehart v. Akers*, 722 F.3d 137, 154 (2d Cir. 2013) ("Plaintiffs cannot maintain a claim for breach of the duty to monitor … absent an underlying breach of the duties imposed under ERISA" by the party being monitored), *vacated on other grounds*, 134 S. Ct. 2900 (2014), *and reaff'd sub nom. Rinehart v. Lehman Bros. Holdings, Inc.*, 817 F.3d 56 (2d Cir. 2016).

In any event, Plaintiffs once again fail to allege any facts about what the Plan's monitoring processes were—or what monitoring procedures it should have had in place. Without these process allegations, Plaintiffs have failed to state a plausible monitoring claim. *See, e.g.*, *White*, 2016 WL 4502808, at *19 (dismissing duty-to-monitor claim because "plaintiffs allege[d] no facts showing how the monitoring process was deficient").

## V.    CONCLUSION

For these reasons, the Court should dismiss Plaintiffs' Amended Consolidated Complaint. Because Plaintiffs have already had a chance to cure the pleading defects identified above, including in response to issues raised in Defendants' pre-motion-to-dismiss letters (Dkt. 59, 79 & 87), that dismissal should be with prejudice.

Dated: April 1, 2021

Respectfully Submitted,

*/s/ Mark C. Nielsen*
GROOM LAW GROUP, CHARTERED
Mark C. Nielsen, Bar No. MN4214
Sarah M. Adams (*pro hac vice*)
Edward J. Meehan (*pro hac vice*)
David N. Levine (*pro hac vice*)
Kevin L. Walsh (*pro hac vice*)
Ross P. McSweeney (*pro hac vice*)
Kalena R. Kettering (*pro hac vice*)
1701 Pennsylvania Ave., N.W.
Washington, D.C. 20006
202-857-0620 (phone)
202-659-4503 (fax)
mnielsen@groom.com
sadams@groom.com
emeehan@groom.com
dlevine@groom.com
kwalsh@groom.com
rmcsweeney@groom.com
lkettering@groom.com

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on April 1, 2021, I filed in this action the foregoing **MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)** electronically via the Court's ECF System.  Notice of this filing will be sent in this action by operation of the Court's electronic system to all counsel of record in the ECF System.

Respectfully Submitted,

*/s/ Mark C. Nielsen*
Mark C. Nielsen (Bar No. MN4214)
GROOM LAW GROUP, CHARTERED
1701 Pennsylvania Ave., N.W.
Washington, D.C. 20006
202-861-5429 (phone)
202-659-4503 (fax)
mnielsen@groom.com

*Attorney for Defendants*