**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IMRAN KHAN et al., | |
|      Plaintiffs, | |
| v. | No. 7:20-cv-07561-PMH |
| | [rel. 20-cv-08503] |
| BOARD OF DIRECTORS OF PENTEGRA DEFINED CONTRIBUTION PLAN et al., | |
|      Defendants. | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS AMENDED COMPLAINT [DOC. 93]**

**CONTENTS**

Authorities ......................................................................................................................... ii

Introduction ...................................................................................................................... 1

Background ....................................................................................................................... 1

    I.    The Pentegra Defined Contribution Plan for Financial Institutions ............................... 1

    II.   ERISA fiduciary standards ........................................................................................ 2

    III.  Plaintiffs' claims ..................................................................................................... 3

        A.   The Plan's excessive recordkeeping and administrative fees ................................... 4

        B.   The Plan's excessive investment fees ................................................................ 6

Argument .......................................................................................................................... 6

    I.    Standard of review: the complaint's well-pleaded facts are construed liberally and need only raise a plausible inference of misconduct. ............................................... 6

    II.   Plaintiffs allege plausible breaches of fiduciary duties regarding the Plan's fees. .......... 7

        A.   Count I plausibly alleges a breach regarding recordkeeping fees. .......................... 9

        B.   Count III plausibly alleges a breach regarding investment fees. ........................... 16

        C.   The complaint plausibly alleges disloyalty. ..................................................... 17

    III.  Plaintiffs plausibly allege prohibited transactions (Count II). ..................................... 18

    IV.  Plaintiffs plausibly allege Pentegra's fiduciary and non-fiduciary liability. ................. 20

        A.   Pentegra acts through its CEO, who undisputedly is a fiduciary. ........................ 20

        B.   Pentegra admittedly acted as a fiduciary over its compensation. .......................... 24

        C.   Defendants concede that Pentegra is liable as a non-fiduciary. ........................... 25

    V.   Plaintiffs plausibly allege a failure to monitor fiduciaries (Count IV) ........................ 25

    VI.  Defendants' request for dismissal *with prejudice* is contrary to Second Circuit law. ...................................................................................................................... 25

Conclusion ...................................................................................................................... 25

**AUTHORITIES**

**Cases**

*Anderson v. Intel Corp.*,
  No. 19-4618, 2021 WL 229235 (N.D. Cal. Jan. 21, 2021) .................................................. 11

*Bell v. Pension Comm. of ATH. Holding Co.*,
  No. 15-2062, 2017 WL 1091248 (S.D. Ind. Mar. 23, 2017) .............................................. 8

*Bernhard v. Cent. Parking Sys. of N.Y., Inc*.,
  282 F.R.D. 284 (E.D.N.Y. 2012) ................................................................................ 20

*Blatt v. Marshall & Lassman*,
  812 F.2d 810 (2d Cir. 1987) ...................................................................................... 22

*Bowers v. BB&T Corp.*,
  No. 15-732 Doc. 58 (M.D.N.C. Apr. 18, 2016) .......................................................... 8

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009) ........................................................................ 7, 11, 13, 19

*Braswell v. United States*,
  487 U.S. 99 (1988) ..................................................................................................... 20

*Brotherston v. Putnam Investments, LLC*,
  No. 15-13825, 2016 WL 1397427 (D. Mass. Apr. 7, 2016) ........................................ 8

*Camreta v. Greene*,
  563 U.S. 692 (2011) ................................................................................................... 21

*Cassell v. Vanderbilt Univ.*,
  285 F. Supp. 3d 1056 (M.D. Tenn. 2018) .................................................................. 8

*Cates v. Trs. of Columbia Univ.*,
  No. 16-6524, 2017 WL 3724296 (S.D.N.Y. Aug. 28, 2017) ....................................... 8

*Clark v. Duke Univ.*,
  No. 16-1044, 2017 WL 4477002 (M.D.N.C. May 11, 2017) ....................................... 8

*Cresci v. Mohawk Valley Cmty. Coll.*,
  693 F. App'x 21 (2d Cir. 2017) (unpublished) ......................................................... 25

*Cunningham v. Cornell Univ.*,
  2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017) .............................................. 8, 19, 25

*Daugherty v. Univ. of Chi.*,
  No. 17-3736, 2017 WL 4227942 (N.D. Ill. Sept. 22, 2017) ....................................... 8

*Davis v. Washington Univ. in St. Louis*,
  960 F.3d 478 (8th Cir. 2020) ...................................................................................... 24

*Disselkamp v. Norton Healthcare, Inc.*,
  No. 18-48, 2019 WL 3536038 (W.D. Ky. Aug. 2, 2019) ............................................ 8

*Doe v. Columbia Univ.*,
  831 F.3d 46 (2d Cir. 2016) .......................................................................................... 7

*Donovan v. Bierwirth*,
   680 F.2d 263 (2d Cir. 1982) ............................................................ 1, 17, 18

*Est. of Thompson v. Comm'r*,
   382 F.3d 367 (3d Cir. 2004) ..................................................................... 24

*F.H. Krear & Co. v. Nineteen Named Trs.*,
   810 F.2d 1250 (2d Cir. 1987) ................................................................... 23

*Fifth Third Bancorp v. Dudenhoeffer*,
   573 U.S. 409 (2014) .................................................................................... 2

*George v. Kraft Foods Global, Inc.*,
   641 F.3d 786 (7th Cir. 2011) ...................................................................... 9

*George v. Kraft Foods Global, Inc.*,
   674 F.Supp.2d 1031 (N.D.Ill. 2009) ............................................... 8, 9, 16

*Hamilton v. Carell*,
   243 F.3d 992 (6th Cir. 2001) .................................................................... 21

*Harmon v. Shell Oil Co.*,
   No. 20-21, Doc. 139 (S.D. Tex. Mar. 31, 2021) ........................................ 8

*Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*,
   530 U.S. 238 (2000) .......................................................................... 3, 19, 25

*Henderson v. Emory Univ.*,
   252 F. Supp. 3d 1344 (N.D. Ga. 2017) ...................................................... 8

*Howell v. Motorola, Inc.*,
   633 F.3d 552 (7th Cir. 2011) ............................................................... 18, 21

*In re Cardinal Health ERISA Litig.*,
   424 F.Supp.2d 1002 (S.D.Ohio 2006) ..................................................... 21

*In re MedStar ERISA Litig.*,
   No. 20-1984, 2021 WL 391701 (D. Md. Feb. 4, 2021) ............................. 8

*In re Quest Diagnostics Inc. ERISA Litig.*,
   No. 20-07936, 2021 WL 1783274 (D.N.J. May 4, 2021) ......................... 8

*John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*,
   510 U.S. 86 (1993) .................................................................................... 23

*Katsaros v. Cody*,
   744 F.2d 270 (2d Cir. 1984) ....................................................................... 7

*Keiler v. Harlequin Enters.*,
   751 F.3d 64 (2d Cir. 2014) .................................................................... 7, 12

*Kelly v. Johns Hopkins Univ.*,
   No. 16-2835, Doc. 45 (D. Md. Sept. 28, 2017) ......................................... 8

*Kelly-Brown v. Winfrey*,
   717 F.3d 295 (2d Cir. 2013) ..................................................................... 13

*Kirschner v. KPMG LLP*,
    15 N.Y.3d 446, 938 N.E.2d 941 (2010) ............................................................... 21

*Kling v. Fidelity Mgmt. Trust Co.*,
    323 F. Supp. 2d 132 (D. Mass. 2004) ............................................................... 21

*Krueger v. Ameriprise Fin., Inc.*,
    No. 11-2781, 2012 WL 5873825 (D. Minn. Nov. 20, 2012) .................................... 8

*Kruger v. Novant Health, Inc.*,
    131 F. Supp. 3d 470 (M.D.N.C. 2015) ................................................................ 8

*Larson v. Allina Health Sys.*,
    350 F. Supp. 3d 780 (D. Minn. 2018) ................................................................ 8

*Leber v. Citigroup, Inc.*,
    No. 07-9329 (SHS), 2010 WL 935442 (S.D.N.Y. Mar. 16, 2010) ........................ 20

*Liss v. Smith*,
    991 F.Supp.278 (S.D.N.Y. 1998) ..................................................................... 20

*Loomis v. Exelon Corp.*,
    658 F.3d 667 (7th Cir. 2011) ........................................................................... 15

*LoPresti v. Terwilliger*,
    126 F.3d 34 (2d Cir. 1997) .............................................................................. 23

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015) ............................................................................ 25

*Lynch v. City of New York*,
    952 F.3d 67 (2d Cir. 2020) ......................................................................... 7, 11

*McGowan v. Barnabas Health, Inc.*,
    No. 20-13119, 2021 WL 1399870 (D.N.J. Apr. 13, 2021) .................................... 8

*Mertens v. Hewitt Assocs.*,
    508 U.S. 248 (1993) ...................................................................................... 24

*Moitoso v. FMR LLC*,
    451 F. Supp. 3d 189 (D. Mass. 2020) ................................................................ 9

*Moreno v. Deutsche Bank Ams. Holding Corp.*,
    No. 15-9936, 2016 WL 5957307 (S.D.N.Y. Oct. 13, 2016) ............................ 8, 25

*Morin v. Essentia Health*,
    No. 16-4397, 2017 WL 4083133 (D. Minn. Sept. 14, 2017), *rpt. and rec. adopted*,
    2017 WL 4876281 (D. Minn. Oct. 27, 2017) ....................................................... 8

*N.Y. State Teamsters Council Health & Hosp. Fund v. Estate of DePerno*,
    18 F.3d 179 (2d Cir. 1994) .............................................................................. 18

*Nationwide Mut. Ins. Co. v. Darden*,
    503 U.S. 318 (1992) ...................................................................................... 21

*Nicolas v. Trs. of Princeton Univ.*,
    No. 17-3695, 2017 WL 4455897 (D.N.J. Sept. 25, 2017) ..................................... 8

*Palin v. New York Times Co.*,
  940 F.3d 804 (2d Cir. 2019) ............................................................. 7, 22

*Parmer v. Land O'Lakes, Inc.*,
  No. 20-1253, 2021 WL 464382 (D. Minn. Feb. 9, 2021) ...................... 8

*Patrico v. Voya Fin., Inc.*,
  No. 16-7070 (LGS), 2018 WL 1319028 (S.D.N.Y. Mar. 13, 2018) ...................... 20

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Retirement Plan v. Morgan Stanley Inv. Mgmt. Inc*.,
  712 F.3d 705 (2d Cir. 2013) ...................................................... 2, 7, 8, 16

*Perrone v. Johnson & Johnson*,
  No. 19-923, 2020 WL 2060324 (D.N.J. Apr. 29, 2020) ...................... 21

*Pledger v. Reliance Tr. Co.*,
  240 F. Supp. 3d 1314 (N.D. Ga. 2017) ...................................... 8, 10, 14

*Ramos v. Banner Health*,
  461 F. Supp. 3d 1067 (D. Colo. 2020) ............................................ 9

*Renfro v. Unisys Corp.*,
  671 F.3d 314 (3d Cir. 2011) ...................................................... 15

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007) ...................................................... 14

*Rozo v. Principal Life Ins. Co.*,
  949 F.3d 1071 (8th Cir. 2020) ...................................................... 22

*Sacerdote v. New York Univ.*,
  No. 16-6284, 2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017) ...................... 8

*Sellers v. Anthem Life Ins. Co.*,
  316 F. Supp. 3d 25 (D.D.C. 2018) ............................................ 19

*Shetel Indus. LLC v. Adin Dental Implant Sys., Inc.*,
  493 F. Supp. 3d 64 (E.D.N.Y. 2020) ............................................ 20

*Short v. Brown Univ.*,
  320 F. Supp. 3d 363 (D.R.I. 2018) ............................................ 8

*Sweda v. Univ. of Pennsylvania*,
  923 F.3d 320 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2565 (2020) ........ 7, 8, 10, 11, 13, 15, 16

*Taylor v. United Techs. Corp.*,
  No. 06-1494, 2007 WL 2302284 (D. Conn. Aug. 9, 2007) ...................... 8

*Terraza v. Safeway Inc.*,
  241 F.Supp.3d 1057 (N.D. Cal. 2017) ............................................ 8

*Tibble v. Edison Int'l*,
  575 U.S. 523 (2015) ...................................................... 3, 9

*Tibble v. Edison Int'l*,
  843 F.3d 1187 (9th Cir. 2016) (en banc) ...................................... 9, 11, 16

*Tibble v. Edison Int'l*,
  No. 07-5359, 2010 WL 2757153 (C.D. Cal. July 8, 2010) .................................. 17

*Tibble v. Edison Int'l*,
  No. 07-5359, Doc. 26 (C.D.Cal. July 16, 2008) ...................................... 8

*Troudt v. Oracle Corp.*,
  No. 16-175, 2017 WL 1100876 (D. Colo. Mar. 22, 2017) .............................. 8

*Tussey v. ABB, Inc.*,
  746 F.3d 327 (8th Cir. 2014) ............................................ 9, 11, 15

*Tussey v. ABB, Inc.*,
  850 F.3d 951 (8th Cir. 2017) ................................................ 18

*Tussey v. ABB, Inc.*,
  No. 06-4305, 2008 WL 379666 (W.D. Mo. Feb. 11, 2008) ........................... 8

*Varity Corp. v. Howe*,
  516 U.S. 489 (1996) ...................................................... 15

*Vellali v. Yale Univ.*,
  308 F. Supp. 3d 673 (D. Conn. 2018) ....................................... 8, 10

*Wildman v. Am. Century Servs., LLC*,
  237 F. Supp. 3d 902 (W.D. Mo. 2017) ......................................... 8

*Woods v. S. Co.*,
  396 F.Supp.2d 1351 (N.D. Ga. 2005) ......................................... 21

*Young v. GM Inv. Mgmt. Corp.*,
  325 F.App'x 31 (2d Cir. 2009) .............................................. 12

**Statutes**

26 U.S.C. §413(c) ............................................................ 1

29 U.S.C. §1002(14) ......................................................... 19

29 U.S.C. §1002(21)(A) .................................................... 2, 22

29 U.S.C. §1002(34) ........................................................ 1, 3

29 U.S.C. §1104(a)(1)(B) .................................................... 10

29 U.S.C. §1106 ....................................................... 3, 18, 19

29 U.S.C. §1108(b)(2)(A) ................................................. 18, 19

29 U.S.C. §1109(a) ......................................................... 3, 7

**Rules**

Fed.R.Civ.P. 12(b)(6) ....................................................... 13

Fed.R.Civ.P. 8(a)(2) ....................................................... 12

# INTRODUCTION

To protect the interests of workers who invest in retirement savings plans, ERISA requires plan fiduciaries to act prudently and "with an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982). These obligations "are those of trustees of an express trust—the highest known to the law." *Id.* at 272 n.8.

Plaintiffs' complaint amply demonstrates that the Board of Directors of the Pentegra Defined Contribution Plan, including Pentegra through its President and CEO, fell far short of those high standards of conduct.[1] Defendants abdicated their duties to monitor Pentegra's fees and to defray only reasonable Plan expenses. Defendants caused the Plan to pay Pentegra annual recordkeeping and administrative fees of over $10 million—*six times higher* than prevailing market rates for the same services. Defendants imposed these fees by inflating the Plan's investment expenses, thereby enriching Pentegra at the direct expense of employees' retirement savings. As a result of this scheme, the Plan's participants collectively lost over $70 million.

Courts have overwhelmingly denied motions to dismiss similar claims, often based on facts that are not nearly as compelling. *See infra*, 8 n.4. The Court should deny the motion to dismiss.

# BACKGROUND

## I.    The Pentegra Defined Contribution Plan for Financial Institutions

Plaintiffs are participants in the Plan, which is a "defined contribution" or "individual account" employee benefit plan. AC ¶¶6, 10–16; *see* 29 U.S.C. §1002(34). It is intended to be a multiple employer plan. AC ¶7; *see* 26 U.S.C. §413(c). Approximately 250 banks have adopted the Plan for their employees. AC ¶7. Plaintiffs bring this action on behalf of the Plan and a

---

[1] This brief uses the following shorthand references: "AC" (Amended Consolidated Class Action Complaint, Doc. 92), "MIS" (Defs.' Mem. in Support of Motion to Dismiss, Doc. 93-1); "Plan" (Pentegra Defined Contribution Plan for Financial Institutions), "Board" (the Plan's Board of Directors), "Pentegra" (Pentegra Services, Inc.), "Defendants" (all defendants), and "Plaintiffs" (all plaintiffs).

putative class of all participants since September 15, 2014. AC ¶¶1, 5, 112–113.

Defendants allegedly are the Plan's fiduciaries. AC ¶¶17–47. The Plan document designates Defendant Board of Directors as the Plan's named fiduciary with authority to control and manage the Plan's operation. AC ¶¶17–18, 26; Doc. 93-5 at 82 (Art. IX, §1(A));[2] 29 U.S.C. §1102(a)(1). The Board consists of six executives of participating employers, as well as the President and CEO of Pentegra Services, Inc., Defendant Pinto. AC ¶¶17–25. The Plan designates Pinto as the Plan's "President" and "chief administrative officer." AC ¶19.

The Board did not actually oversee the Plan on a day-to-day basis. AC ¶18. As allowed by the Plan, the Board delegated its fiduciary responsibilities to Pentegra and its agents. AC ¶18; Doc. 93-5 at 82 (Art. IX §1(C)). Pentegra admittedly took on an "extremely broad responsibility" for the Plan's fiduciary functions, including serving as Plan administrator and monitoring the "*reasonableness of Pentegra's own fees*." AC ¶¶27–32. Pentegra advertised its credentials as "*one of the most experienced plan fiduciaries*" in the country and touted the "unmatched fiduciary protection" available through its services. AC ¶¶29–30. Pentegra thus acted as a "functional" Plan fiduciary in a variety of roles. 29 U.S.C. §1002(21)(A); AC ¶¶27–45.

## II.  ERISA fiduciary standards

"ERISA's central purpose is to protect beneficiaries of employee benefits plans." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Retirement Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 715 (2d Cir. 2013) ("*PBGC*"). It does so by imposing upon plan fiduciaries "strict standards of trustee conduct … derived from the common law of trusts—most prominently, a standard of loyalty and a standard of care." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 416 (2014). Fiduciaries must act "solely in the interest of the participants" and

---

[2] "Doc." page citations are to the ECF header page numbers at the top of the page.

"with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. §1104(a)(1)(A)–(B). Section 1106 supplements the general duties by categorically prohibiting "certain transactions deemed 'likely to injure'" a plan. *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241–42 (2000); 29 U.S.C. §1106. The duties are ongoing; imprudent practices must be eliminated no matter how long they have been in place. *Tibble v. Edison Int'l*, 575 U.S. 523, 529–30 (2015). A fiduciary who violates its duties is liable for any resulting "losses to the plan" and appropriate equitable relief. 29 U.S.C. §1109(a).

## III. Plaintiffs' claims

In defined contribution plans, "participants' retirement benefits are limited to the value of their own individual investment accounts," which is a function of the amount contributed and investment performance, minus expenses. *Tibble*, 575 U.S. at 525; 29 U.S.C. §1002(34). "Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble*, 575 U.S. at 525; AC ¶55. Over the course of a 40-year career, a 1% difference in fees will reduce the average participant's account balance by $500,000. AC ¶58. Plan fiduciaries have discretion over defined contribution plan expenses, by (1) determining the investment options in which participants can invest (each of which carries an "expense ratio"), and (2) hiring a provider of administrative services, including recordkeeping, and setting its compensation. AC ¶¶56–57, 59.

With over 27,000 participants and $2.1 billion in assets, the Plan is among the largest 0.07% of all defined contribution plans in the United States. AC ¶9. In the competitive market for defined contribution plan services, such "mega" or "jumbo" plans have tremendous leverage to obtain high-quality services at favorable pricing. AC ¶¶9, 59, 66. Despite the Plan's massive bargaining power, the fees paid by participants have far exceeded the rates of comparable plans.

## A.     The Plan's excessive recordkeeping and administrative fees

Defined contribution plans require administrative services. AC ¶66. The largest
administrative expense is for recordkeeping. The recordkeeper tracks each participant's account,
sends quarterly statements, and provides related services such as a call center and website. *Id.*
These services are largely commodities, and there are many high-quality providers in the market
who compete aggressively for the business of large plans. *Id.* ¶¶66–67.

Plans typically pay for administration either through a fixed per-participant fee based on the
number of participant accounts in the plan, or a percentage of plan assets. *Id.* ¶¶70–71. The *cost*
of providing recordkeeping services depends on the number of participants, not assets. *Id.* ¶68. It
costs no more to keep records for a $100,000 account than a $1,000 account. *Id.* In large plans,
recordkeepers achieve economies of scale because overhead costs are spread among more
accounts. *Id.* ¶¶68–69. This allows a 27,000-participant plan to obtain a much lower fee per-
participant than a 10,000-participant plan.

Because the primary driver of recordkeeping costs is the number of participants, the
preferred method of prudent fiduciaries is to negotiate a fixed per-participant recordkeeping fee
(*e.g.*, $40 per-participant per year).[3] *Id.* ¶¶68, 70. Tying the recordkeeper's compensation to the
number of accounts ensures a close correlation between a plan's administrative expenses and the
value of the services received. *Id.* ¶71. In contrast, a percentage-of-assets model inherently
produces arbitrary fee increases that are not correlated to the level or quality of the
recordkeeper's services. *Id.* ¶70. As assets grow (through contributions and investment gains)
while the number of participants remains constant, the recordkeeper receives higher
compensation for the same level of services. *Id.* Thus, while an asset-based method is not a *per*

---

[3] The plan-level *negotiation* method should not be confused with the participant-level *allocation*
method. AC ¶¶71–72.

*se* breach of duty, it is a circumstance demanding a heightened level of diligence and monitoring to ensure that the amount of compensation is reasonable for the services rendered. *Id.* ¶¶73–74. The surest way to determine a reasonable fee is to obtain competitive bids at regular intervals of three to five years, as recommended by the U.S. Department of Labor. *Id*. ¶¶75–76.

Defendants failed to ensure that Pentegra's compensation was reasonable for its services to the Plan and relative to market rates for the same services. *Id*. ¶¶41–42, 77–103. Defendants retained Pentegra as Plan recordkeeper without competition, or even arm's-length negotiation, and caused it to receive over $50 million in Plan assets since 2014, including uncapped, asset-based fees of 28–60 basis points (0.28%–0.60%) *in addition to* annual fees of $75 per participant and $1,950 per employer. AC ¶¶41–42, 77–79, 82. Pentegra's asset-based fees were untied to the participant-based cost of its services to the Plan. *Id.* ¶¶79–80. Defendants did not negotiate a Plan-level cap, allowing Pentegra to retain amounts exceeding a reasonable fee. AC ¶¶80, 84, 86. As Plan assets grew by $200 million from 2014 through 2018, Pentegra's compensation increased each year even though its services did not, and even though fees in the industry generally were declining. *Id.* ¶¶83–86. Defendants never negotiated a reduction in Pentegra's fees. *Id.* ¶86. Defendants have not obtained competitive bids since hiring Pentegra in 2007, repeatedly renewing Pentegra's contract without market competition. *Id.* ¶¶36, 96, 102.

As a result of those failures of fiduciary process, the Plan suffered massive losses. AC ¶¶88–103. From 2014 through 2018, the Plan's annual fees of $9.5 million to $10.5 million (an average of $360–$389 per participant) were nearly *six times higher* than the $1.7 million market rate ($65 per participant account) that could have been obtained through a competitive bidding process for the same services. *Id*. ¶¶97–99. Plaintiffs identify specific examples of other defined contribution plans which paid far lower fees during the same period, including corporate 401(k)

plans, industry surveys, and a multiple employer plan that paid a fraction of the Plan's fees ($65/participant) despite being much smaller. *Id.* ¶¶88–92, 95, 98. Thus, the Plan's multiple-employer structure—which Pentegra advertises as a feature that *reduces* costs—does not explain the excess. *Id.* ¶¶93–95. Including lost investment opportunity, the Plan lost roughly $70 million due to excessive recordkeeping and administrative fees compared to market rates. *Id.* ¶103.

### B.    The Plan's excessive investment fees

Defendants caused Pentegra's recordkeeping and administrative fees to be charged to participants' accounts by adding a layer of fees to the expense ratios of the Plan's investment options. AC ¶78. This caused participants to pay retail rates for their investments in the Plan even though lower-cost institutional versions of the same mutual funds and collective trusts were available to the Plan because of its massive size. *Id.* ¶¶105–10. The institutional options are identical to the Plan's options in every way—they invest in the same portfolio of securities managed by the same investment adviser—but charge much lower fees. *Id.* ¶¶106–09. By causing the Plan to include investment options with higher fees in order to compensate Pentegra, Defendants squandered the Plan's bargaining power and caused losses to the Plan. *Id.* ¶111.

Based on these facts, Plaintiffs assert in four causes of action that Defendants breached their fiduciary duties under 29 U.S.C. §1104(a)(1) with respect to the Plan's fees (Counts I, III, AC ¶¶116–25, 143–48), caused prohibited transactions in violation of 29 U.S.C. §1106 (Count II, AC ¶¶126–42), and that the Board breached its fiduciary monitoring duty (Count IV, AC ¶¶149–54). Plaintiffs seek recovery of the Plan's losses and appropriate equitable relief. AC, pp. 50–51.

## ARGUMENT

### I.    Standard of review: the complaint's well-pleaded facts are construed liberally and need only raise a plausible inference of misconduct.

"[T]o survive a motion under Rule 12(b)(6), a complaint does not need to contain detailed or

elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." *Keiler v. Harlequin Enters.*, 751 F.3d 64, 70 (2d Cir. 2014) (citation omitted). A court must "constru[e] the complaint liberally." *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019). "Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). A plaintiff's plausible theory need not be "the *most plausible* explanation" or more plausible than the defendant's alternative explanation. *Doe v. Columbia Univ.*, 831 F.3d 46, 57 (2d Cir. 2016); *Palin*, 940 F.3d at 815. Plausibility "'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal' conduct." *Lynch*, 952 F.3d at 75 (citation omitted).

## II. Plaintiffs allege plausible breaches of fiduciary duties regarding the Plan's fees.

A breach of fiduciary duty claim has three elements: "(1) a plan fiduciary (2) breaches an ERISA-imposed duty (3) causing a loss to the plan." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 328 (3d Cir. 2019), *cert. denied,* 140 S. Ct. 2565 (2020); 29 U.S.C. §1109(a). With the exception of Pentegra's fiduciary status (addressed *infra*, Part IV), the first and third elements are not disputed. Defendants primarily dispute whether Plaintiffs have plausibly alleged that Defendants breached the duties of prudence or loyalty imposed by 29 U.S.C. §1104(a)(1).

The objective prudent person standard of §1104(a)(1) is a test of conduct. *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984). It requires a thorough and reasoned decision-making process free from self-interest. *Id.* "A fiduciary's process must bear the marks of loyalty, skill, and diligence expected of *an expert* in the field." *Sweda*, 923 F.3d at 329 (emphasis added).

A fiduciary breach claim is plausible if the court can "reasonably 'infer from what is alleged that the process was flawed.'" *PBGC*, 712 F.3d at 718 (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009)). A flawed process is one "tainted by failure of effort,

competence, or loyalty." *Braden*, 588 F.3d at 596. A complaint raises an inference of a flawed

process through well-pleaded facts showing that a "prudent fiduciary in like circumstances

would have acted differently." *PBGC*, 712 F.3d at 720. Claims regarding "reasonableness of

'compensation for services'" involve "inherently factual question[s]" that typically cannot be

resolved on a motion to dismiss. *Sweda*, 923 F.3d at 329. Indeed, courts have overwhelmingly

denied motions to dismiss similar excessive-fee claims.[4]

    This Court should reach the same result. Defendants incurred unreasonable fees for Plan

---

[4] *See, e.g.*, *Sweda*, 923 F.3d at 331–34; *Braden*, 588 F.3d at 595–96 & n.6; *Cunningham v. Cornell Univ.*, 2017 WL 4358769, at *6 (S.D.N.Y. Sept. 29, 2017); *Cates v. Trs. of Columbia Univ.*, No. 16-6524, 2017 WL 3724296, at *2 (S.D.N.Y. Aug. 28, 2017); *Sacerdote v. New York Univ.*, No. 16-6284, 2017 WL 3701482, at *8–10 (S.D.N.Y. Aug. 25, 2017); *Moreno v. Deutsche Bank Ams. Holding Corp.*, No. 15-9936, 2016 WL 5957307, at *6 (S.D.N.Y. Oct. 13, 2016); *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 684–85 (D. Conn. 2018); *In re Quest Diagnostics Inc. ERISA Litig.*, No. 20-07936, 2021 WL 1783274, at *3–5 (D.N.J. May 4, 2021); *McGowan v. Barnabas Health, Inc.*, No. 20-13119, 2021 WL 1399870, at *5–8 (D.N.J. Apr. 13, 2021); Order at 1, *Harmon v. Shell Oil Co*., No. 20-21, Doc. 139 (S.D. Tex. Mar. 31, 2021); *Parmer v. Land O'Lakes, Inc.*, No. 20-1253, 2021 WL 464382, at *6, *8–9 (D. Minn. Feb. 9, 2021); *In re MedStar ERISA Litig.*, No. 20-1984, 2021 WL 391701, at *6–7 (D. Md. Feb. 4, 2021); *Disselkamp v. Norton Healthcare, Inc.*, No. 18-48, 2019 WL 3536038, at *9–10 (W.D. Ky. Aug. 2, 2019); *Larson v. Allina Health Sys.*, 350 F. Supp. 3d 780, 799–800 (D. Minn. 2018); *Short v. Brown Univ.*, 320 F. Supp. 3d 363, 370–71 (D.R.I. 2018); *Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1064-66 (M.D. Tenn. 2018); *Tracey v. Mass. Inst. of Tech.*, No. 16-11620, 2017 WL 4478239, at *3 (D. Mass. Oct. 4, 2017); Mem. to Counsel at 2, *Kelly v. Johns Hopkins Univ.*, No. 16-2835, Doc. 45 (D. Md. Sept. 28, 2017); *Nicolas v. Trs. of Princeton Univ.*, NO. 17-3695, 2017 WL 4455897, at *4 (D.N.J. Sept. 25, 2017); *Daugherty v. Univ. of Chi.*, No. 17-3736, 2017 WL 4227942, at *7 (N.D. Ill. Sept. 22, 2017); *Morin v. Essentia Health*, No. 16-4397, 2017 WL 4083133, at *12 (D. Minn. Sept. 14, 2017), *rpt. and rec. adopted*, 2017 WL 4876281 (D. Minn. Oct. 27, 2017); *Clark v. Duke Univ.*, No. 16-1044, 2017 WL 4477002, at *2 (M.D.N.C. May 11, 2017); *Henderson v. Emory Univ.*, 252 F. Supp. 3d 1344, 1352–53 (N.D. Ga. 2017); *Terraza v. Safeway Inc.*, 241 F.Supp.3d 1057, 1078 (N.D. Cal. 2017); *Pledger v. Reliance Tr. Co.*, 240 F. Supp. 3d 1314, 1329–30 (N.D. Ga. 2017); *Bell v. Pension Comm. of ATH. Holding Co.*, No. 15-2062, 2017 WL 1091248, at *4–5 (S.D. Ind. Mar. 23, 2017); *Troudt v. Oracle Corp.*, No. 16-175, 2017 WL 1100876, at *2–3 (D. Colo. Mar. 22, 2017); *Wildman v. Am. Century Servs., LLC*, 237 F. Supp. 3d 902, 915 (W.D. Mo. 2017); *Marshall v. Northrop Grumman Corp.*, No. 16-06794, 2017 WL 2930839, at *11 (C.D. Cal. Jan. 30, 2017); Order, *Bowers v. BB&T Corp.*, No. 15-732 (M.D.N.C. Apr. 18, 2016); *Brotherston v. Putnam Investments, LLC*, No. 15-13825, 2016 WL 1397427, at *1 (D. Mass. Apr. 7, 2016); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 478–79 (M.D.N.C. 2015); *Krueger v. Ameriprise Fin., Inc.*, No. 11-2781, 2012 WL 5873825, at *19–20 (D. Minn. Nov. 20, 2012); *George v. Kraft Foods Global, Inc.*, 674 F.Supp.2d 1031, 1047–48 (N.D.Ill. 2009); Order at at 23–24, 27–28, *Tibble v. Edison Int'l*, No. 07-5359, Doc. 26 (C.D.Cal. July 16, 2008); *Tussey v. ABB, Inc.*, No. 06-4305, 2008 WL 379666, at *5 (W.D. Mo. Feb. 11, 2008); *Taylor v. United Techs. Corp.*, No. 06-1494, 2007 WL 2302284, at *2–4 (D. Conn. Aug. 9, 2007).

administration and investments, thereby enriching Pentegra at the expense of participants'
retirement savings. A prudent and loyal fiduciary would have acted differently.

### A. Count I plausibly alleges a breach regarding recordkeeping fees.

ERISA fiduciaries are obligated to "understand and monitor plan expenses," and "should be
vigilant in 'negotiation of the specific formula and methodology'" used to pay service providers.
*Sweda*, 923 F.3d at 328 (quoting DOL Advisory Opinion 2013-03A, 2013 WL 3546834, at *4).
The statute states that "administrative costs must be 'reasonable.'" *George v. Kraft Foods
Global, Inc.*, 641 F.3d 786, 789 (7th Cir. 2011) (citing 29 U.S.C. §1104(a)(1)).

The law of trusts reinforces the reasonableness requirement. Because "an ERISA fiduciary's
duty is 'derived from the common law of trusts,'" "courts often must look to the law of trusts" to
determine "the contours of an ERISA fiduciary's duty." *Tibble*, 575 U.S. at 528–29 (citation
omitted). Trust law recognizes a "fundamental" fiduciary obligation to "incur only costs that are
reasonable," to be "cost-conscious," and "to minimize costs," because "wasting beneficiaries'
money is imprudent." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (en banc).

### 1. Plaintiffs' allegations raise a plausible inference of a flawed process.

As many courts have held, causing a plan to incur unreasonable administrative fees is a
breach of fiduciary duties upon which relief can be granted. Judgment has been entered against
fiduciaries who failed to "monitor and control" excessive asset-based "recordkeeping fees,"
particularly when those fees subsidized a fiduciary's corporate expenses and the fiduciaries
failed to determine whether "pricing was competitive" and "leverage the Plan's size to reduce
fees." *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014); *Moitoso v. FMR LLC*, 451 F.
Supp. 3d 189, 213–14, 218 (D. Mass. 2020); *Ramos v. Banner Health*, 461 F. Supp. 3d 1067,
1132–34 (D. Colo. 2020). Evidence that a plan overpaid for recordkeeping due to a "failure to
solicit bids" is sufficient to defeat summary judgment. *George*, 641 F.3d at 798–800. And dozens

of decisions (*supra*, n.4) have held that plan participants state an unreasonable recordkeeping fee claim based on allegations that fiduciaries "failed to solicit bids from service providers, failed to monitor revenue sharing," and "failed to leverage the Plan's size to obtain lower fees or rebates." *Sweda*, 923 F.3d at 331–32; *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 685 (D. Conn. 2018) (allegations of excessive fees resulting from "a decision-making process that was deficient in terms of monitoring, soliciting competitive bids, negotiating, and selecting a reasonably priced recordkeeper" stated a claim); *Pledger v. Reliance Tr. Co.*, 240 F. Supp. 3d 1314, 1329–30 (N.D. Ga. 2017) (denying motion to dismiss in multiple-employer plan case).

In *Sweda*, the Third Circuit found a plausible breach of duty based on allegations that a defined contribution plan's fees far exceeded what similar plans paid "for the same services," that the uncapped "percentage-based fees went up as assets grew, despite there being no corresponding increase in recordkeeping services," and that the defendant "could have assessed the reasonableness of Plan recordkeeping fees by soliciting competitive bids, but, unlike prudent fiduciaries, failed to do so." 923 F.3d at 330. The plaintiff provided "examples of similarly situated fiduciaries who acted prudently," which showed what others "acting in a like capacity and familiar with such matters would [do]." *Id.* at 331–32 (quoting 29 U.S.C. §1104(a)(1)(B)). The court concluded that the complaint plausibly alleged that the defendant "failed to 'defray[ ] reasonable expenses of administering the plan" and otherwise failed to act prudently. *Id*. at 332.

The facts here are similar. Defendants allowed Pentegra to collect uncapped, asset-based payments which escalated over time despite services remaining the same and even though rates in the market declined (AC ¶¶83–86); failed to monitor and calculate the sum of the asset-based charges and determine whether they corresponded to Pentegra's actual costs (AC ¶¶79–80); failed to obtain bids to determine whether Pentegra's pricing was competitive since 2007 (AC

¶¶36, 102); and failed to use the Plan's size to negotiate lower fees (AC ¶¶95). As a result, the

Plan's fees were up to *six times higher* than the reasonable market rate for the same services. AC

¶¶97–99. Plaintiffs cite several "examples of similarly situated fiduciaries who acted prudently"

and paid a reasonable level of fees for the same services, *Sweda*, 923 F.3d at 331–32, further

showing that Defendants' conduct fell short of ERISA's standards. AC ¶¶88–92, 95, 98.

These facts plausibly show that Defendants breached their duties to avoid wasting

participants' money, *Tibble*, 843 F.3d at 1197–98; to monitor and control fees, *Tussey*, 746 F.3d

at 336; and to "defray[ ] reasonable expenses of administering the plan," *Sweda*, 923 F.3d at 332.

Unlike Defendants, a prudent fiduciary would have taken steps to negotiate lower fees. AC

¶¶66–76. That the Plan's fees far exceeded comparably sized and much smaller plans for the

same services shows that Defendants failed to leverage "the power the trust wields" to reduce

fees. *Tibble*, 843 F.3d at 1198. Thus, it is reasonable to infer that Defendants had a "flawed"

process for monitoring recordkeeping and administrative fees and that a loyal and prudent

fiduciary would have acted differently. *PBGC*, 712 F.3d at 718, 720; *Braden*, 588 F.3d at 596;

*Sweda*, 923 F.3d at 332. Plaintiffs' allegations provide "enough fact to raise a reasonable

expectation that discovery will reveal evidence of" liability. *Lynch*, 952 F.3d at 75.

## 2. Defendants mischaracterize the claim and dispute the facts.

a. Defendants rely on inapposite cases rejecting "apples-to-oranges" comparisons in

the context of claims that an *investment* charged excessive fees compared to a completely

different type of investment with a different strategy. *Anderson v. Intel Corp.*, No. 19-4618, 2021

WL 229235, at *9 (N.D. Cal. Jan. 21, 2021). Given the wide variation in strategies among the

thousands of funds in the market, a "bare allegation that cheaper alternative investments exist"

does not raise an inference of imprudence, *Braden*, 588 F.3d at 596 n.7, particularly since the

"cheapest possible fund" could be "plagued by other problems," *Hecker v. Deere & Co.*, 556

F.3d 575, 586 (7th Cir. 2009); *see also Young v. GM Inv. Mgmt. Corp.*, 325 F.App'x 31, 32–33 (2d Cir. 2009) (unpublished) (plaintiff claimed that "similar investment products were available with substantially lower fees and expenses" but alleged no supporting facts).

Plaintiffs do not compare dissimilar investment products. The providers that compete for large defined contribution plan administrative services do not differ materially in terms of service level or quality. AC ¶67. Plans generally require a standard suite of services including recordkeeping, participant statements, call center, and website. AC ¶66. The services are largely commodities. *Id.* Thus, the multitude of variations in strategy and cost inherent in the investment universe are not present in the administrative services market. And because even "high-quality" providers offer attractive pricing terms, *Hecker*'s concern that low-cost investment managers could be plagued by performance problems is inapplicable.

Defendants' claim that Plaintiffs "offer no basis" for the allegation that the comparator plans cited in the complaint are "the same or similar" to the Plan is simply wrong. MIS 13. Indeed, although Defendants claim that Plaintiffs "do not identify the services PSI provides the Plan" (MIS 14), they contradict themselves by admitting that "allegations about what services are provided, and on what terms, are central to the [complaint]." Doc. 93-2 at 4. Plaintiffs identify the specific services that the Plan received under the incorporated Services Agreements, the number of participants in the Plan, and Pentegra's fees each year. AC ¶¶9, 37–39, 41, 79, 82–85, 97, 99. Plaintiffs also cite the number of participants in the comparator plans and those plans' fees for essentially the same services. AC ¶¶88–91, 95, 98. To the extent Pentegra suggests that Plaintiffs must allege an itemized list of each plan's services, Rule 8(a)(2) does not require such "elaborate" or "detailed" facts. *Keiler*, 751 F.3d at 70.

Pentegra is also mistaken in asserting that the comparator plans' fees include recordkeeping

only, while Pentegra's fees include "expenses for basic administrative services—such as plan recordkeeping, accounting, legal and trustee services." MIS 15–16. This argument fails for two reasons. *First*, the Form 5500 states that *other* entities provided "accounting," "legal," and "trustee" services, not Pentegra. Doc. 93-11 at 7–9. *Second*, the comparator plan's fees are not limited to "recordkeeping." AC ¶89 ("recordkeeping and administrative services"); ¶91 ("$33 per-participant fee for administrative services"). Although certain of the comparator allegations refer only to "recordkeeping," the complaint describes recordkeeping as including the full suite of basic administrative services *beyond* just tracking participant accounts. *Id*. ¶66 ("Every defined contribution plan requires administrative services, *such as* recordkeeping. … the market for retirement plan *administrative services* is highly competitive.") (emphasis added).

Even though Plaintiffs are not obligated to "rule out" potential alternative explanations for why the Plan's fees were six times higher than market rates, the complaint does so. *Sweda*, 923 F.3d at 326, 332; *Braden*, 588 F.3d at 597. Pentegra's high fees are not justified by the Plan's multiple-employer structure. AC ¶93. Pentegra concedes that the Plan is "*more cost-effective*" than a single-employer plan. AC ¶94. And the Plan's fees were much higher than the multiple-employer CBERA plan. AC ¶95. Although Defendants try to brush off CBERA by relegating it to a footnote and claiming that it proves only that the Plan is "not the absolute cheapest in the country," that is a gross understatement. MIS 14 n.5. The Plan's fees are *five times* higher than CBERA even though CBERA is a much smaller plan with less bargaining power. AC ¶95.

Defendants' assertion that a multiple employer plan "does not enjoy the same economy of scale as a single-employer plan" simply disputes Plaintiffs' allegations that the multiple-employer structure does not entail significantly higher costs (AC ¶¶93–94), but that cannot be resolved on the pleadings. *Kelly-Brown v. Winfrey*, 717 F.3d 295, 313 (2d Cir. 2013) ("Our role

in considering a motion to dismiss is not to resolve these sorts of factual disputes."). The court in a similar multiple-employer plan case rejected the same argument. *Pledger*, 240 F. Supp. 3d at 1329–30 (arguments that IRS requirements made a multiple-employer plan "more expensive to administer and recordkeep than a traditional 401(k) plan" were not a basis for dismissal).

Defendants' outside source regarding multiple-employer plans' purportedly higher testing costs cannot be considered for its truth at this stage. *Roth v. Jennings*, 489 F.3d 499, 509, 511 (2d Cir. 2007). Even if it could, the document is equivocal at best. While Defendants focus on the statement that efficiencies will "*likely* be smaller" than a single-employer plan, that snippet is part of a section titled "*Reduced Fees and Administrative Savings*," which discusses multiple-employer plans' cost *advantages* at length. 84 Fed. Reg. 31777, 31783–84 (emphasis added). The likelihood that efficiencies may be reduced by some unspecified amount does not begin to explain why the Plan's fees were many multiples higher than single-employer plans.

Further, Pentegra charged its clients an annual $1,950 "base administrative fee" and a $75 per participant service fee *in addition to* its asset-based fees from the Plan. AC ¶41. Thus, even if Pentegra is correct that the Plan's need to conduct "yearly tests" for "*each adopting employer*" involved higher administration costs than single-employer plans (MIS 14), Pentegra does not explain (much less prove) why the additional, client-specific fee of $1,950 did not cover the cost, let alone explain how a yearly test could multiply administrative costs six-fold.

Defendants' apples-to-oranges argument also ignores that the complaint accounts for the Plan's multi-employer structure. While the single-employer plans cited in the complaint paid annual fees in the range of $21–$33 per participant (AC ¶¶88–92), Plaintiffs acknowledge that a higher fee of $65 per participant might have been reasonable given the Plan's features and services. AC ¶97. But even if the Plan's services included an extra "bell" or "whistle," there is no

conceivable level of service to justify paying the Plan's rate of $389 per participant. AC ¶99.

**b.**     Defendants mischaracterize the complaint as alleging that it was "imprudent for the Plan to pay asset-based fees." MIS 16–17. In fact, the complaint acknowledges that "prudent fiduciaries" may decide to use an asset-based method, provided they closely monitor the *amount* paid and negotiate for rebates, which Defendants failed to do. AC ¶74; *Tussey*, 746 F.3d at 336 (while asset-based fees were acceptable, fiduciaries breached duties by "failing to monitor and control" the excessive amount of recordkeeping fees). Defendants also ignore Plaintiffs' allegation that *negotiating* a per-participant rate for the plan (*e.g.*, $40/participant) does not preclude a pro rata *allocation* method, which allows participants with small balances to pay less (AC ¶¶71–72), neutralizing the concern discussed in *Loomis v. Exelon Corp.*, 658 F.3d 667, 672 (7th Cir. 2011). Defendants misread *Renfro v. Unisys Corp.*, 671 F.3d 314 (3d Cir. 2011), which involved a claim that *investment fees* should have been a flat rate. *Id*. at 327. More relevant is *Sweda*, in which the same court rejected Defendants' reading of *Renfro* and found a plausible breach of fiduciary duty based on allegations that plan fiduciaries failed to monitor "percentage-based fees" and to solicit "competitive bids." *Sweda*, 923 F.3d at 330–32, 329–30.

Defendants' assertion that there is no "legal foundation" for a competitive bidding requirement (MIS 17) misunderstands the duty of prudence. ERISA requires a fiduciary to act as a prudent person would under like circumstances. 29 U.S.C. §1104(a)(1)(B). "If the fiduciary duty applied to nothing more than activities already controlled by other specific legal duties, it would serve no purpose." *Varity Corp. v. Howe*, 516 U.S. 489, 504 (1996). Thus, the question is not whether ERISA contains a specific "competitive bidding" requirement, but whether a prudent fiduciary would have obtained bids during the relevant period. Because a prudent fiduciary would solicit bids at three-year intervals (AC ¶¶75–76), Defendants' failure to do so

since 2007 shows a lack of prudence (AC ¶¶36, 102). *George*, 641 F.3d at 798–800; *Sweda*, 923 F.3d at 330–32; *Vellali*, 308 F. Supp. 3d at 685. The Court can reasonably infer "that a prudent fiduciary in like circumstances would have acted differently." *PBGC*, 712 F.3d at 720.

**B.     Count III plausibly alleges a breach regarding investment fees.**

"[C]ost-conscious management is fundamental to prudence in the investment function[.]" *Tibble*, 843 F.3d at 1197–98 (citation omitted). A fiduciary of a jumbo plan "cannot ignore the power the trust wields to obtain favorable investment products, particularly *when those products are substantially identical*—other than their lower cost—to products the trustee has already selected." *Id*. at 1198 (emphasis added). Courts consistently hold that providing higher-cost shares instead of identical lower-cost versions of the same funds raises a reasonable inference of a flawed process. *Supra*, n.4; *Sweda*, 923 F.3d 320, 331–32; *Braden*, 588 F.3d at 595–96 & n.5; *Vellali*, 308 F. Supp. 3d at 686.

For approximately 30 of the Plan's investment options, Defendants provided a higher-cost version, essentially retail rates available to small investors, even though lower-cost institutional versions were readily available to the $2 billion Plan. AC ¶¶105–10. The lower-cost versions would have provided identical investment management because the different share classes invest in the same portfolio of securities managed by the same adviser. *Id.* ¶¶106–09. Because the availability of these "superior alternative investment[s]" would have been "readily apparent" if Defendants had conducted "an adequate investigation" by reviewing fund prospectuses and similar materials, the Court can reasonably infer that Defendants breached their duty by providing the higher-cost options. *PBGC*, 712 F.3d at 719.

Defendants do not dispute that providing higher-cost funds instead of identical lower-cost institutional versions of the same funds raises an inference of imprudence. Instead, Defendants raise a terminology dispute. They contend that the claim fails because the fee differentials are

attributable not to "investment management," but other categories. Defendants cite an exhibit that breaks down the total expenses of the Plan's options into categories. MIS 18–19. However, the exhibit cannot be considered under Rule 12(b)(6). Although Defendants claim that it is a fee disclosure under "ERISA § 408(b)(2)" and was distributed to "*participants*" (MIS 18 n.11), §408(b)(2) governs disclosures from service providers to plan *fiduciaries*, not participants. 29 C.F.R. §2550.408b-2(c)(1)(iv). Defendants produced a different version to Plaintiffs which provides only the total expense figure but no itemization. *See* Ex. 1, attached hereto. Moreover, the source of Defendants' definition of "investment management" fees is unclear.

In any event, while the complaint does refer to "investment management fees" at certain points (AC¶¶105, 110, 145), the chart listing the Plan's "higher-cost investments" compared to "identical lower-cost alternatives" does not attribute the differential to any particular expense category. AC ¶109. It simply uses the headings "Plan Fee" and "Identical Lower Cost Fee." *Id.* Labels aside, Defendants ignore the substance of the claim: that even though the same investments were available in the market for a fraction of the cost, Plan participants were charged much higher fees to invest through the Plan, resulting in losses. It is reasonable to infer that a prudent fiduciary would have investigated and obtained the identical lower-cost shares to avoid wasting participants' assets on unnecessary fees. *Tibble*, 843 F.3d at 1198; *Tibble v. Edison Int'l*, No. 07-5359, 2010 WL 2757153, *25–26 (C.D. Cal. July 8, 2010).

**C.  The complaint plausibly alleges disloyalty.**

To fulfill the duty to act "with an eye single to the interests of the participants and beneficiaries," those with corporate ties must "avoid placing themselves in a position where their acts as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan." *Bierwirth*, 680 F.2d at 271. "Self-dealing, conflicts of interest, or even divided loyalties are inconsistent with fiduciary

responsibilities." *Howell v. Motorola, Inc.*, 633 F.3d 552, 566 (7th Cir. 2011).

Plaintiffs' disloyalty allegations are not confined to "a few thousand dollars in hotel" expenditures as Defendants suggest. MIS 20–21. There is also no merit to Defendants' assertion that prudence and loyalty claims cannot arise from the same facts. MIS 21–22.

"Sections 404(a)(1)(A) and (B) impose three different although *overlapping* standards." *Bierwirth*, 680 F.2d at 271 (emphasis added). The presence of a conflict of interest—as there is here with Pentegra monitoring its own fees and its CEO on the Board—trigger heightened investigative requirements. *See id.* at 276 ("[S]ince their judgment on this score could scarcely be unbiased, at the least they were bound to take every feasible precaution to see that they had carefully considered the other side."). Indeed, a conflicted fiduciary may fail to use a thorough, prudent process precisely *because* its self-interested decision is already preordained. Such was the case here. Defendants' failures to monitor or negotiate Pentegra's fees and automatic contract renewals without competition were certainly imprudent. Those same facts, along with the "systematic pattern of Pentegra using Plan assets to benefit itself" (AC ¶101), also advanced Pentegra's corporate financial interests at the expense of participants, thereby violating the duty of loyalty. *See Tussey v. ABB, Inc.*, 850 F.3d 951, 956–58 (8th Cir. 2017) (fiduciaries had both a flawed process and "improper motives" of seeking "a better deal for themselves.").

## III. Plaintiffs plausibly allege prohibited transactions (Count II).

Subject to certain exemptions, ERISA prohibits: (1) transactions between a plan and a "party in interest," 29 U.S.C. §1106(a)(1), and (2) transactions between a plan and a fiduciary, *id.* §1106(b). Although "reasonable" payments for necessary services qualify for an exemption, a plan is "entitled to recover" any excess above a reasonable fee. *N.Y. State Teamsters Council Health & Hosp. Fund v. Estate of DePerno*, 18 F.3d 179, 183 (2d Cir. 1994); 29 U.S.C. §1108(b)(2)(A). Count II plausibly alleges that Defendants caused both types of transactions, and

Pentegra's excessive compensation negates any potential exemption. AC ¶¶126–42.

A.     "Congress defined 'party in interest' to encompass those entities that a fiduciary might be inclined to favor at the expense of the plan's beneficiaries." *Harris*, 530 U.S. at 242. Here, Pentegra qualifies as a "party in interest" on several different grounds: as an employer, fiduciary, service provider, and because its CEO is a Plan fiduciary. 29 U.S.C. §1002(14)(A)–(C), (H). Allegations that a party in interest received excessive asset-based payments that "far exceeded" reasonable compensation for "services rendered to the Plan" state a plausible violation of §1106(a)(1)(C). *Braden*, 588 F.3d at 601 & n.9. Pentegra "furnish[ed] … services" to the Plan, and its receipt of far "more than reasonable compensation" defeats Defendants' affirmative defense. 29 U.S.C. §1106(a)(1)(C), §1108(b)(2)(A); AC ¶¶38, 84, 95–99, 131.

Defendants' *reductio ad absurdum*, that allowing the claim to proceed "would mean that ERISA per se prohibits a retirement plan's engagement of a third-party service provider" (MIS 22), ignores the statutory text and the facts of this case. The statute begins: "*Except* as provided in section 1108," which includes numerous exemptions. 29 U.S.C. §1106(a)(1) (emphasis added). The statute, therefore, does not prohibit hiring service providers on *reasonable* terms that are *fair* to a plan. It prohibits unreasonable payments, particularly to insiders who a fiduciary might favor at the plan's expense. Even Defendants' cases recognize that the conflicted payments to Pentegra here violate §1106(a)(1). *Cunningham v. Cornell Univ.*, No. 16-6525 (PKC), 2017 WL 4358769, at *10 (S.D.N.Y. Sept. 29, 2017) (requiring allegations of "self-dealing or other disloyal conduct"); *Sellers v. Anthem Life Ins. Co.*, 316 F. Supp. 3d 25, 36 (D.D.C. 2018) (§1106(a)(1) inapplicable to "unrelated service providers" but applies to deals with "plan insiders."). In *Cunningham* and *Sellers*, the service provider's CEO was not a fiduciary. *Sellers* is inapposite also because the alleged party in interest had no "separate

relationship" with the plan until it became a service provider. *Sellers*, 316 F. Supp. 3d at 39. Pentegra has been a party in interest to the Plan for well over a decade and is a party in interest "by virtue of some other relationship" with the Plan. *Id.* at 34; 29 U.S.C. §1002(14)(A)–(C), (H).

B.　　As to Plaintiffs' §1106(b) claim (AC ¶¶128–29), Defendants assert that Pentegra's interests were not "adverse to the Plan." MIS 24–25. But Defendants omit the crucial language from *Patrico*—a transaction for services "*at prevailing market rates*" does not "render the Plan's interests 'adverse' to those of the" fiduciary. *Patrico v. Voya Fin., Inc.*, No. 16-7070 (LGS), 2018 WL 1319028, at *6 (S.D.N.Y. Mar. 13, 2018) (quoting *Leber v. Citigroup, Inc.*, No. 07-9329 (SHS), 2010 WL 935442, at *13 (S.D.N.Y. Mar. 16, 2010)) (emphasis added). Pentegra's fees were multiples higher than prevailing market rates. AC ¶99. The interests of Pentegra and its CEO in maximizing corporate profits are directly adverse to participants' interests in maximizing their retirement savings. Count II states a §1106(b) claim.

## IV.　　Plaintiffs plausibly allege Pentegra's fiduciary and non-fiduciary liability.

### A.　　Pentegra acts through its CEO, who undisputedly is a fiduciary.

Revealing an apparent conflict between Pentegra and defense counsel's other clients who would prefer that Pentegra share in any potential liability, Defendants dispute whether Pentegra was a fiduciary with respect to its own hiring and compensation. MIS 5–12. The question of a defendant's fiduciary status is fact-intensive and generally cannot be determined on a motion to dismiss. *Bernhard v. Cent. Parking Sys. of N.Y., Inc.*, 282 F.R.D. 284, 288 (E.D.N.Y. 2012).

Here, however, Pentegra's fiduciary status is clear. Pentegra does not dispute that its CEO is a fiduciary as a member of the Plan's Board. Pentegra, therefore, is also a fiduciary because "corporations may act only through their agents." *Braswell v. United States*, 487 U.S. 99, 110 (1988); *Shetel Indus. LLC v. Adin Dental Implant Sys., Inc.*, 493 F. Supp. 3d 64, 134 (E.D.N.Y. 2020) ("[B]y definition, a corporation acts through its officers and directors.").

Because no "meaningful distinction can be drawn between a 'corporation' and the directors through whom it must act," a corporate entity should not be dismissed if its officer plausibly breached an ERISA fiduciary duty. *Woods v. S. Co.*, 396 F.Supp.2d 1351, 1373 (N.D. Ga. 2005). This is not *solely* an issue of "*respondeat superior*" as Defendants contend. *See Hamilton v. Carell*, 243 F.3d 992, 1001 (6th Cir. 2001) (noting courts have "confused *respondeat superior* liability with direct liability."). Pentegra's liability is direct. Pentegra hired Pinto as CEO, ensuring that he would be an *ex officio* member of the Plan's Board. As Pentegra's CEO, Pinto's actions as its representative on the Board are the company's actions. *See Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465–66, 938 N.E.2d 941, 951 (2010) ("When corporate officers carry out" their managerial duties, "everything they know or do is imputed to" the company).

Even if construed as an issue of derivative liability, it applies here. Defendants claim that "the Second Circuit rejects *respondeat superior* liability under ERISA," but cite only district courts. MIS 8–9; *cf. Camreta v. Greene*, 563 U.S. 692, 710 n.7 (2011) (district court decisions are "not binding precedent."). In an analogous context, the Supreme Court construed ERISA's definition of "employee" to "incorporate traditional agency law criteria for identifying master-servant relationships." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 319 (1992). The Court reasoned that "the usual common-law principles" should apply unless they "would thwart the congressional design or lead to absurd results." *Id*. at 323–25. *Respondeat superior* is an aspect of agency law. *Howell*, 633 F.3d at 563. Thus, common-law *respondeat superior* principles apply unless the statute evinces a contrary intent, and ERISA does not. *Perrone v. Johnson & Johnson*, No. 19-923, 2020 WL 2060324, at *8–10 (D.N.J. Apr. 29, 2020); *In re Cardinal Health ERISA Litig.*, 424 F.Supp.2d 1002, 1048–49 (S.D. Ohio 2006); *Kling v. Fidelity Mgmt. Trust Co.*, 323 F. Supp. 2d 132, 145–47 (D. Mass. 2004).

Indeed, *rejecting* the doctrine would contradict the statutory text. ERISA defines "fiduciary" as a "person" who performs certain functions, 29 U.S.C. §1002(21)(A), and defines "person" to include not only "an individual," but also various organizational entities including a "corporation," *id.* §1002(9). Thus, ERISA contemplates that corporations can be plan fiduciaries. If agency principles are inapplicable, a corporation could never perform the fiduciary act of exercising "discretionary authority" over a plan. *See* 29 U.S.C. §1002(21)(A)(i). Thus, declining to impute to Pentegra the fiduciary conduct of its CEO would thwart Congress' intent that corporations be included in the class of "persons" subject to fiduciary status.

Defendants do not dispute that Pinto is a proper fiduciary-defendant, but claim that he could not have controlled the Board's decision to approve Pentegra's excessive fees because he purportedly "did not have the right to vote" in Board decisions. MIS 8. The cited documents cannot be considered on a Rule 12(b)(6) motion. *Palin*, 940 F.3d at 811. The complaint did not and could not have "relied heavily" on the cited documents (*id.*)—Defendants failed to produce them despite extensive pre-motion proceedings on this issue. Docs. 59, 79, 80, 85, 87.

Moreover, Pinto need not have controlled "*the Board* and its fiduciary decisions" (MIS 8) to have exercised "*any* authority *or* control" over the *Plan's* management or payment of its assets to Pentegra. 29 U.S.C. § 1002(21)(A)(i) (emphases added). "Control" means "[t]o exercise power or *influence* over." *Rozo v. Principal Life Ins. Co.*, 949 F.3d 1071, 1074 (8th Cir. 2020) (quoting Black's Law Dictionary (11th ed. 2019)) (emphasis added); *see also Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir. 1987) ("An entity need not have absolute discretion with respect to a benefit plan in order to be considered a fiduciary.").

Pinto's presence on the Board necessarily *influenced* the terms of Pentegra's contracts, particularly since Pentegra monitors "the reasonableness of Pentegra's own fees." AC ¶¶32, 87.

It is a plausible inference that as part of Pentegra's "report[ing] to the Board" (AC ¶¶34, 39), Pinto informed the Board that Pentegra's fees were reasonable, which strongly influenced the Board's decision to retain Pentegra without competition and to pay its requested fees. AC ¶¶36, 42, 87. Thus, Pinto's actions resulted in higher fees being charged to participants than would have been charged if Pinto were not a Board member. Accordingly, a finding that Pinto and Pentegra were fiduciaries with respect to Pentegra's fees would further Congressional intent to "commodiously impose[] fiduciary standards on persons whose actions *affect the amount of benefits retirement plan participants will receive*." *John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 96 (1993) (emphasis added); *LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997) ("Congress intended ERISA's definition of fiduciary to be broadly construed."). If Pentegra truly desired an independent process untainted by its corporate interests, it would have removed its CEO from the Board altogether.

The case cited by Defendants does not help them. It holds that "[w]hen a person who *has no relationship to an ERISA plan* is negotiating a contract with the plan," that person "is not an ERISA fiduciary with respect to the terms of the agreement for his compensation." *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1259 (2d Cir. 1987) (emphasis added). Defendants omit the italicized language. MIS 6. Critically, they also ignore that the contract must be the product of "*an arm's length bargain* presumably governed by *competition in the marketplace*." *Id.* (quoting *Schulist v. Blue Cross,* 717 F.2d 1127, 1132 (7th Cir. 1983)) (emphasis added).

In the absence of a prior relationship with the plan, an arm's-length bargain in a competitive market ensures that the provider "is unable to exercise any control over the trustees' decision whether or not, and on what terms, to enter into an agreement with him." *Id.* Here, not only did Pentegra already have a "relationship" with the Plan, Pentegra and its affiliates permeate every

aspect of the Plan down to its name. Far from an arm's-length bargain, Pentegra, through its

Board member CEO, was on both sides of the transaction. AC ¶42; *see Est. of Thompson v.*

*Comm'r*, 382 F.3d 367, 381 (3d Cir. 2004) (no "arm's length bargaining" where one party "stood

on both sides of the transaction"). And the market competition which *F.H. Krear* "presum[ed]"

clearly did not exist—as shown by the lack of competitive bidding, "automatic" contract

renewals, and exorbitant compensation relative to the market. AC ¶¶36, 82–91, 96–99, 102.

### B.      Pentegra admittedly acted as a fiduciary over its compensation.

To attract clients, Pentegra touts its experience serving as the Plan's fiduciary. AC ¶29. It

assures prospective clients that they will receive "[u]nmatched fiduciary protection" because

Pentegra has an "extremely broad responsibility" for "nearly everything." AC ¶¶30–31. Pentegra

acts as Plan administrator and expressly undertakes the responsibility for ensuring the

"reasonableness of Pentegra's own fees." *Id*. ¶§28, 32. Monitoring fees is a fiduciary role,

*Sweda*, 923 F.3d at 328, and one that Pentegra failed to lawfully discharge. AC ¶87. Although

Defendants focus on the next clause—"only the employer can make the final determination"

whether Pentegra's fees are reasonable (MIS 9)—that provides further support for Count I.

Instead of the Board monitoring Pentegra's fees, Defendants apparently expected 250 individual

employers to do so, which only strengthens the inference that Defendants were "asleep at the

wheel." *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 483 (8th Cir. 2020).

Defendants assert that Pentegra's public admissions of fiduciary status are false because the

Services Agreements do not list "[e]nsuring the 'reasonableness of [Pentegra's] own fees'"

among the specified services. MIS 10. But the contracts also do not *prohibit* Pentegra from

undertaking additional tasks for its own benefit. Contract language would not be dispositive in

any event because ERISA defines "'fiduciary' not in terms of formal trusteeship, but in

functional terms." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993).

### C. Defendants concede that Pentegra is liable as a non-fiduciary.

Plaintiffs have also undisputedly alleged Pentegra's liability as a non-fiduciary transferee of ill-gotten plan assets. AC ¶132; *see Harris*, 530 U.S at 250–53. Defendants challenged this allegation in a pre-motion letter (Doc. 87 at 4), but have abandoned the argument.

## V. Plaintiffs plausibly allege a failure to monitor fiduciaries (Count IV)

When a complaint plausibly alleges an underlying breach, a derivative monitoring claim survives to the same extent. *See Cunningham*, 2017 WL 4358769, at *11; *Moreno v. Deutsche Bank Ams. Holding Corp.*, No. 15-9936 (LGS), 2016 WL 5957307, at *8 (S.D.N.Y. Oct. 13, 2016). Because the complaint states underlying claims for relief, Count IV should also proceed. Although Defendants suggest otherwise (MIS 25), Plaintiffs have alleged sufficient facts regarding Defendants' monitoring failures. AC ¶¶18, 28, 77, 141, 149–54.

## VI. Defendants' request for dismissal *with prejudice* is contrary to Second Circuit law.

Defendants seek dismissal "with prejudice" because Plaintiffs "had a chance to cure the pleading defects" in response to "Defendants' pre-motion-to-dismiss letters." MIS 25.

The Second Circuit rejects Defendants' position. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 189–91 (2d Cir. 2015). Limiting a plaintiff's opportunity to amend to a pre-motion letter-writing process is an abuse of discretion. *Id.* at 190. A plaintiff is entitled to "the benefit of a ruling" by the district court and an opportunity to cure any "specific deficiencies." *Id.* at 190–91; *Cresci v. Mohawk Valley Cmty. Coll.*, 693 F. App'x 21, 25 (2d Cir. 2017) (unpublished) ("A plaintiff has no obligation to replead merely because the defendant has argued that the complaint is deficient, without knowing whether the court will agree."). While the complaint is sufficient, any dismissal should be without prejudice and with leave to amend.

## CONCLUSION

For the above reasons, Defendants' motion to dismiss should be denied.

May 13, 2021                    Respectfully submitted,

                                /s/ Jerome J. Schlichter
                                SCHLICHTER BOGARD & DENTON LLP
                                Andrew D. Schlichter, Bar No. 4403267
                                Jerome J. Schlichter*
                                Troy A. Doles*
                                Kurt C. Struckhoff*
                                Alexander L. Braitberg*
                                100 South Fourth Street, Suite 1200
                                St. Louis, Missouri 63102
                                (314) 621-6115, Fax: (314) 621-5934
                                aschlichter@uselaws.com
                                jschlichter@uselaws.com
                                tdoles@uselaws.com
                                kstruckhoff@uselaws.com
                                abraitberg@uselaws.com
                                *admitted *pro hac vice*

                                *Interim Class Counsel for All Plaintiffs*

# CERTIFICATE OF SERVICE

I hereby certify that, on May 13, 2021, a copy of the foregoing was served via email on

Defendants' counsel of record and will be filed at a later date set by the Court's order.

                                By: /s/ *Jerome J. Schlichter*
                                    Jerome J. Schlichter