UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IMRAN KHAN, JOAN BULLOCK, and PAMELA JOY WOOD, et al., individually and as representatives of a class of participants and beneficiaries on behalf of the Pentegra Defined Contribution Plan for Financial Institutions,<br><br>*Plaintiffs,*<br><br>v.<br><br>BOARD OF DIRECTORS OF PENTEGRA DEFINED CONTRIBUTION PLAN, PENTEGRA SERVICES, INC., JOHN E. PINTO, SANDRA L. MCGOLDRICK, LISA A. SCHLEHUBER, MICHAEL N. LUSSIER, WILLIAM E. HAWKINS, JR., BRAD ELLIOTT, GEORGE W. HERMANN, AND JOHN DOES 1–12,<br><br>*Defendants.* | No. 7:20-cv-07561-PMH |

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)**

The gist of Plaintiffs' Opposition to Defendants' Motion to Dismiss ("MTD") is that the Plan's fees are *so high* in comparison to readily available alternatives that they must result from a deficient fiduciary process. *See, e.g.*, Opp. at 11 ("That the Plan's fees far exceeded comparably sized and much smaller plans for the same services shows that Defendants failed to leverage 'the power the trust wields' to reduce fees."). Plaintiffs' Amended Consolidated Complaint fails because its allegations are implausible on their face, contradicted by the documents Plaintiffs cite,[1] and insufficient as a matter of law. Indeed, key assertions underpinning Plaintiffs' theory "are no more than conclusions, [and] are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

1. Conclusion #1: Administrative services are commodities. Opp. at 4.

   Commodities are interchangeable products where producers compete *solely* on price. As the Department of Labor advises regarding administrative services, "*[f]ees are just one of several factors*,"[2] and fiduciaries must consider "*the level and quality of services provided*."[3] Fiduciaries should determine "whether the fees are reasonable *in light of the services provided*"—that is, considering factors *other* than price alone.[4] Administrative services are not one-size-fits-all; fiduciaries choose "what services [they] need for [their] plan."[5]

2. Conclusion #2: The market rate for PSI's services is $65 per participant. Opp. at 5.

   Plaintiffs invented this figure based on what a single different multiple employer plan ("MEP") allegedly paid for some unspecified services from a different provider. ACC ¶ 95. Plaintiffs have not established that the other MEP received services sufficiently comparable to the services PSI provided to the Plan. Even if they had, Plaintiffs have not established that one MEP's fees are representative of the market for MEP services generally. Plaintiffs'

---

[1] A court may consider documents extraneous to a complaint without converting the motion to dismiss into a motion for summary judgment where the documents contradict factual allegations in the complaint. *See Munno v. Town of Orangetown*, 391 F. Supp. 2d 263, 269 (S.D.N.Y.2005).
[2] U.S. Dept. of Labor, Meeting Your Fiduciary Responsibilities, at 5 (2012), https://www.dol.gov/sites/dolgov/ files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf (emphasis added).
[3] ACC ¶ 58 n.13 (citing U.S. Dept. of Labor, *A Look at 401(k) Plan Fees*, at 2 (Sept. 2019), https://www.dol.gov/ sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf) (emphasis added).
[4] ACC ¶ 75 n.25, citing Fiduciary360, Prudent Practices for Investment Stewards, Practices S-1.4, S-4.4 (2007).
[5] U.S. Dept. of Labor, Tips for Selecting and Monitoring Service Providers for Your Employee Benefit Plan, at 1, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/tips-for-selecting-and-monitoring-service-providers.pdf (visited Mat 27, 2021).

repeated assertion that "the Plan's fees were six times higher than market rates," Opp. at 13, is therefore unsubstantiated.

3. Conclusion #3: The Plan's annual fees averaged $360-$389 per participant. Opp. at 5.

   This is an indisputable math error. Plaintiffs calculated this amount by dividing the Plan's total fees by its number of participants. But, as Plaintiffs admit, *participating employers* pay a portion of PSI's total fees. *See, e.g.*, ACC ¶ 41 ("Participating Employers also paid an annual base administrative fee of $1,950."); *see also* MTD at 15 n.6. Thus, Plaintiffs' own allegations show that PSI's participant-paid fees are its total fees *minus* its employer-paid fees, which amount to hundreds of thousands, if not millions, of dollars.

Other conclusory assertions, facially demonstrable factual errors, and legal distortions plague the Opposition, all of which the Court should disregard. *Marino v. Bank of Am. Home Loans*, No. 2:11-CV-241-WKS, 2012 WL 2402034, at *2 (D. Vt. June 22, 2012) (striking conclusory statements from complaint). These include the following:

1. The Board "delegated its fiduciary responsibilities to Pentegra and its agents." Opp. at 2.

   The Plan document provides that "[t]he Board *may* delegate . . . the authority to perform any act pertaining to the Plan or the administration thereof." Doc. 93-5 at 82 (Art. IX §1(C)) (emphasis added). Plaintiffs have alleged no facts showing that the Board so delegated its fiduciary responsibilities.

2. PSI "took an extremely broad responsibility for the Plan's fiduciary functions," including "serving as Plan administrator" and monitoring the "reasonableness of [its] own fees." Opp. at 2.

   Defendants previously explained that the Services Agreements control what PSI provides to the Plan, not these generic marketing statements. *See* MTD at 9-10. Plaintiffs' insistence to the contrary cannot overcome the plain terms of the governing contracts. The governing documents also make clear that the Plan's president—*not PSI*—was the Plan administrator. *See id.* at 9 n.3.[6]

3. The Department of Labor recommends fiduciaries "obtain competitive bids at regular intervals of three to five years" as the "surest way to determine a reasonable fee." Opp. at 5.

   Neither phrase—nor anything like them—appears in the document Plaintiffs cite in support

---

[6] Plaintiffs do not respond to Defendants' arguments that PSI was not the Plan administrator, investment adviser, or investment manager. MTD at 9-12. Plaintiffs have therefore abandoned these claims. *See McLeod v. New York*, No. 14 CIV. 7904 (RMB), 2016 WL 3144052, at *5 (S.D.N.Y. Jan. 29, 2016).

2

of this proposition.[7]  In any event, there are at least "two ways [plan] sponsors can benchmark their fees": competitive bidding and "internal benchmarking [based on] a database of plan sponsors to compare fees paid."[8]  Plaintiffs have not supported their theory that the decision not to solicit bids is inherently a fiduciary breach, nor have they alleged that the Plan did not internally benchmark its fees.

Accounting for these errors,[9] what remains of Plaintiffs' arguments does not rebut, and in fact supports, the arguments Defendants presented in the Motion to Dismiss.

**ARGUMENT**

I. **Plaintiffs Have Not Plausibly Alleged the Plan's Administrative Fees were Excessive.**

A wise car buyer focuses on more than sticker price alone—she also weighs gas mileage, safety ratings, seating capacity, and much more.  Similarly, "any examination of fees needs to account for *total value*—that is, both recordkeeping and collateral services."  *Sacerdote v. New York Univ.*, 328 F. Supp. 3d 273, 294 (S.D.N.Y. 2018) (emphasis added).  "Administrative services" is an umbrella term that, according to the Department of Labor, encompasses "basic administrative services[,] such as plan recordkeeping," *plus* "a host of additional services" that, while not "necessary for administering the plan," a fiduciary can select.[10]  Like a car buyer, a fiduciary cannot judge a provider's fees without knowing the services provided in return.  Of course, as the Department of Labor observes, "the more services provided, the higher the fees."[11]

Plaintiffs allege only the conclusory statement that comparator plans received "essentially

---

[7] *See generally* U.S. Dept. of Labor, Meeting Your Fiduciary Responsibilities (2012), https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-yourfiduciary-responsibilities.pdf.

[8] Lee Barney, *Two Approaches to Benchmarking Plan Fees*, PlanSponsor, May 18, 2021, https://www.plansponsor.com/two-approaches-benchmarking-plan-fees (visited May 24, 2021).

[9] Plaintiffs mischaracterize Defendants' position as conceding that the alleged fiduciary breaches caused a loss to the Plan. Opp. at 7.  Plaintiffs have not adequately alleged what the Plan's fees or the market rate for comparable services were, so they have not established that the Plan suffered any loss.  Nor could PSI have caused a loss to the Plan because it did not have the necessary authority to cause the Plan to contract with it.

[10] U.S. Dept. of Labor, Understanding Retirement Plan Fees and Expenses, at 3, https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf (listing examples of additional services).

[11] *Id.*

the same services"—what Plaintiffs call "the full suite of basic administrative services"—as the Plan. Opp. at 12-13. Plaintiffs' say-so cannot support an inference that the Plan's fees were excessive in comparison. If anything, Plaintiffs' allegations show that the Plan's services were *not* similar to those received by its alleged comparators. According to the Services Agreements, PSI provided employers with, among other things, a "[v]endor dedicated Consultant to explain and discuss plan features"; "[p]eriodic employee education meetings"; "[p]rocessing of all participant enrollments and transactions"; a "[t]oll-free number and business hour telephone support from the employer's designated account representative"; and "[m]onthly and quarterly investment fund performance summaries." MTD, Ex. D at 15-16. These are precisely the sorts of "additional services" that, according to the Department of Labor, go beyond the "basic administrative services" Plaintiffs alleged the comparators received, and which, if selected by fiduciaries, naturally lead to "higher fees."[12] Simply put, Plaintiffs ask this Court to do precisely what the Department of Labor warns prudent fiduciaries against: focus solely on a comparison of fees irrespective of "[t]he level and quality of services provided" in return.[13]

## II. Plaintiffs Have Not Plausibly Alleged a Deficient Process.

Plaintiffs argue it is "reasonable to infer" Defendants employed a flawed process just because "the Plan's fees far exceeded comparably sized and much smaller plans['] for the same services." Opp. at 11. However, inferences must be reasonable and based on factual allegations sufficient to "raise a right to relief about the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). As shown above, Plaintiffs have not plausibly alleged that the Plan's fees "far exceeded" those paid by comparable plans for comparable services. Instead, Plaintiffs hope to ride the coattails of cases in which courts "denied motions to dismiss similar excessive-fee

---
[12] *Id.*
[13] *Id.*

4

claims." Opp. at 8 n.4. Plaintiffs offer no context explaining why these other cases—none of which involved MEPs—should control.[14] Indeed, the entire purpose of a motion to dismiss is to "weed out meritless claims," *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).

### III. The Plan's MEP Structure Shows Why Single-Employer Plans Are Incomparable.

Plaintiffs misconstrue Defendants as arguing PSI's "high fees are . . . justified by the Plan's multiple-employer structure." Opp. at 13. PSI's fees *are not high* (nor have Plaintiffs sufficiently alleged they are) so they need no justification. Instead, the Plan's MEP structure explains why its fees are incomparable to those of large single-employer plans. *See, e.g.*, MTD at 13-16 ("Single-employer plans must conduct these yearly [compliance] tests just once. MEPs, on the other hand, must conduct a test for *each adopting employer.*"). Neither do Defendants "concede that the Plan is '*more cost-effective*' than a single-employer plan." *Id*. Indeed, Defendants embrace the IRS's view that, while "relative to separate small employer plans, a MEP . . . would likely secure substantially lower prices," those efficiencies "would still likely be *smaller than the scale efficiencies enjoyed by very large single-employer plans*." Multiple Employer Plans, 84 Fed. Reg. at 31,784 (emphasis added).[15] The Court can consider these

---

[14] The out-of-circuit decision in *Sweda v. University of Pennsylvania*, 923 F.3d 320 (3d Cir. 2019), offers Plaintiffs no help. Unlike here, the plaintiff in *Sweda* buttressed general allegations about failures to monitor and solicit bids with specific "examples of similarly situated fiduciaries who acted prudently" by doing those things. *Id.* at 330-31. For example, Sweda alleged that defendants, fiduciaries of a certain type of university-sponsored retirement plan, did not "hire[] an independent consultant to request recordkeeping proposals and consolidate[] services with a single provider" or negotiate revenue-sharing rebates, unlike other specifically identified university-sponsored plans of the same type. *Id*. Plaintiffs here make no similar allegations or comparisons. Even if the largely single-employer plans Plaintiffs identify were suitable comparators to the Plan (which they are not—*see* MTD at 13-14), Plaintiffs have alleged no facts about what those plans' fiduciaries did from which the Court can infer anything about the prudence of Defendants' conduct. Instead, Plaintiffs merely "cite the number of participants in the comparator plans and those plans' fees for [allegedly] the same services." Opp. at 12. As explained, MTD at 14-15, these facts tell the Court nothing about whether the allegedly similar plans obtained bids, used their size to negotiate lower fees, or did any of the other things Plaintiffs allege Defendants failed to do.

[15] Remarkably, Plaintiffs claim that the Court cannot consider the IRS's position as presented in the Federal Register because it is an "outside source." Opp. at 14. Plaintiffs are wrong. *See Davila v. Gutierrez*, 330 F. Supp. 3d 925, 934 (S.D.N.Y. 2018) ("Courts are permitted to take judicial notice of the contents of the Federal Register and the Code of Federal Regulations and guidance from administrative agencies."). In any event, it is common sense that, given their structure, MEPs are more expensive than comparably sized single-employer plans. *See* MTD at 13-14.

fundamental differences in determining whether Plaintiffs adequately alleged that PSI's fees were excessive simply by comparing them to large single-employer plans' fees with no reference to the services those plans received in return.

Plaintiffs are wrong that *Pledger v. Reliance Trust Co.*, 240 F. Supp. 3d 1314 (N.D. Ga. 2017), rejected a similar argument. To begin with, *Pledger* was not a "similar multiple-employer plan case," Opp. at 14, as Plaintiffs well know. After all, it was Plaintiffs' counsel who in *Pledger* alleged that the "Plan [was] a 'single-employer plan,' and *not* a 'multiple-employer plan.'" Amend. Compl., *Pledger v. Reliance Trust Co.*, No. 1:15-cv-4444, 2016 WL 11680831, at ¶ 10 (N.D. Ga. Apr. 15, 2016).[16] Moreover, unlike in *Pledger*, Defendants do not argue that PSI's fees are necessarily higher than a single-employer plan's simply because the Plan is a MEP. Rather, the point is that the fundamental differences between MEPs and single-employer plans render fee comparisons between them inapt. Indeed, Plaintiffs imply as much by arguing that MEPs may have cost advantages over single-employer plans in certain respects and cost *dis*advantages in other respects. Opp. at 14. That is another way to say that MEPs and single-employer plans have different—and thus incomparable—fee structures.

## IV. The Facts Alleged Do Not Show the Plan Offered Higher-Cost Retail Investment Options.

Despite Defendants' explanation of the Plan's investment fees structure, MTD at 18-20, Plaintiffs insist that, because they "did not attribute the differential [between the Plan's fees and fees available in the market] to any particular expense category," they have sufficiently alleged that "Plan participants were charged much higher [investment management] fees [than

---

[16] The plan in *Pledger* was a professional employer organization, or PEO. While MEPs and PEOs may be similar in some respects, PEOs pursue a different business model by offering comprehensive human resources services, such as payroll processing and tax filing, to collections of small businesses. *See Bruner v. Baker*, 506 F.3d 1021, 1023 (10th Cir. 2007).

6

marketplace alternatives] to invest through the Plan." Opp. at 17. However, the source of the differential is evident from the fee disclosure Plaintiffs attach to the Opposition, which makes clear that "administration expenses" are "allocated to Plan participants on a pro rata basis." Opp. Ex. 1 at 2. In other words, the "total annual operating expense" (what Plaintiffs call the "Plan Fee," ACC ¶ 109) stated in the fee disclosure of 0.28% for State Street's S&P 500 Index fund explicitly *includes* administration expenses. In contrast, State Street's publicly disclosed "Total Annual Operating Expense Ratio" (what Plaintiffs call the "Identical Lower Cost Fee," ACC ¶ 109) of 0.02% for that same fund *excludes* fees "for recordkeeping, asset servicing, sub-accounting, and communication services to plans."[17] In other words, Plaintiffs are comparing the Plan's *all-in-fees* apples to the funds' *investment-only-fee* oranges.

Even in Plaintiffs' hypothetical world where a "prudent fiduciary . . . obtained the [allegedly] identical lower-cost shares" disclosed by State Street, Opp. at 17, that fiduciary would *still* have to obtain "recordkeeping, asset servicing, sub-accounting, and communication services" *not* offered by State Street, and charge its participants for those expenses. If, as ERISA allows, the fiduciary assessed those fees on an asset (rather than per participant) basis, a participant's pro rata share of these expenses would naturally be higher than the standalone investment fee quoted by State Street. *See* MTD at 19-20.

**V.    Plaintiffs Have Not Plausibly Alleged Disloyalty.**

Plaintiffs protest that their disloyalty allegations rest on a "systematic pattern of Pentegra using Plan assets to benefit itself" and not solely "a few thousand dollars in hotel expenditures." Opp. at 18. If so, they do not say what other alleged facts support that conclusion. The *only*

---

[17] *See* https://stateofmi.voya.com/static/epweb/pdf/ffs/MI21.PDF at 3. Because of these exclusions, State Street encourages participants to "contact [their] Plan Administrator for a complete description of the fees and expenses applicable." *Id*. at 1.

examples Plaintiffs offer of an alleged "systematic pattern" are a "$7,370 payment [in 2010] to the Ritz Carlton Naples and $5,015 payment to the New York Palace Hotel," plus unspecified "board of director expenses." ACC ¶ 81. This is not enough to state a plausible claim that Defendants disloyally directed tens of millions of dollars in excessive fees to PSI.

## VI. ERISA § 408(b)(2)'s Safe Harbor Applies.

Plaintiffs contend that their bare allegation that PSI's fees were excessive "defeats Defendants' affirmative defense" provided by ERISA § 408(b)(2)'s exemption of arrangements involving reasonable compensation for necessary services. Opp. at 19. The case on which they rely, however—*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009)—is inapplicable. Unlike the Second Circuit, plaintiffs in the Eighth Circuit need not affirmatively plead that a party in interest's compensation was unreasonable. *Compare id.* at 601 (plaintiffs do "not bear the burden of pleading facts" showing compensation was unreasonable), *with Skin Pathology Assocs. Inc. v. Morgan Stanley & Co.*, 27 F. Supp. 3d 371, 378 (S.D.N.Y. 2014) (requiring a plaintiff to plausibly allege that defendant's conduct fell outside statutory exemption).

Moreover, the plaintiff in *Braden* alleged that the defendant received secret illegal kickbacks in exchange for nominal services. *Id.* Thus, the compensation was inherently unreasonable—even though plaintiff did not know how much it was, *id.* at 602—because, however much it was, it "far exceeded the *value* of the services actually performed." *Id.* at 601 n.9 (emphasis added). Plaintiffs here have alleged no theory comparable to kickbacks that would render the payments inherently unreasonable. *Braden* thus does not help them overcome their failure to allege facts sufficient to show the Plan's fees were excessive in light of the services provided.

## VII. PSI Is Neither Directly Nor Derivatively Liable as a Fiduciary.

Plaintiffs theorize that PSI is a Plan fiduciary because its CEO, John Pinto, is a member

of a *different* entity's—*i.e.*, the Plan's—board of directors. This view violates the "two-hat doctrine," one of ERISA's most fundamental principles. *See Pegram v. Hedrich*, 530 U.S. 211, 225 (2006). Such an extraordinary claim demands equally extraordinary support. Instead, Plaintiffs cite non-ERISA cases for the unremarkable point that corporations act through their officers and directors. The lone ERISA case Plaintiffs do cite, *Woods v. Southern Co.*, 396 F. Supp. 2d 1351 (N.D. Ga. 2005), is inapplicable. There, the issue was whether a corporation could sidestep fiduciary responsibility for the actions of its *own* board of directors. *Id.* at 1373. Nothing in *Woods*—or any other authority—suggests that a corporate officer's service on *another* entity's board of directors transforms the corporation into a fiduciary.

Plaintiffs dispute that the Second Circuit rejects *respondeat superior* liability under ERISA because Defendants "cite only district courts." Opp. at 21. Of course, Plaintiffs cite *no* cases from within the Second Circuit suggesting otherwise, and the decisions of other district courts, particularly from the same district, are "relevant and persuasive." *Baldanzi v. WFC Holdings Corp.*, No. 07 Civ. 9551(LTS)(GWG), 2008 WL 4924987, at *3 (S.D.N.Y. Nov. 14, 2008). The consensus of the district courts in this circuit is the opposite of what Plaintiffs propose: "While courts in other circuits do not uniformly reject *respondeat superior* liability under ERISA, courts in the Second Circuit do." *In re M&T Bank Corp. ERISA Litig.*, No. 16-CV-375 FPG, 2018 WL 4334807, at *3 (W.D.N.Y. Sept. 11, 2018).

## VIII. "Mere Influence" Does Not Equal Control.

Faced with the fact that PSI's CEO, by virtue of his simultaneous service as Plan president, was an *ex officio*, non-voting member of the Plan's Board, Plaintiffs now argue that he need not have controlled the Board's decision to engage PSI, but only to have "influence[d]" it, to convert PSI into a fiduciary. Opp. at 22. Not so. A service provider's "mere influence" over a trustee's decision "is not [the type] of effective control over plan assets" that creates fiduciary

9

liability. *Agway, Inc. Employees' 401(k) Thrift Inv. Plan v. Magnuson*, No. 5:03-CV-1060 HGM/DEP, 2006 WL 6903738, at *23-24 (N.D.N.Y. July 13, 2006); *see also* 29 U.S.C. § 1002(21)(A) (Fiduciary status depends on "discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets.").

In some circumstances, influence can be "so great that it confers effective discretionary authority." *Liss v. Smith*, 991 F. Supp. 278, 302–03 (S.D.N.Y. 1998). Showing that such circumstances exist demands "a fair amount of support," however. *Id.* In *Liss*, for example, plaintiff alleged that a plan attorney kept secret his financial ties to service providers he encouraged the plan to hire, "supporting a finding of fiduciary status because of the underlying conflicts and improper motives involved." *Id.* at 304. In contrast, there is no plausible suggestion that the Plan's Board did not know Pinto was PSI's CEO.[18] Plaintiffs simply conclude, with zero supporting factual allegations, that "Pinto's presence on the Board necessarily *influenced*" the Board's decision to engage PSI. Opp. at 22. Simply put, Plaintiffs allege that Pinto exerted no more than "mere influence" over the Board. Such bare allegations do not support a plausible inference that Pinto effectively controlled the Board's decision to engage PSI.

## CONCLUSION

For all these reasons, and for the reasons raised in Defendants' Memorandum of Law in Support of their Motion to Dismiss, the Court should dismiss Plaintiffs' Amended Consolidated Complaint, with prejudice.

---

[18] *See* Pentegra Executive Team, http://www.pentegra.com/about/leadership (listing John E. Pinto as "President and CEO") (visited June 2, 2021).

Dated: June 4, 2021                    Respectfully Submitted,


                                       */s/ Mark C. Nielsen*
                                       GROOM LAW GROUP, CHARTERED
                                       Mark C. Nielsen, Bar No. MN4214
                                       Sarah M. Adams (*pro hac vice*)
                                       Edward J. Meehan (*pro hac vice*)
                                       David N. Levine (*pro hac vice*)
                                       Kevin L. Walsh (*pro hac vice*)
                                       Ross P. McSweeney (*pro hac vice*)
                                       Kalena R. Kettering (*pro hac vice*)
                                       1701 Pennsylvania Ave., N.W.
                                       Washington, D.C. 20006
                                       202-857-0620 (phone)
                                       202-659-4503 (fax)
                                       mnielsen@groom.com
                                       sadams@groom.com
                                       emeehan@groom.com
                                       dlevine@groom.com
                                       kwalsh@groom.com
                                       rmcsweeney@groom.com
                                       lkettering@groom.com

                                       *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on June 4, 2021, I filed in this action the foregoing **MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)** electronically via the Court's ECF System. Notice of this filing will be sent in this action by operation of the Court's electronic system to all counsel of record in the ECF System.

Respectfully Submitted,

*/s/ Mark C. Nielsen*_____

Mark C. Nielsen (Bar No. MN4214)
GROOM LAW GROUP, CHARTERED
1701 Pennsylvania Ave., N.W.
Washington, D.C. 20006
202-861-5429 (phone)
202-659-4503 (fax)
mnielsen@groom.com

*Attorney for Defendants*